# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                                      Case No. 12-cr-20751

v.

                                  Hon. Robert H. Cleland

WILLIAM MICHAEL HOWARD.,

    Defendant.

                                  **Oral Argument Requested**

---

Gjon Juncaj (P63256)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9623
gjon.juncaj@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW PC
370 E. Maple Rd., Third Floor
Birmingham, Michigan 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for William Howard*

---

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Defendant William Howard ("Howard"), through counsel, WADE FINK LAW, P.C., moves this Court for an order reducing his sentence and releasing him from prison under the compassionate release provision of 18 U.S.C. § 3582, as modified by the First Step Act. Such an Order is warranted not only because Howard has numerous underlying health conditions which increase his risk of developing

catastrophic health consequences should he contract COVID-19, but also because Howard has already served the majority of his sentence.

In the alternative, Howard humbly requests an order of home confinement or similar terms under supervised release.

Pursuant to Local Rule 7.1, the undersigned sought concurrence on this motion on June 24, 2020, but the government has not yet given an indication as to whether it will concur. Given the emergency nature of the motion, it is being filed now.

Date: June 25, 2020                         Respectfully Submitted,

                                            WADE FINK LAW P.C.

                                            /s/ Wade G. Fink
                                            Wade G. Fink (P78751)
                                            *Attorneys for Defendants*
                                            370 E. Maple Rd., Third Floor
                                            Birmingham, MI 48009
                                            248-712-1054
                                            wade@wadefinklaw.com

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                              Case No. 09-20236

v.

                              Hon. Robert H. Cleland

MICHAEL WILLIAM HOWARD,

                          **Oral Argument Requested**

      Defendant.

---

| | |
|---|---|
| Gjon Juncaj (P63256) | Wade G. Fink (P78751) |
| Assistant United States Attorney | WADE FINK LAW PC |
| 211 W. Fort Street, Suite 2001 | 370 E. Maple Rd., Third Floor |
| Detroit, Michigan 48226 | Birmingham, Michigan 48009 |
| (313) 226-9623 | (248) 646-8292 |
| gjon.juncaj@usdoj.gov | wade@wadefinklaw.com |
| *Attorneys for the United States* | *Attorneys for Michael Howard* |

---

## BRIEF IN SUPPORT OF EMERGENCY MOTION FOR COMPASSIONATE RELEASE

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**……………………………………………………iii

**STATEMENT OF ISSUES**…………………………………….………...……vi

**I.    INTRODUCTION AND FACTUAL BACKGROUND**…….……..……..1

**II.    ARGUMENT**…………………………………………...…………..………2

      **A.** THE PRISON SETTING COMBINED WITH HOWARD'S
      UNDERLYING HEALTH CONDITIONS CONSTITUTES A
      COMPELLING AND EXTRAORDINARY CIRCUMSTANCE
      WARRANTING RELEASE……………………………..………...2

        1.  Prisons Are "Tinder Boxes For Infectious Disease………………5

        2.  Howard's Underlying Health Conditions………………………..12

        3.  A Sentence Reduction Is Also Consistent With The Sentencing
        Commission's Policy Statements And The Factors Outlined In §
        3553(a)……………………...…………………………………..17

      **B.** ALTERNATIVELY, THIS COURT SHOULD PERMIT HOWARD
      TO COMPLETE HIS SENTENCE IN HOME CONFINEMENT….23

**III.   CONCLUSION**…………………………………………………..…...24

# TABLE OF AUTHORITIES

## Cases

*Harrell v. United States*, No. 13-20198, 2020 U.S. Dist. LEXIS 92944 (E.D. Mich. May 28, 2020) …………………………………………………………………….15

*Howard v. United States*, No. 16-cr-20222-2, 2020 U.S. Dist. LEXIS 90130 (E.D. Mich. May 22, 2020) …………………………………………………………………...14

*In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020 U.S. Dist. LEXIS 50017 (N.D. Cal. Mar. 19, 2020) …………………………………………………………10

*Miller v. United States*, No. 16-20222-1, 2020 U.S. Dist. LEXIS 62421 (E.D. Mich. Apr. 9, 2020) …………………………………………………………………………...17

*United States v. Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321 (6th Cir. June 2, 2020) ……………………………………………………………………………….3

*United States v. Atwi*, No. 18-20607, 2020 U.S. Dist. LEXIS 68282 (E.D. Mich. Apr. 20, 2020) …………………………………………………………………………….12

*United States v. Butler* No. 18 Cr. 834 (PAE), Dkt. 461, 2020 U.S. Dist. LEXIS 61021 (S.D.N.Y. Apr. 7, 2020) …………………………………………………..24

*United States v. Cassidy*, No. 17-CR-116S, 2020 U.S. Dist. LEXIS 84692 (W.D.N.Y. May 13, 2020) ……………………………………………………………6

*United States v. Coker*, No. 3:14-CR-085, 2020 U.S. Dist. LEXIS 66286 (E.D. Tenn. Apr. 15, 2020) ………………………………………………………………………4, 5

*United States v. Copeland*, No. 03-cr-01120 (FB), 2020 U.S. Dist. LEXIS 87983 (E.D.N.Y. May 19, 2020) …………………………………………………………17

*United States v. Credidio*, No. 19 Cr. 111 (PAE), Dkt. 62, 2020 U.S. Dist. LEXIS 58238 (S.D.N.Y. April 2, 2020) ……………………………………………………..24

*United States v. Daugerdas*, No. 09cr581, 2020 U.S. Dist. LEXIS 77658 (S.D.N.Y. May 1, 2020) …………………………………………………………………...19

*United States v. Delgado*, No. 3:18-cr-17-(VAB)-1, 2020 U.S. Dist. LEXIS 84469
(D. Conn. Apr. 30, 2020) ………………………………………………………….18

*United States v. Echevarria*, 2020 U.S. Dist. LEXIS 77894
(D. Conn. May 4, 2020) …………………………………………………………….5

*United States v. Goldman*, No. 2:18-cr-00077-TLN, 2020 U.S. Dist. LEXIS 96828
(E.D. Cal. June 2, 2020) ………………………………………………………5, 6

*United States v. Hammond*, 2020 U.S. Dist. LEXIS 67331
(D.D.C. April 16, 2020) …………………………………………………………...17

*United States v. Lacy*, No. 15-cr-30038, 2020 U.S. Dist. LEXIS 76849, at *1 (C.D.
Ill. May 1, 2020)…………………………………………………………………..16

*United States v. Martin*, No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451
(S.D.N.Y. Apr. 10, 2020) …………………………………………………………13

*United States v. Matecki*, No. 2:15-cr-00177-TLN, 2020 U.S. Dist. LEXIS 86155
(E.D. Cal. May 14, 2020) …………………………………………………………..6

*United States v. Meron*, No. 2:18-cr-0209-KJM, 2020 U.S. Dist. LEXIS 97687 (E.D.
Cal. June 2, 2020) …………………………………………………………………..5

*United States v. Moore-Brown*, No. 3:17-CR-129, 2020 U.S. Dist. LEXIS 81293
(M.D. Pa. May 8, 2020) …………………………………………………………….5

*United States v. Pomante*, No. 19-20316, 2020 U.S. Dist. LEXIS 85626 (E.D. Mich.
May 15, 2020) …………………………………………………………………11, 25

*United States v. Rahim*, No. 16-20433, 2020 U.S. Dist. LEXIS 89355 (E.D. Mich.
May 21, 2020) …………………………………………………………………….11

*United States v. Reddy*, No. 13-cr-20358, 2020 U.S. Dist. LEXIS 82208 (E.D. Mich.
May 11, 2020) …………………………………………………………………….15

*United States v. Rodriguez*, No. 03-00271, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa.
Apr. 1, 2020) …………………………………………………………………..7, 20, 21

*United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418 (E.D.N.Y. Apr. 10, 2020). ……………………………………………………….21, 23

*United States v. Scparta*, No. 18-cr-578 (AJN), 2020 U.S. Dist. LEXIS 68935 (S.D.N.Y. Apr. 19, 2020) …………………………………………………………16

*United States v. Stephenson*, No. 3:05-CR-00511, 2020 U.S. Dist. LEXIS 89591 (S.D. Iowa May 21, 2020) ……………………………………………………...16

*United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414 (C.D. Cal. Apr. 10, 2020) …………………………………………………..13

*United States v. White*, No. 13-cr-20653-1, 2020 U.S. Dist. LEXIS 88542 (E.D. Mich. May 20, 2020) ………………………………………………………...18

## **Statutes and Rules**

18 U.S.C. § 922(g)(1)...……………………………………..………………1

18 U.S.C. § 3582……………………………………………….………*passim*

U.S.S.G. § 1B1.13……………………………………………………...21

## STATEMENT OF ISSUES

1.    Has Howard demonstrated a compelling and extraordinary circumstance warranting compassionate release in light of his incarceration, age, diabetes, hypertension, obesity, chronic Hepatitis C, and hyperlipidemia, all of which heighten his risk of developing life-threatening complications should he contract COVID-19?

Defendant answers, yes.

2.    Has Howard demonstrated that a reduction in sentence would be consistent with Section 3353(a) factors and policy statements issued by the Sentencing Commission, which require the Court to consider Howard's danger to society and other elements, when Howard has taken steps to better himself since incarcerated?

Defendant answers, yes.

## I.    <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

On November 15, 2012, William Howard was indicted for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1) stemming from an arrest on July 24, 2012. Indictment, ECF No. 13, PageID.26. On that date, Howard had stumbled upon children attempting to assemble a gun in an alleyway. He confiscated the inoperable firearm to prevent them from hurting themselves or others but was arrested minutes later before he could dispose of the gun. Deft's Sent. Memo, ECF No. 25, PageID.77.

Despite the parties disagreement on why Howard had a fire arm when he was approached by law enforcement, Howard took responsibility for illegally possessing the gun and pled guilty to one count of possessing a stolen firearm. Plea Agreement, ECF No. 23, PageID.54. Howard's agreed-upon sentencing guidelines were expressed as 120 months. *Id*. at PageID.55. On August 22, 2013, Howard was subsequently sentenced to 120 months. Judgement, ECF No. 30, PageID.104.

Howard is currently serving his sentence at FCI Ashland Satellite Camp in Ashland, Kentucky and is scheduled to be released in less than two years – on April 4, 2022. **Exhibit A**, BOP Inmate Data. To date, **Howard has served over four fifths of his sentence**.[1] He is 63 years old, obese, and suffers from diabetes, hypertension, chronic Hepatitis C, and hyperlipidemia. Because of his underlying health

---

[1] Howard only has 21 months, or 17%, of his 120 month sentence remaining.

conditions, Howard is at a high risk for developing catastrophic health consequences should he contract COVID-19.

Howard now files this motion for his compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). This Court should grant such relief for the following reasons: first, Howard has satisfied the exhaustion requirement contained in Section 3582. Second, Howard asserts that the global health crisis, in combination with his underlying health conditions, constitutes compelling and extraordinary circumstances warranting his compassionate release as the conditions render him especially vulnerable to developing a severe case of COVID-19. Third, a reduction in Howard's sentence would not be contrary to the factors outlined in Section 3553(a) and would be consistent with the Sentencing Commission's policy statements.

In the alternative, Howard asks that this court allow him to serve the remaining 21 months of his sentence in home confinement or on similar supervised release conditions.

## II.   ARGUMENT

### A.   THE PRISON SETTING COMBINED WITH HOWARD'S UNDERLYING HEALTH CONDITIONS CONSTITUTE A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE WARRANTING RELEASE.

18 U.S.C. § 3582, as amended by the First Step Act, provides that a defendant must "fully exhaust [] all administrative rights" or otherwise "wait for 30 days after

the warden's receipt of [their] request." *United States v. Alam*, No. 20-1298, 2020 U.S. App. LEXIS 17321, at *5 (6th Cir. June 2, 2020).[2]

Howard has exhausted administrative requirements. On April 6, 2020 Howard submitted the first of numerous petitions to the BOP, requesting home confinement. **Exhibit B**, April 6, 2020 Petition. In his Inmate Request to Staff, Howard pleaded his case to BOP staff for release, stating "I am 63 years old. I have diabetes, high blood pressure, and high cholesterol . . . I have somewhere to go in order to be safe for the home confinement program." *Id.* Howard, however, was later notified that his request for home confinement was denied because of an armed robbery conviction 40 years ago and because he was disciplined in the past year for being late to a call out. *Id.*

Howard then submitted an Informal Resolution Attempt, emphasizing that he was "at very high risk for coronavirus due to [his] health. Social distancing is not possible in prison." **Exhibit C**, May 7, 2020 Informal Resolution Attempt. The Warden of FCI Ashland responded on May 18, 2020, denying his request one more. **Exhibit D,** Warden Denial. Howard continued to file petitions disputing his ineligibility based on the armed robbery conviction after the denial. **Exhibit E, Exhibit F**. Howard has recently begun feverishly submitting requests for

---

[2] All unpublished cases attached as **Exhibit Q**.

compassionate release. **Exhibit G**, June 2, 2020 Compassionate Release Request. On June 4, 2020, a Reduction in Sentence Coordinator for FCI Ashland denied his compassionate release response because Howard "failed to provide all of the documentation as required in the Program Statement." **Exhibit H**, June 4, 2020 Denial.

The BOP, with the government's guidance, continues to evolve its arguments searching for any creative argument or technicality in the compassionate release process to keep vulnerable inmates incarcerated and prevent them from reaching the courts. These arguments not only lack humanity but they run contrary to the plain language and obvious purpose of § 3582. Howard is an inmate, not a lawyer versed in administrative law or statutory interpretation. His multiple, different petitions to the BOP demonstrate that he tried everything possible to file the correct paperwork.

Because Howard anticipates that the government will indeed argue that his petitions and compassionate release requests are flawed and therefore fatal to his satisfaction of the exhaustion requirement, Howard urges this Court to view his petitions liberally and either (1) construe his home confinement requests as a request for compassionate release, or (2) find that the BOP's denial of his compassionate release request satisfies the mandatory exhaustion requirement.[3]

---

[3]*See United States v. Coker*, No. 3:14-CR-085, 2020 U.S. Dist. LEXIS 66286, at *9 (E.D. Tenn. Apr. 15, 2020) (**declining to "hold [a defendant] to the same standards of semantic precision that it would hold an attorney**" where the

In fact, Howard's requests for home confinement contained sufficient information to constitute a properly submitted compassionate release request. 28 C.F.R. § 571.61 states that a compassionate release request must include

> at minimum the following information: (1) the extraordinary or compelling circumstances that the inmate believes warrant consideration; and (2) proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

*United States v. Goldman*, No. 2:18-cr-00077-TLN, 2020 U.S. Dist. LEXIS 96828, at *3-5 (E.D. Cal. June 2, 2020) (internal quotations omitted).

In the April 6, 2020 petition, Howard listed his medical conditions that increase his vulnerability to catastrophic health consequences should he contract COVID-19 and stated that he had a place to live should he be released. Consequently

---

defendant had submitted a CARES Act request for home confinement instead of a compassionate release request pursuant to Section 3582); *United States v. Meron*, No. 2:18-cr-0209-KJM, 2020 U.S. Dist. LEXIS 97687, at *7 (E.D. Cal. June 2, 2020) (finding that although home confinement and compassionate release are two different remedies, it "does not necessarily mean the court should not construe defendant's [request for home confinement] as sufficient to trigger any exhaustion clock applicable to compassionate release requests."); *United States v. Echevarria*, 2020 U.S. Dist. LEXIS 77894, at *2 (D. Conn. May 4, 2020) (finding the exhaustion requirement satisfied where a defendant submitted a request for home confinement over 30 days prior); *United States v. Moore-Brown*, No. 3:17-CR-129, 2020 U.S. Dist. LEXIS 81293, at *3 (M.D. Pa. May 8, 2020) (treating a defendant's request "for compassionate release to home confinement" as a request for compassionate release, starting the clock for exhaustion, but ultimately finding no exhaustion).

Howard urges this Court to find that he has satisfied the exhaustion requirement contained in § 3582. *See United States v. Matecki*, No. 2:15-cr-00177-TLN, 2020 U.S. Dist. LEXIS 86155, at *4-5 (E.D. Cal. May 14, 2020) (construing an inmate's request for home confinement as a request for compassionate release where the petition described the inmate's age, medical conditions, and his proposed residence without specifically mentioning § 3582); *Goldman*, 2020 U.S. Dist. LEXIS 96828 at *3-5 (finding same where an inmate asserted that he was at increased risk for contracting COVID-19 because of his proximity to others who had tested positive or were awaiting results and listed details about his re-entry plan).

Having exhausted, Section 3582 next instructs a court considering compassionate release to determine "whether extraordinary and compelling reasons exist for a sentence reduction" and whether "a sentence reduction is consistent with the applicable Sentencing Guidelines provisions." *United States v. Cassidy*, No. 17-CR-116S, 2020 U.S. Dist. LEXIS 84692, at *4 (W.D.N.Y. May 13, 2020) (quoting § 3582(c)(1)(A)). Howard submits that his underlying health conditions in light of the extreme ease of transmission of COVID-19, constitute an extraordinary and compelling circumstance. Howard also submits that his release would be consistent with the Sentencing Guidelines.

1.       Prisons Are "Tinder Boxes For Infectious Disease"[4]

Howard is being housed at the satellite camp at FCI Ashland, a BOP facility located in Kentucky – a state which continues to report an increase of COVID-19 cases following a reopening of the economy.[5] Based on the steady presence of the virus in the surrounding area of the prison, "the likelihood that [the virus] is inside of FCI Ashland already is more probable than not. And if it is not already, it is a virtual certainty that it will be in the relative near future" according to epidemiologist Katie Lin Brasher- Beaudry. **Exhibit I** Affidavit and CV of Katie Brasher-Beaudry, MPH at para. 3.

Ms. Brasher-Beaudry is trained as an epidemiologist, with a master's degree in public health. Her experience is consulting in infection prevention and epidemiology. She conducts surveillance of healthcare acquired infections and tracks infections to their source using clinical data, as well as consults on communicable diseases to identify causal associations.

In coming to her conclusion about FCI Ashland, Ms. Brasher-Beaudry stated that "with Kentucky moving forward with reopening plans despite the state

---

[4] *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 U.S. Dist. LEXIS 58718, at *2 (E.D. Pa. Apr. 1, 2020).

[5] *A 'Very Fragile Place.' Kentucky Sees 234 New Cases of COVID-19, Three More Deaths*, https://www.kentucky.com/article243632232.html

continuing to report triple digit number of confirmed COVID-19 cases, the staff at FCI Ashland will assuredly be exposed to the virus present in Boyd County." *Id.* at para. 5. Indeed, Boyd County, where FCI Ashland is located has 54 confirmed cases of COVID-19, and 3 deaths.[6] Ms. Brasher-Beaudry noted that because the virus lurks in the vicinity of the prison that "the probability of COVID-19 entering FCI Ashland is extremely high" because staff who can now frequent gyms, bars, and movie theaters in their free time are coming in and out of the prison on a daily basis. *Id.* at para 7. In fact, upon information and belief, Howard was just informed yesterday that a staff member at FCI Ashland's satellite camp has tested positive for COVID-19.

FCI Ashland reporting its first confirmed case of the virus was only a matter a time. Ms. Brasher-Beaudry emphasized that the lack of testing at FCI Ashland was not painting an accurate picture, which is important because as of tonight, the BOP website is still not reflecting this positive test. Of the 1,095 inmates housed at either FCI Ashland and the adjacent minimum-security satellite camp, **only ten inmates, or .009% of the facility's population, have been tested for the virus**.[7] *Id.* at para 4. Further, the BOP did not specify whether those ten inmates are at the satellite

---

[6] *Kentucky Coronavirus Map and Case Count,* https://www.nytimes.com/interactive/2020/us/kentucky-coronavirus-cases.html

[7] *COVID Inmate Testing*, https://www.bop.gov/coronavirus/

8

camp, where Howard is serving his sentence, or at FCI Ashland – meaning that the testing rate of Howard's fellow inmates could very well be 0%.

The extremely low testing rate is not surprising given statements from BOP representatives that "[t]he goal of [its] reporting is to provide the public with **insight** as to the current status of our COVID-19 response at various facilities . . . and does not necessarily account for the unconfirmed (non-tested) cases."[8] One staff member working within FCI Oakdale, the first BOP facility to report a COVID-19 inmate fatality, even stated that the BOP was not testing inmates "because **they assume** if someone has symptoms, they have it."[9]

These unconfirmed, non-tested cases are most likely spreading like wildfire in BOP facilities. The small number of federal prisons who have conducted widespread testing corroborate this. For instance, FCI Lompoc, which houses 939 inmates,[10] reported 921 confirmed cases of COVID-19[11] – surpassing the total

[8] *Bureau of Prisons Underreporting COVID-19 Outbreak in Prison*, https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#d517db87ba32

[9] '*Something is Going to Explode': When Coronavirus Strikes a Prison*, https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html

[10] FCI Lompoc, https://www.bop.gov/locations/institutions/lof/

[11] *See COVID Inmate Testing*, *supra* note 7.

infections among residents within the county where the facility was located.[12] FMC Fort Worth and FCI Terminal Island similarly reported shockingly high infection rates after mass testing.[13] The BOP, who is now publishing testing data, confirms that only 20% of its inmates have been tested, and those who have been, are testing positive at an absolutely horrifying rate of 31%.[14] This spate of testing demonstrates that COVID-19 is circulating in prisons in much greater numbers than the BOP's reporting suggests.

Howard himself reports that no inmates at the satellite camp are being tested. This is alarming considering the CDC's recent findings that at least 35% of individuals who contract COVID-19 are asymptomatic (possibly up to 50%) and, further, that 40% of those who do spread the virus once infected do so prior to symptom onset.[15] *See also In re Manrique,* No. 19-mj-71055-MAG-1 (TSH), 2020

---

[12]    *Lompoc Prison COVID-19 Cases Skyrocket to 599,* https://www.independent.com/2020/05/07/lompoc-prison-covid-19-cases-skyrocket-to-599/

[13] *More Than 600 Inmates Test Positive for COVID-19 at Federal Prison in Fort Worth,* https://www.nbcdfw.com/news/coronavirus/more-than-600-inmates-test-positive-for-covid-19-at-federal-prison-in-fort-worth/2367644/; *Nearly Half of Inmates at Terminal Island Federal Prison Infected with Coronavirus,* https://www.dailybreeze.com/2020/04/29/nearly-half-of-inmates-at-terminal-island-federal-prison-infected-with-coronavirus/

[14] *See COVID Inmate Testing, supra* note 7.

[15]    *COVID-19 Pandemic Planning Scenarios,* https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html

U.S. Dist. LEXIS 50017, at *1 (N.D. Cal. Mar. 19, 2020) (noting that "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . **We don't know who's infected**" (emphasis added)).

Accordingly, many district courts rightly express that it matters not how many cases the BOP has "confirmed" because that number is meaningless without adequate testing. *United States v. Rahim*, No. 16-20433, 2020 U.S. Dist. LEXIS 89355, at *8-9 (E.D. Mich. May 21, 2020) ("the Court is not persuaded that a lack confirmed cases alone [in a BOP facility] is a compelling reason not to grant relief if a defendant otherwise qualifies"); *United States v. Pomante*, No. 19-20316, 2020 U.S. Dist. LEXIS 85626, at *9 (E.D. Mich. May 15, 2020) ("Until the BOP increases its testing capacity, a lack of confirmed cases has very little bearing on the amount of actual cases in a federal prison").

To make matters worse, correctional settings inherently prevent inmates from protecting themselves from infectious disease like COVID-19 because of prison living conditions. Although BOP facilities have been on lockdown for months to try to combat the unique challenges prisons are facing, inmates still remain in close proximity to each other, unable to practice social distancing, and share the same ventilation system, phones, showers, computers, and so on without any sanitation. All it takes is one sneeze, cough, or breath from an infected inmate to release

respiratory droplets containing infections particles into the ventilation system or onto any surface. **Ex. I**, para 7. Accordingly, both the CDC and courts within this district have emphasized the heightened dangers inmates face due to their living situation.[16]

Things have apparently gotten so bad within BOP facilities that the Union which represents BOP guards across the country filed an Imminent Danger complaint with the Occupational Safety and Health Administration ("OSHA"). **Exhibit J**, OSHA Complaint. The complaint alleges that staff, including those working at FCI Ashland, have not been allowed to properly self-quarantine after coming into contact with inmates suspected of having COVID-19, have not been provided the proper personal protection equipment, and have even been called back to work after being sent home for possible exposure. *Id.* The complaint concludes that "[BOP's] actions described herein are proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities.

---

[16] *See United States v. Atwi*, No. 18-20607, 2020 U.S. Dist. LEXIS 68282, at *11 (E.D. Mich. Apr. 20, 2020) ("There can be little doubt that incarcerated individuals face an even greater risk of transmission, given the conditions frequently present in correctional and detention facilities"); *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced").

The agency's actions and inactions are expected to result in death and severe health complications and/or possible life-long disabilities." *Id.*

The dire warnings contained in the OSHA complaint were, unfortunately, a prediction of the future, as 88 inmates within the Bureau's custody have tragically lost their lives to date.[17] It appears that nothing has changed with FCI Ashland since the OSHA complaint was filed either. Howard reports that staff is not actively asking inmates if they are experiencing symptoms, and only some officers are wearing masks. The only monitoring the facility has conducted are three temperature checks dating back to the beginning of April.

In short, despite BOP efforts, the bottom line is that "individuals housed within our prison systems nonetheless remain particularly vulnerable to infection." *United States v. Vo Duong Tran*, No. CR 08-00197-DOC, 2020 U.S. Dist. LEXIS 65414, at *5-6 (C.D. Cal. Apr. 10, 2020). *See also United States v. Martin*, No. 18-CR-834-7 (PAE), 2020 U.S. Dist. LEXIS 63451, at *7 (S.D.N.Y. Apr. 10, 2020) ("The crowded nature of federal detention centers . . . present an outsize risk that the COVID-19 contagion, once it gains entry, will spread."). With the lackluster efforts taken by FCI Ashland to contain COVID-19, it is a very real possibility that Howard's remaining 21 months of incarceration may be transformed into a death sentence.

---

[17] *See* COVID-19 Cases, https://www.bop.gov/coronavirus/

### 2.      Howard's Underlying Health Conditions

Howard is even more at risk than the general population at the satellite camp at FCI Ashland for catastrophic health consequences should he contract COVID-19.

Howard is a clinically obese, diabetic, 63-year old. He also suffers from hypertension, chronic Hepatitis C, and hyperlipidemia. **Exhibit K**, BOP Medical Records pg. 12. The BOP has accordingly designated Howard as a chronic care inmate. **Exhibit L**, Individualized Re-Entry Plan. Each of these five underlying conditions, combined with Howard's age, will be addressed in turn. All heighten Howard's vulnerability to developing a severe case of COVID-19 on their own.

First, the CDC explicitly recognizes that people with diabetes are at high-risk for severe illness from COVID-19.[18] According to a study published by the CDC, the fatality rate for patients with diabetes was 7.3%, while the fatality rate was 0.9% for those with no underlying health conditions.[19] District courts across the country have accordingly granted compassionate release to inmates facing increased risk due to being diabetic. *See Howard v. United States*, No. 16-cr-20222-2, 2020 U.S. Dist.

---

[18] *People Who Are At Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[19] See *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, CDC (Jun. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

LEXIS 90130, at *8 (E.D. Mich. May 22, 2020) (labeling the government's argument that a defendant was not at risk because his diabetes was well controlled as medical minutiae, unpersuasive, and ultimately granting release); *Harrell v. United States*, No. 13-20198, 2020 U.S. Dist. LEXIS 92944, at *7 (E.D. Mich. May 28, 2020) (noting that "the CDC states that people with diabetes, of any kind, are vulnerable because, diabetes-related health problems can make it harder to overcome COVID-19); *United States v. Reddy*, No. 13-cr-20358, 2020 U.S. Dist. LEXIS 82208, at *18 (E.D. Mich. May 11, 2020) (concluding that the combination of an inmate's conditions "including her Type II diabetes and hypertension – substantially increases her risk of dire medical consequences").

Second, Howard's medical records state that he has a history of hypertension and that he receives medication to keep his blood pressure controlled. **Ex. M.** pg. 1, 8. Although hypertension is not explicitly noted on the CDC's list of underlying health conditions which heighten an individual's fatality risk should they contract COVID-19, the CDC has recognized hypertension as a risk factor in subsequent studies. *Id.* The CDC's *Interim Clinical Guidance* states that "[h]eart disease, hypertension, prior stroke, diabetes, chronic lung disease, and chronic kidney disease have all been associated with increased illness severity and adverse outcomes."[5] The same study also reported that individuals who contracted COVID-19 and also suffered from hypertension had a mortality rate of 6%, compared to the 0.9% fatality

rate for persons with no known underlying health issues. *Id*. Many district courts have agreed with such study, the CDC's *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, and cited its findings in concluding that hypertension increases an inmate's risk.[20]

Third, the CDC also recognizes that individuals with liver disease face an increased risk of developing severe complications if infected with COVID-19. Howard's medical records indicate that he has chronic Hepatitis C, and that it was bad enough that he was being "evaluated for priority level and possible treatment" for the disease. **Ex. K**, pg. 12. Hepatitis C is "a viral infection that affects the liver" which can "lead to serious liver problems, including cirrhosis or liver cancer."[21] District courts and the government have consequently recognized the heightened risk imposed on those suffering from Hepatitis C. *United States v. Stephenson*, No. 3:05-CR-00511, 2020 U.S. Dist. LEXIS 89591, at *14-16 (S.D. Iowa May 21, 2020)

---

[20] *United States v. Scparta*, No. 18-cr-578 (AJN), 2020 U.S. Dist. LEXIS 68935, at *29 (S.D.N.Y. Apr. 19, 2020) ("The Centers for Disease Control has identified hypertension as a comorbidity that increases the likelihood of serious risk from COVID-19); *United States v. Lacy*, No. 15-CR-30038, 2020 WL 2093363, at *6 (C.D. Ill. May 1, 2020) ("Besides obesity, Defendant suffers from hypertension and diabetes, both of which he manages with medication. **Any one of these three factors alone would increase the serious risks of COVID-19 for Defendant**") (emphasis added)).

[21] *U.S. Department of Health and Human Services, Hepatitis C Quick Facts*, https://www.hhs.gov/opa/reproductive-health/fact-sheets/sexually-transmitted-diseases/hepatitis-c/index.html

(granting compassionate release to a "Defendant . . . [who pointed] to authorities showing that long-term hepatitis C infections weaken the immune system. The government [did] not dispute the health risks") (collecting articles explaining Hepatitis C's negative impact on immune systems).[22]

The CDC also recommends that people infected with hepatitis C should "continue to maintain a healthy lifestyle" because that "is the best way to keep your immune system healthy."[23] However, because of the lockdown, Howard has not been able to follow this advice. Howard has been unable to exercise and only gets 2 hours of yard time every 7 days. Howard's medical records show that he weighted 219 pounds in 2018. **Ex. K**, pg. 8. Although Howard has not had access to a scale, he reports weight gain due to the lockdown.

Consequently, in addition to the risks that Howard faces because of his hypertension and diabetes, he also faces risks due to his weight. Studies have found

---

[22] *See also United States v. Copeland*, No. 03-cr-01120 (FB), 2020 U.S. Dist. LEXIS 87983, at *3 (E.D.N.Y. May 19, 2020) (reducing an inmate's sentence to time served who suffered from, among other things, hepatitis C); *Miller v. United States*, No. 16-20222-1, 2020 U.S. Dist. LEXIS 62421 (E.D. Mich. Apr. 9, 2020), at *3 (same); *United States v. Hammond*, 2020 U.S. Dist. LEXIS 67331, *26 (D.D.C. April 16, 2020) ("Aside from conditions related to his cancer and its treatment, defendant has also been diagnosed with hypertension, Hepatitis C, both serious medical conditions in their own right").

[23] *People with Liver Disease*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html

that individuals with a BMI over 30 are at an increased risk for serious complications if they contract COVID-19.[24] The CDC additionally lists a BMI greater than 40 as heightening an individual's vulnerability.[25] With a BMI of 37.6 kg/m2, even before his lock down weight gain, Howard is at risk.[26] *See also United States v. Delgado*, No. 3:18-cr-17-(VAB)-1, 2020 U.S. Dist. LEXIS 84469, at *8 (D. Conn. Apr. 30, 2020) (granting compassionate release to an inmate with a BMI over 30 based on an study which found that "obesity of patients was the single biggest chronic factor, after age, in whether those with COVID-19 had to be admitted to a hospital" and defining obesity "as a BMI of 30 and higher"); *United States v. White*, No. 13-cr-20653-1, 2020 U.S. Dist. LEXIS 88542, at *3-4 (E.D. Mich. May 20, 2020) (granting compassionate release to an inmate with a BMI of 38.6 because he

---

[24] *See* Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission. Clinical Infectious Diseases, https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa415/5818333 ("Of the 3615 individuals who tested positive for COVID-19, 775 (21%) had a body mass index (BMI; kg/m$^2$) 30–34"); Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019, CDC, https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm?s_cid=mm6915e3_w (defining obesity as a body mass index $\geq$ 30 kg/m$^2$ and finding that among patients age 18–49 and 50–64, obesity was the most common comorbidity).

[25] See *People Who Are At Higher Risk, supra* note 18.

[26] Howards medical reports indicated that he was 5 foot 4 inches and 218 pounds in 2017. According to a BMI calculator on the CDC's website, his BMI is 37.6. https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html

"qualifie[d] as obese by medical standards due to his BMI — in fact, he is at the top of the obese range and nearly qualifies as severely obese") (internal quotations omitted).

Fifth, Howard's medical records indicate that he also suffers from, and is medicated for, hyperlipidemia. **Ex. K.** The government itself has previously recognized that hyperlipidemia, in circumstances like those presented here, does indeed heighten an individual's risk of serious complications should they contract COVID-19. *See United States v. Daugerdas*, No. 09cr581, 2020 U.S. Dist. LEXIS 77658, at *7 (S.D.N.Y. May 1, 2020) ("Daugerdas contends—and the Government does not dispute—that he suffers from Type 2 diabetes, obesity, hypertension, and high cholesterol, which expose individuals to a higher risk of serious illness from COVID-19"). Howard's medical records also specify that his ASCVD score is 20% due to his hyperlipidemia **Ex. K,** pg. 12 – putting Howard in the highest risk group possible for having a cardiovascular problem like a heart attack or stroke within the next ten years. **Exhibit M**, Understanding Your ASCVD Risk Score.

Finally, Howard is 63 years old. Although he is two years shy of being 65, which the CDC recognizes as increasing an individual's risk of developing a severe case of COVID-19, a CDC study has also recognized that Howard's current age renders him more vulnerable. According to the *Planning Scenarios* study published by the CDC, individuals between 50 and 64 years old are still at higher increased

risk.[27] Moreover, at 63, Howard is older than about 96% of the rest of the prison population, making him by definition higher risk than the vast majority of inmates.[28]

In sum, Howard is at a heightened risk for developing catastrophic health consequences should he contract because of his age, diabetes, hypertension, obesity, Hepatitis C, and hyperlipidemia. Such conditions, therefore, when viewed in light of the high probability that Howard will be exposed to COVID-19 at FCI Ashland, present compelling and extraordinary reasons for his compassionate release. *Rodriguez*, 2020 U.S. Dist. LEXIS 58718 (E.D. Pa. Apr. 1, 2020) (granting compassionate release to inmate who had served 85% sentence, had health issues including Type 2 diabetes, essential hypertension, obesity, and liver abnormalities).

### 3. A Sentence Reduction Is Also Consistent With The Sentencing Commission's Policy Statements And The Factors Outlined In § 3553(a).

In addition to finding a compelling and extraordinary circumstance warranting compassionate relief, a court considering a defendant's motion under Section 3582(c)(1)(A) must decide whether a sentence reduction would "be consistent with the applicable policy statements issued by the Sentencing Commission" and supported by the "factors set forth in section 3553(a)." § 3582(c)(1)(A).

---

[27] *See COVID-19 Pandemic Planning Scenarios, supra* note 15.

[28] *Inmate Age,* https://www.bop.gov/about/statistics/statistics_inmate_age.jsp

### a.    *Policy Statements*

Section 3582(c)(1)(A) is accompanied by a policy statement and commentary promulgated by the Sentencing Commission. The relevant section states that a court may reduce a sentence for "extraordinary and compelling reasons," including situations, among others, where an individual is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A). This Court has the authority to decide what is extraordinary and compelling and is not limited by, only guided by, the policy statements. *Rodriguez*, 2020 U.S. Dist. LEXIS 58718 at *4, 6. For the reasons discussed *infra*, Howard is at an increased risk for developing life-threatening conditions should he contract COVID-19. If infected with a severe or debilitating case of COVID-19, Howard will certainly have a difficult time caring for himself. Thus, the defendant urges this Court to find that qualifies as an extraordinary or compelling reason, favoring his early release. *United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 U.S. Dist. LEXIS 64418, at *7 (E.D.N.Y. Apr. 10, 2020).

### b.    *§ 3553(a) Factors*

Similarly, the application of the § 3553(a) factors militates towards Howard's compassionate release. In considering what is "sufficient but not greater than

21

necessary, to comply with the purposes of [sentencing]", § 3553(a) instructs a court

to consider the following:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed—
>
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> **(B)** to afford adequate deterrence to criminal conduct;
>>
>> **(C)** to protect the public from further crimes of the defendant; and
>>
>> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> **(3)** the kinds of sentences available;
>
> **(4)** [the kinds of sentence and sentencing range provided for in the USSG]
>
> **(5)** any pertinent [Sentencing Commission policy statement]
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> **(7)** the need to provide restitution to any victims of the offense

*Sawicz*, 2020 U.S. Dist. LEXIS 64418 at 7, 8 (summarizing § 3553(a)).

First, Howard recognizes the serious nature of the crimes he committed which

landed him behind bars. At his plea hearing, Howard took accountability for the

22

weapon charges. Although his crime involved a gun, he never contested that he was wrong for possessing it, only disputing his reason – trying to keep children safe. Furthermore, Howard acknowledges that he was no stranger to the criminal justice system prior to this case. His prior convictions, however, mostly include petty thefts and one conviction for armed robbery – which was over 40 years ago. Howard is in a far different part of his life than he was back then, stating "[I am] 63 years old I would never do the things I did at 17 years old" in one of his petitions to the BOP. **Ex. F**.

Howard has also tried to better himself while incarcerated. He has taken advantage of the limited classes available to him in BOP custody after completing his GED **Ex. L**, has maintained a job at UNICOR for four years **Exhibit N**, UNICOR Inmate Earning Statement, and has avoided any major disciplinary infractions. **Exhibit O**, Incident Reports.[29] Consequently, should Howard be released he will live with his granddaughter Breanna Davis in Ann Arbor at 2791 Adrian Dr until his own home is vacated by the current renters. Additionally, he will have two job offers waiting for him – one with Local Union 499 and another offer with a transportation company as a mechanic and/or driver which still stands. **Exhibit P**, Employment Offer.

---

[29] Although Howard has in fact received disciplinary violations, they have been for minor non-violent infractions including two cigarette possession and being late for a call out.

In moving this court for a reduction in his sentence, Howard is not trying to take advantage of the unfortunate circumstances ravaging the country by asking to be released months into his sentence. *See e.g. United States v. Credidio*, No. 19 Cr. 111 (PAE), Dkt. 62, 2020 U.S. Dist. LEXIS 58238 (S.D.N.Y. April 2, 2020) (denying compassionate release of a 72-year old defendant where he had only served two months of a 33 month sentence); *United States v. Butler* No. 18 Cr. 834 (PAE), Dkt. 461, 2020 U.S. Dist. LEXIS 61021 (S.D.N.Y. Apr. 7, 2020) (denying compassionate release for a defendant with asthma because he had only served 15 months out of a 60 month sentence).

Instead, Howard is asking that his sentence, which he has already served the vast majority of, be reduced in light of his increased vulnerability to catastrophic health consequences should he contract COVID-19. Such a measure would still reflect the seriousness of his offense, but would also take into account the devastating consequences that COVID-19 could inflict on Howard should he have to serve the rest of his sentence. Furthermore, Howard's release would not endanger the public. He will get out of prison, and soon. The question is whether the theoretical penal benefits of the 17% remaining on his sentence are worth the risk of Howard dying from COVID-19. Our answer is no.

**B.     ALTERNATIVELY, THIS COURT SHOULD PERMIT HOWARD TO COMPLETE HIS SENTENCE IN HOME CONFINEMENT**.

Should this Court decline to reduce Howard's sentence to time served, Howard moves this Court to allow him to complete the remaining 17% of his sentence via home confinement. *Pomante*, 2020 U.S. Dist. LEXIS 85626 at *9 (imposing a "term of supervised release equal to the unserved portion of [the] original term of imprisonment"). Howard would serve his sentence in Ann Arbor at his granddaughter's home, where he would be able to isolate himself and better protect himself from COVID-19. Without any sort of relief, there is a very real possibility that COVID-19 will transform Howard's remaining 21months in prison into a death sentence – as has already happened for 88 fellow inmates in the Bureau's custody.

## III.     CONCLUSION

For the foregoing reasons, Defendant requests that this Honorable Court enter an order reducing his sentence.

                                        Respectfully Submitted,

Date: June 25, 2020                     WADE FINK LAW P.C.

                                        /s/ Wade G. Fink
                                        Wade G. Fink (P78751)
                                        *Attorneys for William Howard*
                                        370 E. Maple Rd., Third Floor
                                        Birmingham, MI 48009
                                        wade@wadefinklaw.com

## PROOF OF SERVICE

I hereby certify that on June 25, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Wade G. Fink
Wade G. Fink (P78751)
*Attorneys for William Howard*
370 E. Maple Rd., Third Floor
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com