# Exhibit A

# *United States v. Alam*

United States Court of Appeals for the Sixth Circuit

June 2, 2020, Decided; June 2, 2020, Filed

File Name: 20a0171p.06

No. 20-1298

**Reporter**

2020 U.S. App. LEXIS 17321 *; 2020 FED App. 0171P (6th Cir.) **

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. WASEEM ALAM, Defendant-Appellant.

**Prior History:** [*1] Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 2:15-cr-20351-2—Sean F. Cox, District Judge.

*United States v. Alam, 2020 U.S. Dist. LEXIS 61588 (E.D. Mich., Apr. 8, 2020)*

**Counsel:** ON BRIEF: Michael R. Dezsi, LAW OFFICE OF MICHAEL R. DEZSI, PLLC, Detroit, Michigan, for Appellant.

Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

**Judges:** Before: SUTTON, COOK, and MURPHY, Circuit Judges.

**Opinion by:** SUTTON

# Opinion

 [**1]  SUTTON, Circuit Judge. Like many Americans in poor health, 64-year-old Waseem Alam has legitimate fears about the health risks created by the COVID-19 pandemic. And like many inmates, he has ample reason to fear that a prison exacerbates those risks. But when Alam moved for compassionate release under *18 U.S.C. § 3582(c)(1)(A)*, he failed to invoke all of the options for obtaining relief from the prison. Alam asks us to overlook that reality by finding the **[**2]** requirement non-mandatory or by fashioning an exception of our own. But because this exhaustion requirement serves valuable purposes (there is no other way to ensure an orderly processing of applications for early release) and because it is mandatory (there is no exception for some compassionate-release requests over others), we must enforce it. We affirm the district court's **[*2]** dismissal of Alam's request without prejudice to filing a new one.

In 2016, Alam pleaded guilty to conspiracy to commit health care and wire fraud for his role in a roughly $8,000,000 Medicare kickback scheme. He received a 101-month sentence and has served about half of it. Alam suffers from obesity, poorly controlled diabetes, sleep apnea, and coronary artery disease. And he has kidney stones and bladder issues.

On March 25, Alam sent a letter to the prison warden requesting compassionate release. But he didn't wait for a response. Ten days later, on April 4, Alam moved for emergency relief in federal court. The government pointed out that Alam had not complied with the compassionate-release statute's administrative exhaustion requirement, *18 U.S.C. § 3582(c)(1)(A)*. The district court responded that the requirement was obligatory and dismissed Alam's claims without prejudice. Alam appealed.

By statute, a federal court "may not modify a term of imprisonment once it has been imposed." *18 U.S.C. § 3582(c)*. But that rule comes with a few exceptions, one of which permits compassionate release. The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. *Id. § 3582(c)(1)(A)*. Or it may come through a motion **[*3]** filed by the inmate

after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf" or after "the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier." *Id.* After "considering the factors set forth in *section 3553(a),*" a court may reduce the prisoner's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction" or if the "[prisoner] is at least 70 years of age," has "served at least 30 years," and meets certain other conditions. *Id.*

Alam seeks compassionate release under *§ 3582(c)(1)(A)*. But he can't square that request with the terms of the statute. The Director of the Bureau of Prisons did not move for **[*3]** compassionate release. And Alam has not exhausted his administrative appeals because he waited just 10 days after the warden's receipt of his request to file his motion in federal court, not the required 30 days.

That leaves two questions. Does Alam's failure to satisfy the *§ 3582(c)(1)(A)* administrative exhaustion requirement deprive federal courts of subject-matter jurisdiction to hear his case? If not, may we excuse Alam's failure to satisfy that requirement **[*4]** over the government's timely objections?

Alam's failure to satisfy this administrative exhaustion requirement does not deprive us of subject-matter jurisdiction. The Supreme Court has worked over the last decade or so to distinguish between jurisdictional rules (that bear on the competence of courts to hear a claim) and non-jurisdictional mandatory rules (that do not). *See Arbaugh v. Y & H Corp., 546 U.S. 500, 516, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)*. The two rules differ in key respects. Chief among them: Courts must raise jurisdictional defects on their own initiative and may not overlook them even if the parties forfeit or waive challenges to them. *See Gonzalez v. Thaler, 565 U.S. 134, 141, 132 S. Ct. 641, 181 L. Ed. 2d 619 (2012)*. By contrast, mandatory claim-processing rules bind the courts only when properly asserted and not forfeited. *See Eberhart v. United States, 546 U.S. 12, 19, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005)* (per curiam).

It's "usually a mistake" to "treat a statutory limit on our power as a statutory limit on our subject-matter jurisdiction," *United States v. Marshall, 954 F.3d 823, 826 (6th Cir. 2020)*. A prescription limits our subject-matter jurisdiction only if "the Legislature clearly states that [the] prescription counts as jurisdictional." *Fort Bend County v. Davis, 139 S. Ct. 1843, 1850, 204 L. Ed. 2d*

*116 (2019)*.

Nothing in this administrative exhaustion requirement clearly limits our jurisdiction. It merely imposes a requirement on prisoners before they may move on their own behalf: They must "fully exhaust[] all administrative **[*5]** rights" or else they must wait for 30 days after the warden's "receipt of [their] request." *18 U.S.C. § 3582(c)(1)(A)*. That language neither "speak[s] in jurisdictional terms" nor "refer[s] in any way to the jurisdiction" of the courts. *Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)*. In appearance, the provision looks like a claim-processing rule, and in operation it acts like one.

**[**4]** The Supreme Court's "interpretation of similar provisions" supports this view. *Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 168, 130 S. Ct. 1237, 176 L. Ed. 2d 18 (2010)*. This exhaustion requirement in material ways mimics Title VII's requirement, which is non-jurisdictional. *Fort Bend, 139 S. Ct. at 1847, 1851-52*. *Title VII* requires claimants to present their claims to the EEOC so that the agency may decide whether to take legal action on their behalf. *See id.* Only after the EEOC elects not to act—or after 180 days pass—may the claimant proceed to federal court. *Id.* So too here. And so too in other cases. *See Woodford v. Ngo, 548 U.S. 81, 101, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)* (holding non-jurisdictional the PLRA's administrative exhaustion requirement); *see also EPA v. EME Homer City Generation, L.P., 572 U.S. 489, 511-12, 134 S. Ct. 1584, 188 L. Ed. 2d 775 (2014)* (holding non-jurisdictional the requirement that Clean Air Act plaintiffs object with reasonable specificity to a rule during that rule's public comment period); *Reed Elsevier, 559 U.S. at 163-65* (holding non-jurisdictional the requirement that *Copyright Act* plaintiffs register their copyrights before bringing an infringement action).

Even **[*6]** though this exhaustion requirement does not implicate our subject-matter jurisdiction, it remains a mandatory condition. If the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court only by moving for it on his own behalf. To do that, he must "fully exhaust[] all administrative rights to appeal" with the prison or wait 30 days after his first request to the prison. *18 U.S.C. § 3582(c)(1)(A)*.

When "properly invoked," mandatory claim-processing rules "must be enforced." *Hamer v. Neighborhood Hous. Servs. of Chi., 138 S. Ct. 13, 17, 199 L. Ed. 2d 249 (2017)*. *Ross v. Blake* illustrates the point. *136 S. Ct.*

*1850, 195 L. Ed. 2d 117 (2016)*. It rejected the idea that courts could create a "special circumstances" exception to the PLRA's exhaustion requirement. *Id. at 1856*. Because "Congress sets the rules" when it comes to statutory exhaustion requirements, the judiciary has a role to play in exception-crafting "only if Congress wants [it] to." *Id. at 1857*. Nothing in *§ 3582(c)(1)(A)* suggests the possibility of judge-made exceptions.

Nor can Alam show that exceptions to mandatory claim-processing rules—waiver or forfeiture—apply here. *See United States v. Cotton, 535 U.S. 625, 630, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002)*. The government timely objected to Alam's failure to exhaust at every available opportunity. And with good reason: It wants to implement an orderly system for reviewing compassionate-release **[*7]** applications, not one that incentivizes line jumping.

 **[**5]** Alam pushes back that the exhaustion requirement is not mandatory because it does not contain language like "no action shall be brought" common to many mandatory claim-processing rules. But a sufficient explanation for a mandatory rule is not a necessary one. The language Congress used is quite mandatory anyway. It says a "court may not" grant relief without complying with the exhaustion requirement, *18 U.S.C. § 3582(c)*, and thus operates as an "unyielding procedural requirement[]," *United States v. Dowl, 956 F.3d 904, 908 (6th Cir. 2020)* (per curiam).

Alam adds that the exhaustion requirement in *§ 3582(c)(1)(A)*, unlike the *§ 1997e(a)* exhaustion requirement contained in the PLRA, does not limit itself to administrative remedies "available" to prisoners. *42 U.S.C. § 1997e(a)*; *cf. Ross, 136 S. Ct. at 1858-62*. That, he says, shows Congress did not mean to require exhaustion in all compassionate-release cases. But there is a distinction between the statutes in this respect. Prisoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them. Prisoners lack that luxury under the PLRA.

Alam notes that another provision, *18 U.S.C. § 3582(c)(2)*, authorizes prisoners to seek a sentence reduction without administrative exhaustion. **[*8]** He's right. But why that helps him remains unclear. The neighboring provision applies to prisoners who had their sentence set based on a subsequently lowered sentencing range. Courts will have little trouble determining whether prisoners are eligible for resentencing under that provision; they need only

compare the prisoner's presentence report and current guidelines range. By contrast, eligibility for compassionate release turns on harder-to-parse considerations that benefit from greater ventilation. The absence of an exhaustion requirement in *§ 3582(c)(2)* in truth hurts Alam's case. It shows that, when exhaustion is not needed, Congress knows how to omit it.

Alam insists that the backdrop to *§ 3582(c)(1)(A)* suggests that Congress wished to make compassionate release available to a broader group of inmates. Prior to 2018, it is true, only the Director of the Bureau of Prisons could move for compassionate release. The First Step Act changed that. *See First Step Act of 2018, § 603, Pub. L. No. 115-391, 132 Stat. 5239*. It amended *§ 3582(c)* to allow prisoners to move for compassionate release on their own behalf. No one contests that Congress made this change to increase access to compassionate release. **[**6]** But it does not follow that Congress meant to excuse prisoners' **[*9]** failure to follow an exhaustion requirement that it deliberately added in the *same* amendment.

Noting that the Supreme Court has reserved the question whether "equitable exceptions" may "ever" apply to "mandatory claim-processing rules," *Fort Bend, 139 S. Ct. at 1849 n.5* (quotation omitted), Alam requests that we innovate an equitable exception to this requirement to account for irreparable harm or futility. But the norm is to follow a mandatory rule unless the statutory exceptions apply. *See Hamer, 138 S. Ct. at 17*; *Manrique v. United States, 137 S. Ct. 1266, 1271-72, 197 L. Ed. 2d 599 (2017)*; *Ross, 136 S. Ct. at 1856-57*; *Eberhart, 546 U.S. at 19* (per curiam).

*McKart v. United States, 395 U.S. 185, 193-97, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969)*, and *McCarthy v. Madigan, 503 U.S. 140, 147-48, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992)*, do not alter this conclusion. They involve judge-made exceptions to judge-made exhaustion doctrines. Those are birds of a different feather. *See Ross, 136 S. Ct. at 1857*. And Alam's reliance on *Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000)*, hurts his cause. That case declined to read atextual exceptions into a statutory requirement. *Id. at 11-14*. And the Court has subsequently cited that case for the proposition that courts may not "add unwritten limits" into administrative exhaustion requirements. *Ross, 136 S. Ct. at 1857*.

Even if federal courts possessed a general power to create equitable carveouts to statutory exhaustion

requirements, Alam does not show why an exception would make sense in the context of this statute. Remember that Congress made compassionate release available only to elderly prisoners [*10] and those with "extraordinary and compelling" reasons for release. *18 U.S.C. § 3582(c)(1)(A)*. For such prisoners, time usually will be of the essence. That would make nearly every prisoner eligible to invoke "irreparable harm" and eligible to jump the line of applications—making the process less fair, not more fair.

Appending a futility requirement does not improve things. How could we divine whether the Bureau of Prisons may wish to act on any given petition? And, in any event, why must we assume that the Bureau of Prisons' failure to act render the act of waiting "futile"? Speed matters, yes. But accuracy matters too. Preventing prisoners from charging straight to federal court serves important purposes. It ensures that the prison administrators can prioritize the most [**7] urgent claims. And it ensures that they can investigate the gravity of the conditions supporting compassionate release and the likelihood that the conditions will persist. These are not interests we should lightly dismiss or re-prioritize.

Just one published decision of a federal court of appeals has faced a circumstance in which a prisoner failed to comply with the *§ 3582(c)(1)(A)* administrative exhaustion requirement. That court found the omission [*11] a "glaring roadblock foreclosing compassionate release." *United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020)*. We agree.

Alam counters that this pandemic is unprecedented. Fair enough. Diseases with the morbidity of COVID-19 arise only occasionally. But it is not clear which way that cuts. By creating a compassionate-release option in the First Step Act, Congress gave inmates an option to seek early release on health grounds. The seriousness of COVID-19 and its spread in many prisons make it all the more imperative that the prisons have authority to process these applications fairly and with due regard for the seriousness of each inmate's risk. Free-floating exceptions to the rule, available to anyone willing to go to federal court first, will not help that cause. Recall that inmates can identify the ongoing public health crisis in their initial petition to their wardens. If that doesn't work, prisoners can pursue administrative review. If that also comes up short (or if 30 days pass), prisoners have the option to go to federal court. Thirty days hardly rises to the level of "an unreasonable or indefinite timeframe." *McCarthy, 503 U.S. at 147*.

Nor have the political branches been insensitive in responding to the COVID-19 pandemic. The CARES Act expands the power [*12] of the Bureau of Prisons to "place a prisoner in home confinement" as an alternative to compassionate release. *Coronavirus Aid, Relief, and Economic Security Act (CARES Act), § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020)*. And the Attorney General has instructed the Bureau of Prisons to make the most of this expanded power by placing in home confinement "all inmates whom [the Bureau] deem[s] suitable candidates." *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19*, Office of the Attorney General (Apr. 3, 2020). The system is working as it should. A policy problem appeared, and policy solutions emerged.

[**8] One final question: What should we do with Alam's untimely motion? We conclude that we should dismiss it without prejudice. The Supreme Court has previously applied this remedy in cases where parties filed in court before waiting out a statutorily required non-adversarial window. *See, e.g.,* *Hallstrom v. Tillamook County, 493 U.S. 20, 33, 110 S. Ct. 304, 107 L. Ed. 2d 237 (1989)*. We have done the same in cases where parties failed to exhaust. *See, e.g.,* *S.E. v. Grant Cty. Bd. of Educ., 544 F.3d 633, 642-43 (6th Cir. 2008)*; *Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999)*. This approach comports with the general rule that we must strictly enforce statutory limits on the timing of a claim's filing. *See* *Carlisle v. United States, 517 U.S. 416, 433, 116 S. Ct. 1460, 134 L. Ed. 2d 613 (1996)*. And it makes plenty of sense on its own terms. If (rather than dismissing) we sat on untimely compassionate [*13] release motions until the 30-day window ran its course, we could end up reviewing stale motions. Better to have Alam refile with the benefit of whatever additional insight he may have gleaned.

We affirm the dismissal of Alam's motion without prejudice.

**End of Document**

## *United States v. Coker*

United States District Court for the Eastern District of Tennessee

April 15, 2020, Filed

No. 3:14-CR-085

**Reporter**
2020 U.S. Dist. LEXIS 66286 *

UNITED STATES OF AMERICA v. MARY M. COKER

**Prior History:** *United States v. Hicks, 2014 U.S. Dist. LEXIS 151026 (E.D. Tenn., Oct. 24, 2014)*

**Counsel: [*1]** For USA, Plaintiff: Caryn L Hebets, LEAD ATTORNEY, U S Department of Justice (Knox USAO), Office of U S Attorney, Knoxville, TN.

**Judges:** Leon Jordan, United States District Judge.

**Opinion by:** Leon Jordan

# Opinion

## MEMORANDUM OPINION

This matter is before the Court on the defendant's motion to reduce sentence pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)* for immediate compassionate release. [Doc. 856]. The United States has responded in opposition to the motion, and the defendant has submitted a reply. [Docs. 861, 866]. The matter is now ripe for the Court's review. For the reasons stated below, the defendant's motion for immediate compassionate release will be granted.

## I. BACKGROUND

In March 2015, the Honorable Thomas W. Phillips sentenced the defendant to a 96-month term of imprisonment, to be followed by five years' supervised release, for conspiring to manufacture methamphetamine. [Doc. 454]. According to the Bureau of Prisons ("BOP"), the defendant is presently incarcerated at FMC Carswell with a scheduled release date of May 15, 2021. *See* Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Apr. 14, 2020).

Through counsel, the defendant now moves for immediate compassionate release pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)*, as amended by the First Step Act of 2018 **[*2]** . Recent BOP medical records appended to the motion show that the defendant, age 52, suffers from COPD and is oxygen dependent. [Doc. 854, ex. 4]. In January of this year, the defendant caught the flu, resulting in more than three weeks' placement in both a hospital and long-term care facility due to COPD exacerbation. [*Id.*] According to medical records, the defendant was in the long-term care facility from February 5 through 20, 2020, because BOP was "unable to provide the high amount of oxygen needed." [*Id.*] The defendant was in acute respiratory failure. [*Id.*]

According to an undated assessment by a medical officer at FMC Carswell, the defendant's COPD has gradually worsened during her incarceration. [*Id.*, ex. 5]. She is wheelchair dependent and requires round-the-clock supplemental oxygen. [*Id.*] The BOP medical officer wrote that the defendant's "lung function is not reversible and will only continue to decline. Even with maximal medical management. [*Id.*] (punctuation in original). According to the BOP, the defendant has a "[p]oor prognosis. Given patient's age and severe COPD, she will have continued decline in her lung function which may ultimately lead to her death." [ **[*3]** *Id.*]

The defendant contends that her medical conditions constitute "extraordinary and compelling reasons" under *§ 3582(c)(1)(A)* that warrant a sentence reduction,

particularly in light of the current COVID-19 pandemic. [Doc. 856]. She requests that her sentence be reduced to time served and that her conditions of supervised release be modified to accommodate her release plan, which involves living with a friend in Lake Panasoffkee, Florida. [*Id.*, ex. 3].[1] Specifically, Defendant requests that her conditions of supervised release be modified to allow her to live in the Middle District of Florida, to report to the probation officer by telephone, and to be excused from the condition of her judgment requiring that she maintain employment while on supervision. [Doc. 856].

Also appended to the defendant's motion is her April 2, 2019 Application for Compassionate Release under § 3582(c)(1)(A)(i), which was denied by the BOP in October 2019. [*Id.*, exs. A, B]. In that application, the defendant "request[ed] compassionate release due to my rapidly failing health"—namely, COPD and emphysema, oxygen usage, wheelchair dependence, and other mobility limitations.

The United States opposes compassionate release on exhaustion of remedies [*4] grounds, arguing both that the instant motion raises claims different than those presented to the BOP in 2019, and that the defendant has presented a renewed *pro se* request to the BOP within the last 30 days. [Doc. 861]. In support of the latter argument, the United States has submitted the defendant's handwritten April 1, 2020 *pro se* Inmate Request to Staff form, in which the defendant asks in full, "I would like to be considered for home confinement and early release under COVID-19." [*Id.*, ex. 1].

In reply, the defense contends that the instant motion is based on the same health conditions presented in the 2019 *pro se* § 3582 request. [Doc. 866]. As to the April 1, 2020 *pro se* Inmate Request to Staff, it is the defense's position that,

> In the case of Ms. Coker's "inmate request," a decision by the BOP to move an inmate to home confinement is a completely separate mechanism than the relief available under *18 U.S.C. § 3582(c)(1)(A)(i)*. The mere fact that Ms. Coker included the words "early release" in a hand-written inquiry cannot justify a denial of her compassionate release request which was formally submitted over

five months after she exhausted her administrative remedies and was denied release.

. . . The government's [*5] suggestion that this hand-written plea for help should be manipulated by this Court to erect complex jurisdictional barriers to Ms. Coker's valid request for relief is illogical and unjust.

[*Id.*].

## II. DISCUSSION

As noted by the defense, two distinct statutory "mechanisms" are currently receiving heightened attention from the courts and the BOP as they grapple with release requests during the current pandemic.

First, *section 12003 of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020)*, presently and temporarily provides for expanded prisoner home confinement. The CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. *See id.*; *accord 18 U.S.C. § 3624(c)(2)*. Courts therefore do not have power to grant relief under Section 12003 of the CARES Act.

Alternatively, *18 U.S.C. § 3582(c)(1)(A)(i)* allows district courts to consider prisoner motions for sentence reduction upon a finding of "extraordinary and compelling reasons." *18 U.S.C. § 3582(c)*, as amended by the First Step Act of 2018, provides in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, *or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau* [*6] *of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in *section 3553(a)* to the extent that they are applicable, if it finds that—
> > (i) extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing

---

[1] In August 2019, the United States Probation Office in the Middle District of Florida approved the defendant's proposed residence. [*Id.*]. On April 14, 2020, the Court conferred with the probation office of this district, which in turn confirmed that the defendant's proposed residence is still approved.

Commission....

*18 U.S.C. § 3582(c)(1)(A)* (emphasis added). Prior to the First Step Act, a motion for compassionate release could only be brought by the BOP Director, not the defendant. *See 18 U.S.C. § 3582(c)(1)(A) (2017)*. The First Step Act amended *§ 3582(c)(1)(A)* to allow a defendant to file a motion for compassionate release with the court, after filing a request for the BOP to file such a motion on his behalf, and being denied. *United States v. Beck, No. 1:13-CR-186-6, 2019 U.S. Dist. LEXIS 108542, 2019 WL 2716505, at *5 (M.D.N.C. June 28, 2019)*. Beyond this change, the statute still applies the same statutory requirements to a defendant's motion for compassionate release as previously **[*7]** applied to motions by the BOP Director. *Id.*

The Sentencing Commission has promulgated a policy statement regarding compassionate release under *§ 3582(c)*, which is contained in *U.S.S.G. § 1B1.13* and the accompanying Application Notes. *United States v. McGraw, No. 2:02-cr-18, 2019 U.S. Dist. LEXIS 78370, 2019 WL 2059488, at *3 (S.D. Ind. May 9, 2019)*. While that particular policy statement has not yet been updated to reflect that defendants (and not just the BOP) may move for compassionate release, courts have universally turned to *U.S.S.G. § 1B1.13* to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence reduction. *2019 U.S. Dist. LEXIS 78370, [WL] at *2* (citations omitted). Moreover, the Court has no reason to believe that the identity of the movant (either the defendant or the BOP) should have any impact on the factors the Court should consider. *See id.* (concluding likewise).

As provided in *§ 1B1.13*, consistent with the statutory directive in *§ 3582(c)(1)(A)*, the compassionate release analysis requires several findings. First, the Court must address whether "[e]xtraordinary and compelling reasons warrant the reduction" and whether the reduction is otherwise "consistent with this policy statement." *U.S.S.G. § 1B1.13(1)(A), (3)*. Second, the Court must determine whether a movant is "a danger to the safety of any other person or to the community, as provided **[*8]** in *18 U.S.C. § 3142(g)*." *U.S.S.G. § 1B1.13(2)*. Finally, the Court must consider the *§ 3553(a)* factors, "to the extent they are applicable." *U.S.S.G. § 1B1.13*.

## A. Exhaustion

In this case, the government argues extensively that the

defendant has not properly exhausted her remedy of requesting relief from the BOP, and therefore this Court lacks authority to grant relief under *§ 3582(c)(1)(A)*. First, the government argues that the instant motion is based on COVID-19 which is a different "fact and circumstance" than what was presented in the defendant's April 2019 *pro se* Application for Compassionate Release (worsening emphysema and COPD), and thus these "new" request must be presented to the BOP first. The Court disagrees. While it is true that the present motion discusses COVID-19 at length, it does so to illustrate the increasing danger presented by the defendant's previously cited health conditions. The defendant's prior application was based on emphysema, COPD, and her nearly 24 hour per day reliance on oxygen and a wheelchair. The instant motion is based on those very same conditions. As such, the Court finds that the present motion is not a new request which must be first presented to the BOP.

The Court also reject the United States' argument that the defendant's **[*9]** recent *pro se* submission of an Inmate Request to Staff constitutes a new *§ 3582(c)(1)(A)(i)* request. Viewed in context, that form is plainly a CARES Act request to be released to home confinement. It was submitted on April 1, 2020, a mere five days after the CARES Act authorized BOP to consider expanded home confinement eligibility. The defendant is not an attorney. Instead, she has a seventh-grade education and reports occasional trouble writing. [Doc. 336, ¶ 128]. On those facts, while the defendant indeed requested "home confinement *and early release* under COVID-19" (emphasis added), the Court will not hold her to the same standards of semantic precision that it would hold an attorney. Moreover, the Court notes that the defendant's prior *pro se § 3582(c)(1)(A)* request was submitted on an Application for Compassionate Release form. If it was her intention two weeks ago to submit another *§ 3582(c)(1)(A)* request, she has demonstrated that she knows what form to use.

The Court is therefore not persuaded that it lacks authority to address this matter. The plain language of *§ 3582(c)(1)(A)*, as amended by the First Step Act, gives the Court authority to act "upon motion of the defendant after the defendant has fully exhausted all administrative rights **[*10]** to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" *18 U.S.C. § 3582(c)(1)(A)* (emphasis added). Other district courts have recognized that the language of *§*

3582(c)(1)(A), as amended by the First Step Act, requires the defendant to file an administrative request with the BOP "and then either exhaust administrative appeals _or_ wait thirty days after submitting his request to the BOP." *See, e.g., United States v. Heromin, No. 8:11-cr-550-T-33SPF, 2019 U.S. Dist. LEXIS 96520, 2019 WL 2411311, at *1 (M.D. Fla. June 7, 2019)* (emphasis added).

Here, Defendant filed an administrative request with the BOP in 2019, asking for compassionate release on the same fundamental grounds as the instant motion. In October 2019, the BOP declined to file such a motion on the defendant's behalf. She does not have a new request that has been pending before the BOP for 30 days or less. Accordingly, the Court concludes that it has authority under _§ 3582(c)(1)(A)_ to address the instant motion.

**B. Merits**

**1. Extraordinary and Compelling Reasons**

The Application Notes to guideline _1B1.13_ provide, in part:

1. Extraordinary and Compelling Reasons.— ... [E]xtraordinary and compelling reasons **[*11]** exist under any of the circumstances set forth below:
(A) Medical Condition of the Defendant.—
(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
(ii) The defendant is—
(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,
that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

_U.S.S.G. § 1B1.13 cmt. n.1._

The Court finds the defendant's combination of medical conditions, particularly her COPD and extensive need for oxygen therapy, to be extraordinary and compelling reasons justifying a sentence reduction. The BOP acknowledges that the defendant has worsening, severe, and irreversible COPD which will cause "continued **[*12]** decline in her lung function which may ultimately lead to her death." She is now essentially wheelchair bound and requires round-the-clock supplemental oxygen. Her recent bout with the flu led to acute respiratory failure and long-term care facility placement because the BOP was "unable to provide the high amount of oxygen needed." With or without consideration of the dangers of the current pandemic, the defendant has demonstrated "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," _id. cmt. n.1(A)(ii)(I)_, thus constituting an extraordinary and compelling reason for sentence reduction pursuant to _§ 3582(c)(1)(A)._

**2. Danger to Any Other Person or to the Community**

_Guideline 1B1.13_ provides that compassionate release is only appropriate where "the defendant is not a danger to the safety of any other person or to the community, as provided in _18 U.S.C. § 3142(g)_[.]" _U.S.S.G. § 1B1.13(2). Section 3142(g)_ outlines the factors the Court must consider in determining whether a defendant should be detained pending trial. Specifically, _§ 3142(g)_ provides:

(g) Factors to be considered.—The judicial officer shall, **[*13]** in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of _section 1591_, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
(2) the weight of the evidence against the person;
(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community **[\*14]** that would be posed by the person's release.

*18 U.S.C. § 3142(g)*.

The Court has considered the defendant's plea agreement [doc. 126], her Presentence Investigation Report ("PSR") [doc. 336], and her Bureau of Prisons SENTRY Report. The defendant's role in this conspiracy case was that of a "smurf," providing a significant quantity for pseudoephedrine to co-conspirators for use in the manufacture of methamphetamine. That conduct was serious. There is, however, no evidence that the defendant used or encouraged violence in this case, or that she possessed a weapon. [Doc. 336, ¶¶ 31-38].

The defendant's criminal history and record of arrests is lengthy, spanning from paragraph 57 to paragraph 113 of the PSR. The majority of those convictions and arrests pertain to theft, driving, and drug offenses, consistent with the defendant's history of substance abuse beginning at age 12. Additionally, there was an assault conviction in 2002 for scratching the face of an arresting officer. [*Id.*, ¶ 64]. A 2003 weapon possession charge was not prosecuted. [*Id.*, ¶ 65]. There was a 2005 weapon possession conviction about which the probation office was unable to obtain further information. [*Id.*, ¶ 68]. A 1996 domestic violence **[\*15]** charge was dismissed. [*Id.*, ¶ 93].

According to her SENTRY Report, the BOP classifies the defendant as a minimum security inmate with a minimum risk of recidivism. She has incurred only one disciplinary sanction while incarcerated, resulting from her admittedly possessing "the pills" on February 20, 2020. The sanction for this offense was 15 days' loss of phone privileges, suggesting that the infraction was not serious.

The defendant appears to have limited family ties. [Doc. 336, ¶¶ 114-16]. She has, however, arranged for a post-release residence which the probation office deems suitable. The defendant has limited financial resources but has previously been approved for Social Security disability payments. [*Id.*, ¶¶ 129-31].

The above facts, paired with the defendant's serious physical impairments and limited mobility, persuade the Court that the defendant would not pose a danger to the safety of any other person or the community if released.

### 3. *Section 3553(a)* **Factors**

*Section 3553(a)* provides:

(a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in *paragraph (2)* of this subsection. The court, in determining the particular **[\*16]** sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission];

. . . .

(5) any pertinent policy statement guidelines [issued by the Sentencing Commission];

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of

the offense.

18 U.S.C. § 3553(a).

The defendant contends that, under the § 3553(a) factors, her [*17] time served constitutes a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing. The Court agrees.

Many of the pertinent § 3553(a) factors have already been discussed in the preceding section of this memorandum. As for the considerations of adequate deterrence and the avoidance of unwarranted sentence disparity, the Court notes that the defendant has been in federal custody since July 21, 2014. [Doc. 336, p 1]. She has served the bulk of her 96-month sentence, with only 13 months left. A five-year term of supervised release remains in place.

The Court finds that reducing the defendant's sentence to of time served is consistent with the § 3553(a) factors. Although it does not wish to minimize the seriousness of the defendant's offense and her criminal history, the Court concludes that the defendant's service of almost six years in prison is sufficient under the § 3553(a) factors. The remaining 13 months of the defendant's sentence is negligible for purposes of achieving the goals of sentencing but is far from negligible as it pertains to her serious physical condition.

Thus, the Court concludes that, in light of the defendant's serious medical conditions, her continued incarceration [*18] would not serve the goals of sentencing as set forth in the § 3553(a) factors. Because the Court finds that the defendant has shown extraordinary and compelling reasons for a reduction, and that she does not pose a danger to the safety of any other person or the community, and that a reduction in sentence would be consistent with the § 3553(a) factors, the defendant's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) will be granted.

## C. Conditions of Supervised Release

The defendant requests that her conditions of supervised release be modified to accommodate the reasons for the sentence reduction. Specifically, she asks that she be allowed to reside in the Middle District of Florida, that she be allowed to report to the probation officer by telephone, and that the employment requirement be excused. The government did not respond to these requests.

The Court may, in its discretion, modify a condition of supervised release at any time prior to the expiration of the supervised release term, pursuant to the provisions governing the initial setting of supervised release conditions. 18 U.S.C. § 3583(e)(2); United States v. Johnson, 529 U.S. 53, 60, 120 S. Ct. 1114, 146 L. Ed. 2d 39 (2000). Specifically, the Court must consider the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) in modifying conditions of supervision. 18 U.S.C. § 3583(e). "The [*19] applicable statutory provisions generally require that the conditions be reasonably related to the goals of rehabilitation of the defendant and the protection of the public, and involve no greater deprivation of liberty than is reasonably necessary." Green v. United States, No. 3:08-0784, 2010 U.S. Dist. LEXIS 49318, 2010 WL 2010937, at *2 (M.D. Tenn. May 19, 2010) (citing United States v. Lowenstein, 108 F.3d 80, 85 (6th Cir. 1997); Fed. R. Crim. P. 32.1(c)).

Although the Court generally must hold a hearing before modifying conditions of supervised release, the hearing is not required if: (1) the relief sought is favorable to the person and does not extend the term of supervised release; and (2) an attorney for the government has received notice of the relief sought, has had a reasonable opportunity to object, and has not done so. Fed. R. Crim. P. 32.1(c)(2)(B)-(C). The Court concludes that no hearing is necessary in this case, as the relief sought is favorable to the defendant, does not extend the term of supervision, and the government received a chance to respond to the requests but failed to do so.

The Court finds that, considering the applicable factors under § 3553(a), the defendant's requested modifications to her conditions of supervised release are largely reasonable. Her plan to reside in the Middle District of Florida has already been approved by the probation office. The [*20] defendant's request to waive the employment condition is reasonable in light of her physical condition. As to the defendant's request that she be allowed to report to her probation officer by telephone, the Court finds this request appropriate—at least initially—in light of the defendant's medical conditions and the COVID-19 precautions currently in place. Accordingly, the Court will substantially grant the defendant's request to modify the conditions of supervised release.

## III. CONCLUSION

Accordingly, for the reasons stated herein, Defendant's

motion to reduce sentence, pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)*, for immediate compassionate release [doc. 856] will be **GRANTED**. An order consistent with this opinion will be entered.

ENTER:

/s/ Leon Jordan

United States District Judge

---

**End of Document**

## *United States v. Meron*

United States District Court for the Eastern District of California

June 2, 2020, Decided; June 3, 2020, Filed

No. 2:18-cr-0209-KJM

**Reporter**
2020 U.S. Dist. LEXIS 97687 *

UNITED STATES OF AMERICA, Plaintiff, v. JIM A. MERON, Defendant.

**Prior History:** *United States v. Meron, 2020 U.S. Dist. LEXIS 66533 (E.D. Cal., Apr. 14, 2020)*

**Counsel:** **[*1]** For USA, Plaintiff: Andre M. Espinosa, GOVT, LEAD ATTORNEY, U.S. Attorney's Office, Eastern District of California, Sacramento, CA; Kevin Christopher Khasigian, GOVT, LEAD ATTORNEY, United States Attorney's Office, Sacramento, CA.

**Judges:** Kimberly J. Mueller, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** Kimberly J. Mueller

# Opinion

ORDER

Defendant renews his request for an order granting early release from confinement subject to the sentence this court imposed and seeks admission instead to home confinement, under *18 U.S.C. § 3582(c)*. Defendant makes this motion in light of the increased risks to health that the coronavirus ("COVID-19") poses to incarcerated persons and, as he argues, to him in particular. For the following reasons, the court orders

supplemental briefing on defendant's motion due to the parties' dispute over exhaustion and its potential jurisdictional ramifications.

I. BACKGROUND

On June 17, 2019, defendant Jim Meron was sentenced to 33 months in prison followed by 36 months of supervised release on two counts of wire fraud in violation of *18 U.S.C § 1341*. Sentencing Mins., ECF No. 28; Plea Agreement, ECF No. 10. Defendant is now serving his sentence at FCI Sheridan, the Federal Correctional Institution in Sheridan, Oregon. First Mot., **[*2]** ECF No. 36, at 3. On March 30, 2020, defendant submitted to his case manager an Inmate Request to Staff, which the BOP, through a Mrs. Bilbrey, denied on April 21, 2020. Opp'n, ECF No. 41, at 7 (stating BOP denied the request); *id.,* Ex. B, ECF No. 371-1, at 8 (Inmate Request) (depicting handwritten denial signed by Bilbrey on April 20, 2020). On April 3, 2020, defendant filed his first motion for compassionate release under *18 U.S.C. § 3582(c)(1)(A)*. *See* First Mot. The government opposed, ECF No. 37, and defendant filed a reply, ECF No. 38. The court denied the motion without prejudice, because defendant had not met the exhaustion requirement. Order, ECF No. 39.

In his renewed motion for compassionate release, filed on April 25, 2020, defendant argues he has now exhausted administrative remedies because BOP denied his March 30 Inmate Request to Staff on April 21. Mot., ECF No. 40. The government has opposed. Opp'n, ECF No. 41. Defendant replied, Reply, ECF No. 42, and also submitted a declaration from the Assistant Warden at a separate facility, FCI Miami, regarding systemwide BOP procedures regarding administrative requests, *see* Broton Decl., ECF No. 43. In response, the government has filed a sur-reply, accompanied **[*3]** by a request to file a sur-reply, Sur-Reply, ECF No. 44. The court grants this request, because defendant introduced new evidence on reply. *See, e.g., Magic Link Garment Ltd. v. ThirdLove, Inc., No. 18-CV-07366-PJH, 2020 U.S. Dist. LEXIS 71126, 2020 WL 1940802, at *8 n.2 (N.D. Cal. Apr. 22, 2020)* (permitting sur-reply to

allow party to respond to new evidence on reply, in absence of the sur-reply with an additional response, unaccompanied by any request for leave to file such a response; the court does not consider this further response as it is unwarranted additional briefing. ECF No. 45.

## II. EXHAUSTION

Defendant brings his motion for release under *18 U.S.C. § 3582(c)(1)(A)(i)*, which allows a court to modify a sentence under certain circumstances. Under the current version of the statute, a motion for modification may be made by either the Director of the Bureau of Prisons (BOP) or by a defendant "after the defendant has fully exhausted all administrative rights to appeal or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier," *18 U.S.C. § 3582(c)(1)(A)*.

The government argues defendant has not exhausted administrative remedies, and therefore his motion must be denied. The government contends that defendant's March **[*4]** 30, 2020 "Inmate Request to Staff," "did not contain sufficient information to constitute a properly submitted Compassionate Release request to BOP" so as to trigger a 30-day timeline for exhaustion and defendant has not exhausted additional available appeals. Opp'n at 11; *see* Inmate Request to Staff. Specifically, the government argues that defendant's Inmate Request to Staff does not trigger the statutory administrative remedies exhaustion period, because it is not a formal request for Reduction in Sentence, and does not "contain sufficient information to constitute a properly submitted Compassionate Release/Reduction in Sentence request to BOP," as required under BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of *18 U.S.C. §§ 3582* and *4205(g)*.[1] Opp'n at 11 (citing BOP Program Statement 5050.50 (January 17, 2019)[2] ). The government takes the position that defendant's Inmate Request to Staff should

not be construed as a request for compassionate release because it "made no mention of permanent reduction of his sentence under *Section 3582(c)*" but rather requests consideration for "priority home confinement as directed by A.G. Barr and the Care [sic] act." *Id.* (citing **[*5]** Opp'n, Ex. 2, ECF No. 41-1).

While on the one hand, defendant argues exhaustion should be waived, on the other hand, defendant argues he has met the statute's exhaustion requirements. To that end, defendant argues that his Inmate Request to staff should be considered a Reduction in Sentence request, because "Meron's Inmate Request to Staff is processed by the BOP as a [request for] permanent reduction of his sentence under *Section 3582(c)*" and the BOP "indicated that they had sufficient information to constitute a properly submitted Compassionate Release/Reduction in Sentence request to BOP." Reply at 2 (apparently relying on BOP Program Statement 5050.50). Thus, defendant argues, "exhaustion has elapsed April 21st, 2020 when he was denied." Mot. at 6.

In support of this argument, defendant has submitted a declaration from Jennifer Broton, Associate Warden at FCI Miami, which explains BOP's systemwide procedure for processing home confinement and compassionate release requests. Broton Decl. Defendant points to paragraph 17 of the declaration, which reads:

> Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which **[*6]** ones meet the criteria established by the Attorney General. While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

Broton Decl. ¶ 17. Defendant appears to argue that this paragraph supports a conclusion that defendant's only avenue to pursue release to home confinement is to submit a request to his or her case manager, which defendant here has done. *See* Reply at 2.

In its sur-reply, the government counters that defendant conflates requests for "home confinement (a remedy BOP may grant or deny and for which no judicial review is available)" with requests for "compassionate release (a remedy BOP may seek from a court on behalf of an inmate or, that an inmate may seek from a court after exhausting his administrative remedies or after 30 days from his request to the prison seeking that relief)." Sur-

---

[1] In relevant part, *18 U.S.C. § 4205(g)*, which applies to defendants sentenced before the effective date of *§ 3582(c)*, allows a sentencing court, on motion of the Bureau of Prisons, to order an inmate with a minimum term sentence immediately eligible for parole by reducing the minimum term of the sentence to time served. *See* BOP Program Statement 5050.50 *§ 571.60*; *United States v. Lika, No. 84-CR-499 (CS), 2020 U.S. Dist. LEXIS 93290, 2020 WL 2766049, at *1 (S.D.N.Y. May 28, 2020)*.

[2] https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

Reply at 2 (citing Broton Decl. ¶¶ 3-20 (discussing statutory basis for, and operation of, home confinement requests); *id.* ¶¶ 24-25 (discussing statutory basis for, and operation of, compassionate relief requests)). The government **[\*7]** is correct that Broton's declaration does differentiate between the procedure for requesting home confinement and the procedure for requesting "compassionate release/reduction in sentence," Broton Decl. ¶ 24. However, that BOP processes the requests differently and home confinement and compassionate release are two different remedies, does not necessarily mean the court should not construe defendant's Inmate Request to Staff as sufficient to trigger any exhaustion clock applicable to compassionate release requests.

The government's argument, that the Inmate Request to Staff does not contain sufficient information to be considered a request for compassionate release, is not supported by the program statement the government cites. Under the section entitled "Initiation of Request - Extraordinary or Compelling Circumstances," BOP Program Statement 5050.50 does not require the use of any form and provides:

> A request for a motion under *18 U.S.C. 4205(g)* or *3582(c)(1)(A)* shall be submitted to the Warden. Ordinarily, the request shall be in writing, and submitted by the inmate. . . . The inmate's request shall at a minimum contain the following information:
>
> (1) The extraordinary or compelling circumstances that the inmate **[\*8]** believes warrant consideration. (2) Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment. . . .
>
> A request for a RIS [reduction in sentence] is considered "submitted" for the purposes of *18 USC §3582 (c)(1)*, when received by the Warden in accordance with this section.

BOP Program Statement 5050.50 *§ 571.61*. Defendant's Inmate Request to Staff includes the information called for by the program statement as relevant here: defendant explains his risk factors for COVID-19, his plan to reside with his wife and daughter in Granite Bay, California, his belief that this will "reduc[e] my risk of contracting Covid-10," and his plan to "home school my daughter while my wife works." Inmate Request at 8.

Otherwise, in substance, defendant's Inmate Request to Staff is, in all functional respects, a request for compassionate release. Defendant apparently submitted his request on his own, without counsel at the time. *See* Reply at 2 ("Jim Meron brought a motion for compassionate release . . . ."); *see* **[\*9]** *also* Inmate Request to Staff (handwritten request by "Jim Meron"). This fact supports a liberal construction of his submission. *Cf. United States v. Coker, 2020 U.S. Dist. LEXIS 66286, 2020 WL 1877800 at \*4* (interpreting Inmate Request for home confinement and reduction in sentence as request for home confinement only, where such interpretation was favorable to defendant, in part because "defendant is not an attorney").

At least one other district court has considered specifically whether an inmate's request to staff requesting transfer to home confinement is sufficient to trigger the 30-day timeline for exhaustion purposes under *§ 3582*. *United States v. Echevarria, No. 317CR44MPSMPS, 2020 U.S. Dist. LEXIS 77894, 2020 WL 2113604, at \*2 (D. Conn. May 4, 2020)* (finding exhaustion satisfied under *§ 3582(c)(1)(A)* where defendant "submitted an 'Inmate Request to Staff' form dated [over 30 days prior], in which he requested to 'be placed in home confinement to complete [his] sentence' due to his asthma and the 'COVID-19 pandemic.'"). Other court decisions appear to have reached the same conclusion without spelling out their reasoning. *See United States v. Singh, No. 2:15-CR-00015-TLN, 2020 U.S. Dist. LEXIS 79086, 2020 WL 2128588, at \*1 (E.D. Cal. May 5, 2020)* (referring to inmate request for release to home confinement as request for compassionate release); *see also United States v. Moore-Brown, No. 3:17-CR-129, 2020 U.S. Dist. LEXIS 81293, 2020 WL 2306855, at \*3 (M.D. Pa. May 8, 2020)* (treating defendant's **[\*10]** request "for compassionate release to home confinement" as request for compassionate release triggering exhaustion timeline under *§ 3582(c)(1)(A)* but ultimately finding no exhaustion).

For these reasons, the court is inclined to construe defendant's Inmate Request to Staff as a request for compassionate release, the contents of which are sufficient to trigger the 30-day timeline set forth in *§ 3582(c)(1)(A)*. However, the text of *§ 3582(c)(1)(A)* dictates that the 30-day timeline begins to run "after receipt of such a request by the Warden." Here, defendant's request is addressed to and was denied by "Mrs. Bilbrey," who is not the Warden of FCI Sheridan; it appears the Warden is Josias Salazar, *see United States v. Holden, No. 3:13-CR-00444-BR, 2020 U.S.*

*Dist. LEXIS 60123, 2020 WL 1673440, at \*10 (D. Or. Apr. 6, 2020)* (identifying Salazar as warden of FCI Sheridan). *See* Inmate Request at 8. Neither party offers any evidence to clarify whether the request was ever received by the Warden, or whether addressing the request to Mrs. Bilbrey is sufficient to satisfy this requirement. This issue appears material to the exhaustion analysis, and the court concludes supplemental briefing on this issue is necessary as discussed below.

The government also argues there is no evidence defendant appealed BOP's denial of **[*11]** his Inmate Request to Staff such that he has exhausted all administrative grievances. Opp'n at 11. The government does not outline what precisely is required to exhaust administrative appeals, however it cites to BOP Program Statement 5050.50, *id.* at 17, which arguably expands on the statutory exhaustion requirement for compassionate release motions. *See* BOP Program Statement 5050.50 *§ 571.63(a)* (citing Administrative Remedy Program appellate procedure at *section 542 subpart B*, found at *28 C.F.R. § 542.10 et seq.*, as proper method of administratively appealing request made based on *§ 3582(c)(1)(A)* that is denied in first instance); *see also id. § 571.63* (explaining inmate may file compassionate release request "with the sentencing court after receiving a [Central Office Administrative Remedy Appeal form] BP-11 response under subparagraph (a), the denial from the General Counsel under subparagraph (d), or the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility, whichever is earlier"); *28 C.F.R. § 542.15* (directing inmates to appeal denial of an administrative request to "the appropriate Regional Director within 20 calendar days of the date the Warden signed the response," then to General Counsel of BOP). Some district courts have accepted that **[*12]** the exhaustion required for a court to consider a compassionate release request is in fact multi-tiered. *See Martinez-Brooks v. Easter, No. 3:20-CV-00569 (MPS), 2020 U.S. Dist. LEXIS 83300, 2020 WL 2405350, at \*25 (D. Conn. May 12, 2020)* (describing "multi-tiered" administrative appeals process for compassionate release request which "requires each inmate to appeal the denial by the Warden to a BOP Regional Director, followed by an appeal to the BOP General Counsel"); *United States v. Young, No. CR14-5242RJB, 2020 U.S. Dist. LEXIS 62286, 2020 WL 1673043, at \*2 (W.D. Wash. Apr. 6, 2020)* (finding defendant did not exhaust administrative remedies "by appeal to the Director of the Bureau of Prisons or to the Warden"); *United States v. Pinson, No. CR H-08-283,*

*2020 U.S. Dist. LEXIS 93393, 2020 WL 2771343, at \*3 (S.D. Tex. May 28, 2020)* (finding defendant had not exhausted administrative appeals where his request for compassionate release was denied by warden and he did not appeal denial). This court determines supplemental briefing is necessary to clarify the question of what steps are required for defendant to have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," given the statutory text of *§ 3582(c)* providing in the disjunctive for exhaustion within 30 days of the Warden's receipt of an inmate's request. The briefing should address whether BOP's **[*13]** program statements regarding exhaustion are binding authority in this context.

Accordingly, the parties SHALL simultaneously submit supplemental briefing on the two issues outlined above, with each brief limited to no more than 5 pages each and filed within 7 days of the filed date of this order.

IT IS SO ORDERED.

DATED: June 2, 2020.

/s/ Kimberly J. Mueller

CHIEF UNITED STATES DISTRICT JUDGE

_____

**End of Document**

## *United States v. Butler*

United States District Court for the Southern District of New York

April 7, 2020, Decided; April 7, 2020, Filed

1:18-CR-00834 (PAE)

**Reporter**
2020 U.S. Dist. LEXIS 61021 *

UNITED STATES OF AMERICA, -v- DENARD BUTLER, Defendant.

**Prior History:** *United States v. Mack, 2020 U.S. Dist. LEXIS 4280 (S.D.N.Y., Jan. 10, 2020)*

## Core Terms

sentence, factors, compassionate, reduction, reasons

**Counsel:** **[*1]** For Emma M. Greenwood, Coordinating Discovery Attorney: Emma Maya Greenwood, Greenwood Law Group PLLC, New York, ny.

For USA, Plaintiff: Jacob Edwin Warren, Michael Dayton Longyear, LEAD ATTORNEYS, United States Attorney's Office, SDNY, New York, NY; Jonathan Rebold, U.S. Attorney's Office For The Southern District of Ne, New York, NY.

**Judges:** PAUL A. ANGELMAYER, United States District Judge.

**Opinion by:** PAUL A. ANGELMAYER

## Opinion

ORDER

PAUL A. ENGELMAYER, District Judge:

The Court has received a request from counsel for defendant Denard Butler seeking Butler's compassionate release from the Metropolitan Detention Center ("MDC") in Brooklyn, New York, pursuant to *18 U.S.C. § 3582(c)*, in

Sydney Johnson

light of the heightened risk that the COVID-19 pandemic presents for him. Dkt. 453. The Government opposes this request. Dkt. 458.

Butler has been in prison since January 30, 2019. On June 5, 2019, he pled guilty to one count of participating in a racketeering conspiracy for his involvement in the Brooklyn-based Nine Trey Gangsta Bloods gang. On January 30, 2020, this Court sentenced Butler to a term of 60 months' imprisonment to be followed by three years' supervised release.

On April 3, 2020, Butler filed a letter motion seeking a modification of his sentence **[*2]** on grounds relating to the COVID-19 pandemic. Dkt. 453. Butler asks the Court to modify his sentence to enable him serve the remainder of his prison term—approximately 45 months—in home confinement. Dkt. 453. Butler notes that he suffers from asthma and bradycardia, a heart condition. He argues that removing him from the MDC would reduce the risk that he will contract COVID-19. *Id.*

On April 6, 2020, the Government filed a letter in opposition. Dkt. 458. It opposes Butler's early release for reasons including that Butler has yet to serve the bulk of his sentence, that he has a long and violent criminal history, and that his instant offense is serious. *Id.*

Under *18 U.S.C. § 3582(c)(1)(A)*, "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf," a court may reduce such defendant's sentence if it finds that "extraordinary and compelling circumstances warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." *18 U.S.C. § 3582(c)(1)(A)(i)*. The Court must also consider the "factors set forth in *section 3553(a)* to the extent that they are applicable." *Id. § 3582(c)(1)(A)*.

Here, **[*3]** the Government argues, at the threshold, that Butler's motion should be denied because he has failed to exhaust his administrative remedies, in that the BOP had not made a final decision and 30 days have not elapsed since Butler moved for compassionate release Dkt. 458. The Court need not reach this argument, however, because the Court concludes that a reduction of Butler's sentence is not warranted for two independent reasons. Such a reduction would not be "consistent with the applicable policy statements issued by the Sentencing Commission," *18 U.S.C. § 3582(c)(1)(A)(i)*, nor would it be supported by the "factors set forth in *section 3553(a)*," *id. § 3582(c)(1)(A)*.

Congress tasked the Sentencing Commission with identifying the circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence. *United States v. Ebbers, ___ F. Supp. 3d ___, No. (S4) 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020)* (quoting *28 U.S.C. § 994(t)*). Relevant here, the Commission's policy statement and its corresponding commentary on *§ 3582(c)(1)(A)* state that a court may reduce a sentence for "extraordinary and compelling reasons," including where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and **[*4]** from which he or she is not expected to recover."[1] *U.S.S.G. § 1B1.13(1)(A)* & *cmt. n.1(A)*. The defendant must also not be a danger to the community and the reduction must be consistent with the Commission's policy statement. *Id. § 1B1.13(2)-(3)*.

The first of these factors favors Butler's early release. The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration. COVID-19 presents a heightened risk for incarcerated defendants like Butler with respiratory and

---

[1] *U.S.S.G. § 1B1.13(1)(A)* references only "a motion of the Director of the Bureau of Prisons" because it has not yet been updated to reflect the **First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194**, which allows defendants independently to seek compassionate release relief from federal courts. *Ebbers, 2020 U.S. Dist. LEXIS 3746, 2020 WL 91399, at *1, 4*.

Sydney Johnson

2020 U.S. Dist. LEXIS 61021, *4

cardiac ailments. The Centers for Disease Control warns that persons with asthma[2] and serious heart conditions[3] are at high risk of serious illness if they contract the disease. Further, the crowded nature of federal detention centers such as the MDC present an outsize risk that the COVID-19 contagion, once it gains entry, will spread.[4] And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself. For these reasons, in the past two weeks, numerous courts, including this one, have ordered the temporary release of inmates held in pretrial or presentencing custody.[5]

The Court cannot find, however, that Butler "is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). First, the underlying conduct that led to Butler's sentence in this case gravely endangered the safety of the community. As a member of the Nine Trey gang, Butler participated in three incidents in March and April 2018 during which other gang members either brandished or fired gunshots in public spaces, including Times Square and the Barclays Center. While Butler was a secondary player in these incidents, as the Court noted at his sentencing, he willingly participated in conduct that "endangered not only the gang's intended target[s] but members of the public in the vicinity. Each time somebody easily could have gotten wounded, maimed or even killed." Dkt. 433 at 24-25.

Second, Butler's criminal records reflects a pattern of violent and dangerous conduct. He has two convictions, two years apart, for criminal possession **[*6]** of a loaded firearm, and a conviction for robbery in the first degree and criminal possession of a loaded firearm for which he was sentenced to 12 years' imprisonment. While the prospect of contracting COVID-19 undeniably presents a serious risk to Butler's health, his release some 45 months early at least equally exposes the community to a serious risk that he would resume violence.

The Court further cannot find that the application of the § 3553(a) factors favors such an early release. Two such factors, to be sure, are the "history and characteristics of the defendant," and "the need to provide the defendant with needed . . . medical care." 18 U.S.C. § 3553(a). These factors favor Butler's early release in light of the

---

[2] *See People with Moderate to Severe Asthma*, Ctrs. for Disease Control and Prevention (Mar. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.

[3] *See Underlying **[*5]** Conditions: High-Risk Conditions*, Ctrs. for Disease Control and Prevention (April 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html

[4] *See* Timothy Williams, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; *see also United States v. Nkanga, No. 18 Cr. 713 (JMF), 2020 U.S. Dist. LEXIS 56188, 2020 WL 1529535, at *1* (citing *Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control and Prevention 2 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf) (highlighting danger faced by those in jails and prisons).

[5] *See, e.g., United States v. Chandler, No. 19 Cr. 867 (PAC), 2020 U.S. Dist. LEXIS 56240, 2020 WL 1528120, at *1-3 (S.D.N.Y. Mar. 31, 2020)* (granting bail application, pursuant to 18 U.S.C. § 3142(i), of defendant charged with being a felon in possession of a firearm); *United States v. McKenzie, No. 18 Cr. 834 (PAE), 2020 U.S. Dist. LEXIS 55503, 2020 WL 1503669, at *2-3 (S.D.N.Y. Mar. 30, 2020)* (granting bond pending sentencing, pursuant to 18 U.S.C. § 3145(c), to defendant who had pleaded guilty to single count of assault with a deadly weapon and had previously been released on bond); *United States v. Hernandez, No. 19 Cr. 169 (VM), 2020 U.S. Dist. LEXIS 56506, 2020 WL 1503106, at *1 (S.D.N.Y. Mar. 30, 2020)* (granting bail application, pursuant to § 3142(i), of 64-year-old defendant with asthma and high blood pressure that placed him "at a substantially heightened risk of dangerous complications should he contract COVID-19"); *United States v. Witter, No. 19 Cr. 568 (SHS), Dkt. 40 at 2-3, 2020 U.S. Dist. LEXIS 53189 (S.D.N.Y. Mar. 26, 2020)* (granting bond pending sentencing, pursuant to § 3145(c), to defendant who had pleaded to a narcotics offense); *United States v. Perez-Lopez, No. 19 Cr. 297 (PAE), 2020 U.S. Dist. LEXIS 47515, 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020)* (granting bail application, pursuant to § 3142(i), of 65-year-old defendant with COPD, in light of "unique confluence of serious health issues and other risk factors facing this defendant, . . . which place him at a substantially heightened risk of dangerous complications should [he] contract COVID-19"); *cf. United States v. Stephens, ___ F. Supp. 3d ___, No. 15 Cr. 95, 2020 WL 1295155 (AJN), at *3 (S.D.N.Y. Mar. 19, 2020)* (granting defendant's request for reconsideration of bail conditions and releasing him to home confinement, while noting that, in the alternative, § 3142(i) would necessitate his temporary release).

Sydney Johnson

2020 U.S. Dist. LEXIS 61021, *5

COVID-19 pandemic for the reasons discussed above. But they are outweighed by the combined force of several other factors: "the nature and circumstances of the offense" and "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law . . . to provide just punishment for the offense . . . to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." For the reasons stated in detail at Butler's **[\*7]** sentencing, Dkt. 433, which the Court incorporates by reference, a sentence in the range of 60 months imprisonment was necessary to achieve those goals. Converting Butler's sentence to one of home confinement, when he has served just 15 months of a 60-month term of incarceration, would disserve these important *§ 3553(a)* factors. In this respect, Butler's case is far cry from those in which this Court in the past week, given the changed circumstances presented by COVID-19, has ordered or urged the BOP to approve compassionate release for defendants who had served a substantial majority of their sentences. *See, e.g., United States v. Hernandez, No. 18 Cr. 834 (PAE), Dkt. 451, 2020 U.S. Dist. LEXIS 58739 (S.D.N.Y. April 2, 2020)* (ordering compassionate release of co-defendant of Butler's who had served 17 months of a 24-month sentence and was scheduled for release in four months); *United States v. Jasper, Dkt. 18 Cr. 390 (PAE), Dkt. 441, 2020 U.S. Dist. LEXIS 60588 (S.D.N.Y. April 6, 2020)* (ordering compassionate release of defendant who had served all but 34 days of a 4-month sentence); *United States v. Knox*, 15 Cr. 445 (PAE), Dkt. 1078 (S.D.N.Y. April 2, 2020) (recommending that BOP approve the compassionate release of defendant who has served all but 7 months of an 88-month sentence).

Accordingly, finding that Butler continues to pose **[\*8]** a danger to the community and that the *§ 3553(a)* factors do not support a reduction of sentence, the Court denies Butler's motion for compassionate release pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)*.

SO ORDERED.

Dated: April 7, 2020

New York, New York

/s/ Paul A. Engelmayer

PAUL A. ENGELMAYER

United States District Judge

---

**End of Document**

Sydney Johnson

### *United States v. Araña*

United States District Court for the Eastern District of Michigan, Southern Division

May 7, 2020, Decided; May 7, 2020, Filed

Case No. 2:95-cr-80272-LJM-13

**Reporter**

2020 U.S. Dist. LEXIS 80394 *

UNITED STATES OF AMERICA, Plaintiff, v. LUIS ARAÑA, D-13, Defendant.

**Prior History:** *United States v. Arana, 18 F. Supp. 2d 715, 1998 U.S. Dist. LEXIS 11320 ( E.D. Mich., July 24, 1998)*

**Counsel:** [*1] For United States of America, Plaintiff: Wayne F. Pratt, LEAD ATTORNEY, Kevin Mulcahy, U.S. Attorney's Office, Detroit, MI.

**Judges:** LAURIE J. MICHELSON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LAURIE J. MICHELSON

# Opinion

### OPINION AND ORDER ON DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE [842]

Luis Araña was sentenced to life in prison after a jury convicted him of serious drug and murder offenses, including arranging the killing of his former partner in a cocaine trafficking enterprise. Araña is 68 years old and has served 24 years of his sentence. His health is deteriorating and so he now seeks compassionate release from prison. For the following reasons, the motion is DENIED.

I.

In affirming Araña's convictions, the United States Court of Appeals for the Sixth Circuit provided a helpful summary of the underlying facts:

[Luis] Araña, [Gilberto Felipe] Hernandez, and [Jose Alberto] Reyes were charged with various crimes directly and indirectly connected to the death of Gil Debasa, Araña's former partner in a drug dealing enterprise. Araña was the leader of a large-scale drug trafficking organization that moved cocaine between Miami and Detroit. Araña's partner was "Gallego" (Gil Debasa); the two had grown up in the [*2] same neighborhood of Havana, Cuba, and had been very close. Upon moving to the United States, Araña and Debasa began a cocaine importation ring. Araña sent cocaine from Miami to Detroit, and Debasa distributed the product in the Detroit area.

However, Debasa and Araña began to quarrel. Araña claims the dispute was about a woman; apparently a third party, named "Iran," made advances to Araña's girlfriend. Debasa was drawn into the conflict because both Iran and Araña were his friends. He told the two that he wished to remain neutral in the conflict. Araña thought that Debasa was taking sides with Iran, and became angry with him.

There were also disagreements about drug money. Debasa began to have trouble paying Araña for the cocaine that he had received. Araña stopped supplying Debasa with cocaine, because Debasa could not pay Araña for his previous shipments. Araña and Debasa eventually stopped working together; witnesses testified at trial that the money was the primary reason for the breakdown in the relationship.

Both Araña and Debasa continued to deal cocaine independently, although Debasa sold much less because his supply was disrupted by the dispute

with Araña. Araña claimed Debasa [*3] owed him a substantial amount of money for cocaine based on their prior distribution relationship. Araña told Jose Balsce, an associate of the Araña cartel, that Debasa owed him $75,000, and told another witness that the amount was $46,000 plus a kilogram of cocaine.

Each defendant played a part in the slaying of Gil Debasa. The plot began when Araña offered Balsce $20,000 to murder Debasa. Balsce agreed, and Araña detailed Hernandez, a street-level drug dealer and enforcer, to help Balsce with the murder. Hernandez gave Balsce a gun, and drove the getaway car. On November 26, 1994, Balsce entered the V&L Bar in Detroit, and shot Debasa multiple times. Debasa was mortally wounded, but was able to identify Balsce as the killer before dying. Hernandez and Balsce then traveled to Chicago immediately after the murder. Defendant Reyes gave the two money for a hotel room once they reached Chicago, and Araña reimbursed Reyes for the expense. Reyes then paid Balsce for the murder on behalf of Araña with $10,000 and a half a kilogram of cocaine.

Reyes also handled many other aspects of the Araña operation's day-to-day affairs, and was central to the drug distribution conspiracy, although his [*4] involvement with the murder was tangential. Reyes was a drug courier for the Araña organization; he transported up to 30 kilograms of cocaine from Miami to Detroit at a time. . . .

Defendants were convicted on all counts, largely on the testimony of Balsce, who testified for the prosecution.

*United States v. Reyes, 51 F. App'x 488, 490-91 (6th Cir. 2002).*[1]

Araña was convicted of conspiracy to possess cocaine with intent to distribute (Count 1); murder-for-hire (Count 2); aiding and abetting an intentional killing (Count 3); and aiding and abetting a firearms murder in relation to a drug trafficking crime (Count 4). He was sentenced by now-retired District Judge Gerald E. Rosen in May of 1999 to four concurrent terms of life imprisonment. (ECF No. 792, PageID.313.) According to one of the Assistant

United States Attorneys who prosecuted the case, Judge Rosen expressed his belief that a life sentence was the fair and appropriate sentence. (ECF No. 846, PageID.642.)

Araña says that, at age 68, he is a different person today. During his 24 years in prison, he has completed more than 50 programs, including on decision-making, job skills, self-management, handling stress, and avoiding recidivism. (ECF No. 842-2, PageID.649.) He also earned his GED. ( *[*5] Id.*) He completed the drug program and the Challenge Program, which "is a cognitive-behavioral, residential treatment program" that provides "treatment to high security inmates with substance abuse problems and/or mental illnesses." (ECF No. 842-7.) He acknowledges some disciplinary incidents during his prison time—possessing a dangerous weapon in 1999, fighting in 2000, and possessing an unauthorized item in 2011—but notes that these violations all occurred roughly a decade or two ago.

More significantly, he says "his medical condition has deteriorated dramatically in the last year, as he suffered an attack of acute pancreatitis requiring emergency surgery. This has led to lasting debilitating pain and left him wheelchair-bound." (ECF No. 842, PageID.631.) He also receives treatment for infection prevention, high blood pressure, chronic anemia, obesity, enlarged prostate, kidney failure, and edema, and is prescribed over 20 medications. (*Id.*)

On October 24, 2019, Araña petitioned the administration at his prison (located in Victorville, California) for early release.

About five months later, in March 2020, he was examined by a staff doctor. The doctor noted many things that Araña was [*6] able to do with little or no assistance. (ECF No. 846, PageID.684.) But he ultimately concluded that Araña met the standard of Debilitated and Elderly with Medical Conditions. (*Id.*) So the warden at FCC Victorville sent paperwork to the Bureau of Prisons ("BOP") in Washington, D.C., for consideration of granting a sentence reduction.

The BOP denied the request. A doctor who serves as the medical director at the BOP Central Office noted that Araña is independent with all aspects of his Activities of Daily Living (ADLs) and Instrumental Activities of Daily Living (IADLs), including transfers, medication management, using handicapped transportation, and navigating the correctional environment. (ECF No. 846, PageID.685.) The medical

---

[1] In prior briefings, the Government explained that the trial evidence further revealed that Araña typically distributed 30-40 kilograms of cocaine per month, occasionally distributing 70 kilograms in a single transaction. (*See* ECF No. 767, PageID.213.)

director explained that Araña is able to self-propel his wheelchair and transfer in and out of it. (*Id.*) He can walk short distances (20-30 feet) safely without support. (*Id.*) And the medical director found that while Araña's medical conditions are considered chronic, they are stable at this time. (*Id.*) Thus, he concluded in mid-April 2020, that Araña does not currently meet the criteria for a reduction in sentence regarding elderly inmates with medical conditions. **[\*7]** (*Id.*)

Prior to receiving this information, but more than 30 days after requesting relief from the warden, Araña filed this motion for compassionate release based on his age and medical conditions. (ECF No. 842, PageID.633.) He asks the Court to reduce his sentence to time served and release him to live with his adult children. (*Id.*) After the filing, the global coronavirus pandemic hit, which Araña says also supports his immediate release. (ECF No. 847.) The Government acknowledges that Araña's medical condition is serious, but believes it is insufficient to warrant compassionate release at this time, especially given the BOP's ability to handle these medical issues and the nature and seriousness of the underlying offenses. (ECF No. 846, PageID.646.) The Court heard argument at a videoconference hearing on April 30, 2020.

## II.

Unless a specific exception applies, a "court may not modify a term of imprisonment once it has been imposed." *18 U.S.C. § 3582(c)*. The 2018 First Step Act (FSA) provides such an exception. Under the Act, "the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights . . . may reduce **[\*8]** the term of imprisonment . . . after considering the factors set forth in *section 3553(a)* . . . if it finds that extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ." *18 U.S.C. § 3582(c)(1)(A)* (internal numbering omitted).

## A.

The Government does not dispute that Araña has properly exhausted his administrative remedies. (ECF No. 846, PageID.647.) Nor does it strongly dispute that Araña's physical condition constitutes "extraordinary and compelling circumstances."

While Congress has not further defined "extraordinary and compelling," the current policy statement of the Sentencing Commission, adopted before the enactment of the FSA, provides that extraordinary and compelling reasons for a sentence reduction exist where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *U.S.S.G. § 1B1.13 comment n.1(A)(ii)*. Another extraordinary and compelling circumstance exists where "[t]he defendant (i) is at least 65 years old; (ii) is experiencing **[\*9]** a serious deterioration in physical or mental health because of the aging process: and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." *U.S.S.G. § 1B1.13 cmt. n.1(B)*.

The Government believes that only the latter applies. (ECF No. 846, PageID.689.) Araña is 68 years old. He has served 24 years of his life sentence. It is debatable whether Araña's deteriorating medical condition as a result of his pancreatitis "meets the standard of Debilitated and Elderly with Medical Conditions, which is required for consideration for a reduction in sentence." (ECF No. 846, PageID.684.) At least one staff doctor at FCC Victorville concluded that his condition met the standard, while the BOP Medical Director disagreed. Thus, the Government believes this is a close call and even if Araña does not completely cross the medical threshold today, he is close.

The Government further believes that the critical issue in determining the propriety of compassionate release is not whether Araña meets the "extraordinary and compelling reasons" criteria listed in the Policy Statement. So the Court will assume he does.

## B.

But, says the Government, "[m]eeting this qualification, standing alone, **[\*10]** does not mandate release." (ECF No. 846, PageID.689.) While "the Court has discretion to reduce a sentence where the triggering predicate exists," it "must analyze all applicable *§ 3553(a)* factors, must determine that the defendant is not a danger (per *18 U.S.C.] § 3142(g)*), and must find any reduction compliant with applicable Sentencing Commission policy statements." *United States v. Karr, No. 17-CR-25, 2020 U.S. Dist. LEXIS 27149, at \*8 (E.D. Ky. Feb. 18, 2020)*.

According to the Government, "[t]here is no reason to believe that the defendant poses a danger to others or a risk of recidivism if released, at this age and in this medical condition." (ECF No. 846, PageID.686.)

Thus, central to deciding Araña's motion is whether a sentence reduction is consistent with the factors set forth in *18 U.S.C. § 3553(a)*, to the extent they apply. See *United States v. Gotti, 2020 U.S. Dist. LEXIS 8612, at *5 (S.D.N.Y. Jan. 15, 2020)* ("The court confronted with a compassionate release motion is still required to consider all the *Section 3553(a)* factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because *Section 3553(a)* factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances."). These factors require the Court to consider whether early release is consistent with (1) the nature and circumstances of Araña's offenses and **[*11]** personal history, (2) the need to promote respect for the law, deter future crimes, provide for Araña's rehabilitation, and protect the public, and (3) the need to avoid unwarranted sentence disparities among defendants with similar records. *18 U.S.C. § 3553(a)*.

According to the presentence report, while Araña had no prior criminal history, he was involved in drug trafficking for many years (at least 1989-1996) before getting caught. (PSR, ¶ 14.) In the early 1990s, the cocaine distribution grew to multiple kilogram transactions. (*Id.*) But the underlying offense involved more than just drug dealing. It also involved a murder orchestrated by Araña. The Court agrees with the Government that "[i]t is not possible to [over]state the seriousness of the defendant's offense. The defendant was a Miami narco-trafficker who ordered a drug-related hit." (ECF No. 846, PageID.682.) True, in his present condition Araña poses little risk of engaging in the same behavior. And while in prison he has participated in programming to better his life and has "for the most part maintained clear conduct." (ECF No. 842, PageID.643.) He has also maintained strong relationships with his children, who have expressed a willingness **[*12]** to take care of him. (ECF No. 842, PageID.633.)

But the Court also has to consider a sentence that will promote respect for the law, provide just punishment, be an adequate deterrent, and avoid unwarranted sentencing disparities. At the time, the presiding judge believed that life was the appropriate sentence. To this day, Araña has never taken any responsibility or expressed any remorse for his conduct. Within the last

two years, he has accused the prosecuting attorneys and his own trial counsel of misconduct. (*See* ECF No. 835, 836.) So, says the Government, "while Araña doesn't pose a danger to the community of getting back into the cocaine business," we "should not be tricking ourselves into thinking that he is some kind of remade person who has turned over a new leaf and is somehow different at the end of his life." (Draft Hr'g Tr., Apr. 30, 2020.) Also, the co-defendant who carried out the murder served 24 years in prison. While a 24-year sentence for Araña might seem like a non-disparate sentence, his co-defendant accepted responsibility, agreed to cooperate, and testified against the others at trial.

An analysis of the *§ 3553(a)* factors presents another close call. The Government says, **[*13]** "This is not a prisoner deserving of special consideration and leniency from this court in a close case." (ECF No. 846, PageID.690.) Araña's brief says, "[s]uffering in prison, being away from his family during this devastating chapter of his life, having to struggle with his grievous medical conditions while under the extreme stress of incarceration—all of these factors have conspired to make the time Mr. Araña has already served far harder than prison time otherwise would be." (ECF No. 842, PageID.642-643.)

What does the case law say? There are a number of cases addressing compassionate release for sick and elderly defendants serving life sentences that provide some guidance. But only a few arise out of underlying convictions involving murder. For example, in *United States v. Logan, No. 96-cr-20, 2020 U.S. Dist. LEXIS 25222 (W.D. Ky. Feb. 13, 2020)*, the defendant was sentenced to life in prison for setting a hotel on fire, which ultimately killed four people and injured fifteen others. Although the defendant was 81 years old, had served more than 22 years of his sentence, and was suffering from serious health conditions (prostate cancer in remission, glaucoma, visual impairment in the left eye, type II diabetes, stage III chronic kidney **[*14]** disease, degenerative arthritis, folate deficiency, dysphasia, anemia, planta fascial fibromatosis, sciatica, arthropathy, reflux esophagitis, eczema, depression), the court found that reducing his sentence would minimize the nature and seriousness of the offense. *Id. at * 9*; *cf. United States v. Gotti, 02 CR 743-07, 2020 U.S. Dist. LEXIS 8612 (S.D.N.Y. Jan. 15, 2020)* (denying compassionate release motion in the alternative based on 3553(a) factors because defendant, who was sentenced to 300 months' imprisonment consecutive to a 112-month sentence,

had been the "Acting Boss of the Gambino Crime Family" and had "personally ordered the death of a Government cooperator"); _United States v. Webster, No. 91-cr-138, 2020 U.S. Dist. LEXIS 23224 (E.D. Va. Feb. 10, 2020)_ (denying compassionate release motion of defendant with terminal cancer who had killed his estranged girlfriend and was sentenced to life in prison for murder in state court and a consecutive 10-year sentence in federal court for unlawful possession of the firearm.).

The court reached a different result in _United States v. Wong Chi Fai, No. 93-CR-1340, 2019 U.S. Dist. LEXIS 126774 (E.D.N.Y. July 30, 2019)_. There, the defendant was the leader of a New York gang. He was convicted of extortion and racketeering conspiracies and for his involvement in murders in furtherance of the conspiracies. At the time Wong filed for compassionate release, he was 65 years old and had served **[*15]** 26 years of his life term. He had no disciplinary violations. Three years prior to the filing, he was diagnosed with metastatic thyroid cancer. Multiple surgeries and radiation were not effective. A mass in his throat prevented him from eating solid foods. A BOP doctor diagnosed terminal cancer with an estimated 12-month life expectancy. In evaluating the _§ 3553(a)_ factors, the Court noted that "Mr. Wong has already served 26 years of his life sentence, the last three of which have been spent in medical purgatory," and so "[a]t this stage, to require Mr. Wong to serve out the rest of his life sentence would be 'greater than necessary to serve the purposes' of _18 U.S.C. § 3553(a)(2)_." _Id. at *12-13_.

The reference to "medical purgatory" came, in part, from _United States v. McGraw, No. 02-cr-00018, 2019 U.S. Dist. LEXIS 78370 (S.D. Ind. May 9, 2019)_. There, the court also granted compassionate release to the leader of a motorcycle gang who had served approximately 16 years of a life sentence for conspiracy to possess with intent to distribute methamphetamine. At the time, defendant was 72 years old and suffered from a variety of severe chronic illnesses, including diabetes, hyperlipidemia, emphysema, chronic kidney disease stage III, Hepatitis C and chronic pain. Applying the _section 3553(a)_ factors, **[*16]** the court remarked that defendant "has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in _§ 3553(a)(2)_." _Id. at *15-16_.

In granting compassionate release to another defendant sentenced to life, another court noted that the defendant, a major drug trafficker, had not engaged in any violence. _United States v. Mondaca, No 89-CR-0655, 2020 U.S. Dist. LEXIS 37483 (S.D Cal. Mar. 3, 2020)_. The defendant was 77 years old, had served at least 10 years of his term of imprisonment, and as a result of serious deterioration in his physical and mental health had become suicidal and "increasingly vulnerable to victimization within the correctional facility." _Id. at *8-9_. The court found that the nature and circumstances of the offense charged did not reveal a propensity for violence or danger to others. The court stated that "although [d]efendant's crime involves controlled substances and the relevant conduct attributed to [d]efendant preceding the conviction reveals a deeply entrenched drug trafficker, neither violence nor weapons has ever been noted." _Id. at * 10_.

Araña's **[*17]** situation is materially different than Wong's, McGraw's, and Mondaca's. In addition to large scale drug-trafficking, this case involves the ultimate violence—the taking of a human life. That distinguishes Araña's conduct from McGraw's and Mondaca's. And while it is undoubtedly true that Araña's health has deteriorated significantly in the past year due to his pancreatitis, he is not suffering from a terminal illness, nor has he spent years of his sentence while seriously ill and in physical discomfort. That makes his situation different than Wong's. At this time, the record does not support that "his sentence has been significantly more laborious than that served by most inmates." _McGraw, 2019 U.S. Dist. LEXIS 78370, at * 15-16_. Lastly, it is beyond dispute that the coronavirus pandemic poses a heightened risk to those in custody and with other serious medical conditions. So Araña is justifiably concerned. But he is presently housed at a facility that does not appear to have any inmates who have tested positive for COVID-19. And the BOP has been managing Araña's treatment. They have also expressed a willingness to reevaluate a request for compassionate release if "there is evidence of further disease or deterioration in the prisoner's **[*18]** condition." (ECF No.846, PageID.686.)

III.

Thus, although the Court sympathizes with Araña's current medical condition, it finds that, on balance, the applicable _§ 3553(a)_ factors do not support Araña's request for compassionate release at this time. The motion is DENIED without prejudice to refiling should

2020 U.S. Dist. LEXIS 80394, *18

there be significant deterioration in Araña's condition.

SO ORDERED.

Dated: May 7, 2020

/s/ Laurie J. Michelson

LAURIE J. MICHELSON

UNITED STATES DISTRICT JUDGE

---

**End of Document**

## *United States v. Bass*

United States District Court for the Northern District of New York

May 27, 2020, Decided; May 27, 2020, Filed

1:10-CR-166 (LEK)

**Reporter**
2020 U.S. Dist. LEXIS 102543 *; 2020 WL 2831851

UNITED STATES OF AMERICA, Plaintiff, -against-CHRISTOPHER BASS, Defendant.

**Counsel:  [*1]** For Christopher Bass, Defendant: Gene V. Primomo, LEAD ATTORNEY, Office of the Federal Public Defender - Albany Office, Albany, NY USA; Lisa A. Peebles, Office of the Federal Public Defender - Syracuse Office, Syracuse, NY USA.

For U. S. Attorneys: Edward P. Grogan, Jeffrey C. Coffman, LEAD ATTORNEYS, Office of United States Attorney - Albany James T. Foley U.S. Courthouse, Albany, NY USA.

**Judges:** Lawrence E. Kahn, Senior United States District Judge.

**Opinion by:** Lawrence E. Kahn

# Opinion

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Christopher Bass, an inmate currently incarcerated at the Elkton Federal Correctional Institution ("FCI Elkton"), moved on May 21, 2020 for compassionate release under *18 U.S.C. § 3582(c)(1)(A)*. Dkt. No. 84 ("Motion").

As a basis for release, Bass cites his age, his health conditions, and the risk of infection presented by circumstances at FCI Elkton. Id. at 2. He also points to BOP's April 30 determination that he satisfies the preliminary injunction subclass criteria set out in an April 22 Order by a court in the Northern District of Ohio mandating the immediate release or transfer of medically vulnerable inmates from FCI Elkton. Id.; see also *Wilson v. Williams, No. 20-CV-794, 2020 U.S. Dist. LEXIS 70674, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020) ("April 22 Order")*; id., Dkt. No. 35-1 at 4 ("Subclass List"). The Government **[*2]** opposes the Motion, as indicated in the Government's May 26, 2020 Response. Dkt. No 89 ("Response").

For the following reasons, the Court grants Defendant's Motion.

## II. BACKGROUND

On October 27, 2011, this Court sentenced Bass to 151 months imprisonment after he pled guilty to one count of mail fraud and one count of attempting to evade or defeat income tax. Dkt. No. 42 at 1. Bass was delivered to FCI Elkton on January 17, 2012, Dkt. No. 47, where he has resided since. His actual release date, based on good time credit, is October 29, 2020. *Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/; Dkt. No. 87 ("Letter Requesting Extension") (letter from the United States Attorney for the Northern District of New York indicating that "the government has verified that Bass's expected release date is, in fact, October 29, 2020.").

FCI Elkton has endured an outbreak of COVID-19 that has been exacerbated by features of the prison's internal architecture that inhibit social distancing. As of the date of this order, FCI Elkton reports 203 cases of COVID-19 among inmates and 7 among staff. *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited **[*3]** May 27, 2020). Seventy-six inmates and 46 staff members have previously been infected and since recovered. Id.

2020 U.S. Dist. LEXIS 102543, *3

Nine inmates have so far died. Id. Moreover, "the prison's dorm-style design guarantees that inmates remain in close proximity to one another." *Wilson, 2020 U.S. Dist. LEXIS 70674, 2020 WL 1940882, at *1* (internal quotation marks omitted).

On April 3, 2020, the Attorney General released a memorandum recognizing a "significant level[] of infection" at FCI Elkton and recommending "immediately" transferring "vulnerable inmates" to home confinement. Memorandum from Attorney General William Barr to Director of Bureau of Prisons, *The Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020) ("April 3 Memo").

On April 13, 2020, a class of inmates at FCI Elkton filed an action pursuant to *28 U.S.C. § 2241* seeking relief from detention under conditions that allegedly violate their *Eighth Amendment* rights. Wilson, No. 20-CV-794, Dkt. No. 1 at 3. On April 22, the court in *Wilson* granted a preliminary injunction to a subclass of medically vulnerable inmates, mandating that inmates in that subclass be immediately transferred out of FCI Elkton. See *Wilson, 2020 U.S. Dist. LEXIS 70674, 2020 WL 1940882, at *6, 10*. The court defined the subclass as follows:

> [A]ll Elkton inmates 65 years or older and those with **[*4]** documented, pre-existing medical conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher).

*2020 U.S. Dist. LEXIS 70674, [WL] at *6*. This definition tracks the Centers for Disease Control guidelines indicating what age and health conditions place an individual at risk of severe illness from COVID-19. *2020 U.S. Dist. LEXIS 70674, [WL] at *6 n.50*. The court provided BOP with a non-exclusive list of options for transferring inmates on the Subclass List out of FCI Elkton: (1) compassionate release; (2) parole or community supervision; (3) transfer furlough;[1] and (4)

non-transfer furlough.[2] *2020 U.S. Dist. LEXIS 70674, [WL] at *10*. The court ordered the Bureau of Prisons ("BOP") to submit a list of inmates who met the subclass definition within one day of the April 22 Order, and to transfer all inmates on that list out of FCI Elkton no later than 14 days after that order was issued. Id.

On April 30, 2020, BOP submitted the Subclass List, which included 837 inmates at FCI Elkton. Wilson, No. 20-CV-794, Dkt. Nos. 35-1; 49 at 1. Bass is on this list. Wilson, Dkt. No. 35-1 **[*5]** at 4.

Bass maintains that, at some time in late April, he "along with several other inmates were corralled and placed in quarantine . . . [and] told they were being released to home confinement after 14 days." Mot. at 6. Nevertheless, "after spending 14 days in quarantine, prison officials, without explanation, told them all they would not be released," and then returned Bass and the others to the general population. Id.

Bass states that on May 4, he filed an administrative application for compassionate release. Mot. at 17.[3] The Warden denied this application on May 8. Id. at Ex. 2 ("Denial Letter").

On May 19, 2020, the *Wilson* court granted a motion by the plaintiffs to enforce the April 22 preliminary injunction and ordered BOP to take steps to comply with the preliminary injunction. Dkt. No. 85 ("May 19 Order"). In the May 19 Order, the court found that BOP was still largely out of compliance with the April 22 Order:

> As of May 8, 2020, five subclass members were pending home confinement community placement. Six inmates were identified as maybe qualifying for home confinement. No inmates were deemed eligible for furlough transfer. But to date, Respondents have not identified any inmates **[*6]** whose confinement has actually been enlarged as a consequence of the preliminary injunction. Such results do not comply with this Court's previous Order.

Id. at 4 (internal quotation marks and alterations omitted). In responses to the May 19 Order, the

---

[1] See *28 C.F.R. § 570.32(a)* ("A furlough for the purpose of transferring an inmate from one Bureau facility to another, a non-federal facility, or community confinement (including home confinement)[.]").

[2] See *28 C.F.R. § 570.32(b)* ("A furlough for any purpose other than a transfer furlough, and which may be defined based on its nature, as either emergency or routine[.]").

[3] The Court notes that the parties have not provided documentation establishing the date on which Bass submitted his administrative compassionate release application.

2020 U.S. Dist. LEXIS 102543, *6

Government did not indicate that it has released or transferred any inmates since May 8. Wilson, Dkt. Nos. 89, 91.

On May 21, Bass filed the Motion that is the subject of this order. In the Motion, he states that he is 63 years old. Mot. at 2. He asserts that he has hypertension and previously endured a mild heart attack and a stroke. Id. He has not submitted medical records. As indicated in an affidavit by an investigator employed by the Office of the Federal Public Defender, Bass's attorney has attempted to obtain Defendant's medical records from FCI Elkton but has been unable to reach them by e-mail or phone after several attempts. Mot. Ex. 1. The Government has indicated that it also has been unsuccessful in obtaining Defendant's medical records. Response at 5. Defendant's Pre-Sentence Investigation Report ("PSIR") from 2011 confirms that he reported suffering a mild heart attack in 1991 and a mild stroke in 2009 but does not mention hypertension. [*7] PSIR ¶ 45.

Bass is still detained at FCI Elkton.

## III. LEGAL STANDARD

As amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment:

> [U]pon motion of the Director of the Bureau of Prisons [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, after considering the factors set forth in [18 U.S.C. § 3553(a)] to the extent that they are applicable, if it finds that—
> (i) extraordinary and compelling reasons warrant such a reduction
> ***
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

§ 3582(c)(1)(A).

Section 1B1.13 of the United States Sentencing Guidelines contains the only policy statement issued by the Sentencing Commission pertaining to compassionate release. This policy statement, which has not been amended since the passage of the First Step Act, states, in relevant part:

> Upon motion of the Director of the [BOP] under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does [*8] not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
> (1) (A) extraordinary and compelling reasons warrant the reduction;
> . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);
> and (3) the reduction is consistent with this policy statement.

§ 1B1.13.

Section 1B1.13 provides that extraordinary and compelling reasons exist in the following situations:

> (A) Medical Condition of the Defendant.—
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> (ii) The defendant is—
> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the [*9] ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
> (B) Age of the defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because

of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

§ 1B1.13 cmt. n.1.

## IV. DISCUSSION

### A. Exhaustion

As indicated above, the Court must first determine whether Bass has exhausted his administrative remedies as required to pursue his Motion, or, if not, whether the Court may waive the exhaustion requirements in this case.

Bass states that on May **[*10]** 4, he submitted a request to BOP for a sentence reduction under § 3582(c)(1)(A) based on concerns about his underlying health conditions in light of their interaction with COVID-19. See Mot. at 17; Ex. 2. The Warden denied this request on May 8. Id. Because it does not appear that Bass has completed available administrative appeals, and because 30 days have not passed since May 4,[4] Bass has not exhausted his administrative remedies. For the reasons stated below, the Court waives the exhaustion requirement.

The Court recognizes that several of its sister courts have ruled that § 3582's exhaustion requirement cannot be excused due to the exigencies of the COVID-19

pandemic. See, e.g., United States v. Roberts, No. 18-CR-528, 2020 U.S. Dist. LEXIS 62318, 2020 WL 1700032, at *2-5 (S.D.N.Y. Apr. 8, 2020); United States v. Pereyra-Polanco, No. 19-CR-10, 2020 U.S. Dist. LEXIS 65743, 2020 WL 1862639, at *1 (S.D.N.Y. Apr. 14, 2020); United States v. Hernandez, No. 18-CR-834, 2020 U.S. Dist. LEXIS 60535, 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020). However, numerous other courts have determined that the exhaustion requirement is excusable under certain circumstances. See United States v. Colvin, No.19-CR-179, 2020 U.S. Dist. LEXIS 57962, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020); United States v. Perez, 17-CR-513, 2020 U.S. Dist. LEXIS 57265, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020); United States v. Zukerman, No. 16-CR-194, 2020 U.S. Dist. LEXIS 59588, 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020).

As it did in its previous compassionate release decisions, the Court "joins others in this Circuit" that have found that the exhaustion requirement is excusable. See United States v. Rountree, No. 12-CR-308, 2020 U.S. Dist. LEXIS 91064, 2020 WL 2610923 *5-6 (N.D.N.Y. May 18, 2020) (Kahn, J.); United States v. Logan, No. 12-CR-307, Dkt. No. 140, at 6, 2020 U.S. Dist. LEXIS 103617 (N.D.N.Y. April 22, 2020) (Kahn, J.); **[*11]** United States v. Salvagno, No. 02-CR-51, Dkt. No. 1166, at 7, 2020 U.S. Dist. LEXIS 95844 (N.D.N.Y. April 23, 2020) (Kahn, J.).

As an initial matter, the Court agrees with its peers who have determined that § 3582's exhaustion requirement is a claims-processing rule, rather than a jurisdictional requirement. A rule qualifies as jurisdictional only if "Congress has clearly stated that the rule is jurisdictional." Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 153, 133 S. Ct. 817, 184 L. Ed. 2d 627 (2013). But § 3582 "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the [federal] courts." United States v. Haney, No. 19-CR-541, 2020 U.S. Dist. LEXIS 63971, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)). Moreover, the provision is "not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment." Id. (quoting United States v. Taylor, 778 F.3d 667, 671 (7th Cir. 2015)). Rather, the exhaustion requirement "seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." United States v. Scparta, No. 18-CR-578, 2020 U.S. Dist. LEXIS 68935, 2020 WL 1910481, at *4 (S.D.N.Y. Apr.

---

[4] The parties have not documented the date of submission. For purposes of this order, since Defendant does not maintain otherwise, the Court assumes that 30 days have not passed since the date of submission.

*20, 2020)* (quoting *Henderson v. Shinseki, 562 U.S. 428, 435, 131 S. Ct. 1197, 179 L. Ed. 2d 159 (2011))*. It governs the process by which a compassionate release claim may be brought, by specifying who may bring such claim, and when. See id. For these reasons, the rule is not jurisdictional in nature. See *United States v. McIndoo, No. 15-CR-142, 2020 U.S. Dist. LEXIS 80487, 2020 WL 2201970, at *6 (W.D.N.Y. May 6, 2020)* ("*[Section] 3582(c)(1)(A)*'s exhaustion requirement is a claim-processing rule, not a jurisdictional prerequisite."); *United States v. Gentille, No. 19-CR-590, 2020 U.S. Dist. LEXIS 62680, 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020)* (same).

Although *§ 3582*'s exhaustion requirement **[*12]** is not jurisdictional, whether the Court can excuse a defendant's failure to comply with this statutory requirement is a separate question, one the Court answers in the affirmative. "Even where," as here, "exhaustion is seemingly mandated by statute . . . the requirement is not absolute." *Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019)*. "Congressional intent is 'paramount' to any determination of whether exhaustion is mandatory." See *United States v. Haney, No. 19-CR-541, 2020 U.S. Dist. LEXIS 63971, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020)* (quoting *McCarthy v. Madigan, 503 U.S. 140, 144, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992)*). In amending *§ 3582(c)(1)(A)* via the First Step Act, Congress sought to "expand compassionate release" and "expedite[] compassionate release applications." *164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018)*; see also Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n (2016) (statement of Michael E. Horowitz, Inspector General, Department of Justice) ("The First Step Act—and the critical 30-day lapse route it provided [in *§ 3582(c)(1)(A)*'s exhaustion requirement]—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision."). These concerns are reflected in the statute, which instructs courts to consider whether any of a variety of exigent circumstances constitute "extraordinary and compelling reasons" that **[*13]** merit release. See *United States v. Soto, No. 18-CR-10086, 2020 U.S. Dist. LEXIS 67912, 2020 WL 1905323, at *5 (D. Mass. Apr. 17, 2020)* (citing *18 U.S.C. § 3582(c)(1)(A)(i)*; *U.S.S.G. § 1B1.13 cmt. n.1*). It is thus evident from the context of enactment and the text itself that "Congress necessarily recognized that time is of the essence for determining whether compassionate release is appropriate." Id.; see also *United States v. Russo, No. 16-CR-441, 2020 U.S. Dist.*

*LEXIS 65390, 2020 WL 1862294, at *1 (S.D.N.Y. Apr. 14, 2020)* (noting that the 30-day rule was intended "as an accelerant to judicial review ").

Prisons are "powder kegs for infection" and have allowed "the COVID-19 virus [to] spread[] with uncommon and frightening speed." *United States v. Skelos, No. 15-CR-317, 2020 U.S. Dist. LEXIS 64639, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020)*; see also *An Ohio prison is now the largest source of virus infections in the country*, The N.Y. Times (Apr. 20, 2020), https://www.nytimes.com/2020/04/20/us/coronavirus-live-news.html#link-52cdb996 (noting that "four of the 10 largest-known sources of infection in the United States were correctional facilities"). In light of the dangers posed by the prison environment, the need to expedite consideration of requests for compassionate release premised on potential exposure to COVID-19 takes on even new urgency. See *Haney, 2020 U.S. Dist. LEXIS 63971, 2020 WL 1821988, at *4* (noting that "under present circumstances, each day a[n] [inmate] must wait before presenting what could otherwise be a meritorious petition threatens him with a greater risk of infection and worse"). Hence, the Court concludes **[*14]** that Congressional objectives underlying the First Step Act not only permit, but compel, courts to waive *§ 3582(c)(1)(A)*'s exhaustion requirement in the face of the pandemic. See id. (concluding that "Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late."); *Russo, 2020 U.S. Dist. LEXIS 65390, 2020 WL 1862294, at *1* ("It would . . . certainly [be] inconsistent with congressional intent[] for the thirty days to serve as a substantial obstacle to effective judicial relief.").

BOP's response to the COVID-19 threat underscores this conclusion. Alarmingly, and despite the demonstrated danger COVID-19 poses in the prison environment, "[i]t does not appear that the BOP has updated [its] regulations [governing compassionate release requests] since the First Step Act was passed, let alone made any attempt to suspend them or otherwise accelerate the process during the pandemic."[5] *Martinez-Brooks v. Easter, No. 20-CV-569,*

---

[5] The *Martinez-Brooks* court summarized those regulations:

"[A]n initial response from the Warden-when it arrives-is

2020 U.S. Dist. LEXIS 83300, 2020 WL 2405350, at *25 (D. Conn. May 12, 2020). As a result, if BOP responds at all to an inmate's initial compassionate release request—-itself no guarantee, cf. id. (describing how, in at least one federal prison, the prison administration had "not made [*15] even an initial response to some 44% of compassionate release requests")—it is virtually impossible for the inmate to appeal a denial through the multiple stages of review required by BOP regulations within 30 days. Under the circumstances, where "Congress understood that some requests for relief may be too urgent to wait for the BOP's process," Soto, 2020 U.S. Dist. LEXIS 67912, 2020 WL 1905323, at *5, "judicial waiver [of the exhaustion requirement] is permissible in light of the extraordinary threat certain inmates face from COVID-19," see United States v. Smith, No. 12-CR-133, 2020 U.S. Dist. LEXIS 64371, 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020).[6]

---

only the first step in a multi-tiered administrative remedy process the inmate must follow to 'fully exhaust[]' administrative remedies. That process requires each inmate to appeal the denial by the Warden to a BOP Regional Director, followed by an appeal to the BOP General Counsel. For each level of appeal, the inmate must use a different form and mail it to a different reviewing official. Even if the inmate's request to the Warden is approved . . . that approval must go through at least three more layers of review involving the BOP General Counsel, the Medical Director or an Assistant Director, and, finally, the Director."

Martinez-Brooks, 2020 U.S. Dist. LEXIS 83300, 2020 WL 2405350, at *25 (internal citations and quotation marks omitted).

[6] As the court in Martinez-Brooks [*16] also noted, BOP also has not updated the substantive criteria it uses to evaluate compassionate release requests since January 2019. See 2020 U.S. Dist. LEXIS 83300, 2020 WL 2405350, at *12, 25. The health-related criteria BOP employs "make[] no mention of COVID-19 or the risk posed by infectious diseases inside prisons in general, and restrict[] use of 'compassionate release' authority to a few, extreme situations that have little to do with susceptibility to COVID-19." 2020 U.S. Dist. LEXIS 83300, [WL] at *25. The Government described these criteria in a filing in Wilson: "Pursuant to BOP policy, having an underlying medical condition that puts you at higher risk for serious complications from COVID-19 according to the CDC does not automatically qualify the inmate to have BOP recommend compassionate release. Rather, the requirements for compassionate release are set forth in BOP Program Statement 5050.50 and 28 C.F.R. §§ 571.60-.64." See Wilson, Dkt. No. 89 at 3. Under these regulatory provisions, an inmate's medical condition must be "terminal" or "debilitating,"

The Government relies on Ross v. Blake, 136 S. Ct. 1850, 195 L. Ed. 2d 117 (2016) in arguing that Congressional intent does not permit the Court to waive the exhaustion requirement in § 3582(c)(1)(A). But Ross concerns the substantially different statutory exhaustion requirement in a different statute, the Prison Litigation Reform Act (PLRA), and is thus not applicable here. Under the PLRA, a prisoner cannot proceed to court until she has exhausted administrative remedies. Soto, 2020 U.S. Dist. LEXIS 67912, 2020 WL 1905323, at *5. "The intent of this 'strengthened' PLRA exhaustion requirement is to 1) give an agency an opportunity to 'correct its own mistakes with respect to the programs it administers before it is haled into federal court' and 2) promote efficiency so that some cases can be resolved quickly and efficiently administratively before proceeding to court." Id. (quoting Woodford v. Ngo, 548 U.S. 81, 89, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)).

The exhaustion requirement in § 3582, by contrast, does not serve either of these policy goals to the same extent. The apparent primary purpose of exhaustion

---

or be a condition related to the aging process that causes irreversible deterioration to the inmate's mental and physical health. See id. at 3-4.

Despite the fact that in amending § 3582(c)(1)(A) via the First Step Act, Congress sought to "expand compassionate release." 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018), BOP's regulations appear to place administrative relief out of reach for the vast majority of inmates faced with an imminent risk of severe illness from COVID-19. See Wilson, Dkt. No. 26-4 at 4 (noting that of 243 medically vulnerable inmates who have submitted a request for compassionate release to the warden at FCI Elkton, "[o]nly one inmate ... met the criteria for compassionate release."); Martinez-Brooks, 2020 U.S. Dist. LEXIS 83300, 2020 WL 2405350, at *25 (noting that "FCI Danbury staff has, to date, not granted a single request for compassionate release."). That these regulations contradict Congressional intent is arguable another basis for waiving the exhaustion requirement.

The obsolete nature of these regulatory criteria might explain the curious fact that the warden denied Bass's compassionate release application, solely on the basis that his health conditions do not qualify him for release, a mere week after including Bass in the Subclass List, which tracks the CDC's list of risk factors for severe illness from COVID-19. See Subclass List at 4; Wilson, 2020 U.S. Dist. LEXIS 70674, 2020 WL 1940882, at *9 n.50); Denial Letter ("Health Services staff have reviewed your medical records and determined you do not meet the criteria for a compassionate release/reduction in sentence at this time.").

under *§ 3582* is simply to determine whether an inmate will have the assistance of BOP in bringing her request to court. Id. The 30-day waiting period does not obviate the need for judicial intervention, to which the inmate is entitled regardless of BOP's **[*17]** determination. Id. And the statute permits the inmate to proceed to court even if the BOP neglects to act, which indicates Congressional recognition that the value of urgent resolution can outweigh the value of judicial economy served by administrative resolution. Id.

Waiver of exhaustion is justified in this case by the extreme urgency of this request. By BOP's own determination, and, as discussed below, by the Court's independent review of the health conditions reported in the PSIR, Bass is vulnerable to a severe case of COVID-19. Courts have found that such a risk, when combined with high-risk prison circumstances, justifies waiver of the exhaustion requirement. See, e.g., *United States v. Coles, No. 00-CR-20051, 2020 U.S. Dist. LEXIS 72327, 2020 WL 1976296, at *5 (C.D. Ill. Apr. 24, 2020)* (waiving the exhaustion requirement for an inmate at FCI Elkton due to dire conditions at the facility); *United States v. Sawicz, No. 08-CR-287, 2020 U.S. Dist. LEXIS 64418, 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020)* (waiving exhaustion because, in light of the defendant's hypertension and circumstances at FCI Danbury, a facility named in the Attorney General's April 3 memo, "[t]he delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences") (internal **[*18]** citations omitted); *Zukerman, 2020 U.S. Dist. LEXIS 59588, 2020 WL 1659880, at *3-4* (waiving exhaustion where defendant was elderly, obese, had diabetes and high blood pressure, and was incarcerated in FCI Otisville, where the internal architecture inhibits social distancing); *Scparta, 2020 U.S. Dist. LEXIS 68935, 2020 WL 1910481, at *9* (waiving exhaustion for a 55-year-old inmate due to his hypertension and an outbreak at FCI Butner that made the prison "a national leader in documented cases of COVID-19" at that time).

Apart from these considerations, the Court notes the problematic result of requiring Bass to wait as long as a week for the 30-day exhaustion period to run when BOP is already violating the April 22 Order by failing to release Bass within 14 days of that order—roughly three weeks ago. To the extent that BOP were to elect to use the compassionate release process in Bass's case as the vehicle for complying with the April 22 Order, it

would violate that order for BOP to require any further delay in the administrative compassionate release process.[7]

## B. Extraordinary and Compelling Reasons

Bass has established an "extraordinary and compelling reason" justifying release under *§ 3582(c)(1)(A)* and *U.S.S.G. § 1B1.13*, based on his health conditions and dire circumstances at FCI Elkton. Even disregarding BOP's **[*19]** determination on April 30 that Bass is a medically vulnerable inmate who qualifies for the Subclass List, the Court would find based on its own review of Defendant's age and health conditions reported in the PSIR that he is at risk of severe illness should he contract the virus. For instance, strokes have been linked to severe illness from COVID-19. See, e.g., *United States v. Jenkins, No. 99-CR-439, 2020 U.S. Dist. LEXIS 86003, 2020 WL 2466911, at *6 (D. Colo. May 8, 2020)* (noting that "according to preliminary CDC data, individuals with neurologic disorders such as stroke and migraine are more likely to require hospitalization after contracting COVID-19.") (citing CDC COVID-19 Response Team, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 - United States, February 12-March 28, 2020*, 69 Morbidity & Mortality Weekly Rep. 382, 384 (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.h

---

[7] As discussed, the *Wilson* court provided BOP with alternatives to compassionate release as a means for removing medically vulnerable inmates from FCI Elkton, including transfer to a different federal facility or release to home confinement. *2020 U.S. Dist. LEXIS 70674, 2020 WL 1940882, at *10*. But compassionate release is the only type of relief among those options that the Court has the authority to grant. The Court does not have the authority, for instance, to compel BOP to transfer Bass to another facility or to home confinement for the remainder of his sentence. See, e.g., *United States v. Kanagbou, 726 F. App'x 21, 25 (2d Cir. 2018)* ("[I]t is well established that the district court does not control how the Executive Branch carries out a defendant's sentence."); *United States v. McCarthy, No. 17-CR-230, 2020 U.S. Dist. LEXIS 61759, 2020 WL 1698732, at *1 n.1 (D. Conn. Apr. 8, 2020)* (denying defendant's request, offered as an alternative to compassionate release based on COVID-19-related concerns, that the court designate a halfway house where the defendant could serve the remainder of his sentence, because "[t]he court has no authority to direct the BOP as to how McCarthy's sentence is carried out"); see also Response at 17-18.

tm); *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed May 27, 2020) ("Heart disease, hypertension, *prior stroke*, diabetes, chronic lung disease, [*20] and chronic kidney disease have all been associated with increased illness severity and adverse outcomes.") (emphasis added); Thomas J. Oxley, et al., Large-Vessel Stroke as a Presenting Feature of Covid-19 in the Young, NEJM.org (April 28, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2009787?amp/= (noting that "data from the Covid-19 outbreak in Wuhan, China, showed that the incidence of stroke among hospitalized patients with Covid-19 was approximately 5%" and suggesting that even young victims of COVID-19 may be vulnerable to strokes). Additionally, at age 63, Bass likely faces a heightened risk of a severe illness from COVID-19. See COVIDView, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (last visited May 27, 2020) (finding the cumulative hospitalization rate since March 1 for adults aged 50 to 64 years to be 105.9 per 100,000 while the overall cumulative rate is 67.9 per 100,000).

Moreover, the COVID-19 outbreak at FCI Elkton, in combination with the special difficulty of social distancing in FCI Elkton's dorm-style environment, weighs heavily in the Court's analysis.[8] As noted, several courts have found an "extraordinary and compelling reason" [*21] supporting release on the basis of a combination of dire prison conditions and underlying health conditions that increase the likelihood of severe illness from COVID-19. See, e.g., *United States v. Rodriguez, No. 03-CR-271, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *1, 7 (E.D. Pa. Apr. 1, 2020)* (finding an "extraordinary and compelling reason" on the basis of the inmate's diabetes, high blood pressure, and liver abnormalities, the outbreak at FCI Elkton, and the short period remaining on his sentence); *Sawicz, 2020 U.S. Dist. LEXIS 64418, 2020 WL 1815851, at *2* (finding an "extraordinary and compelling reason" on the basis of the inmate's hypertension and conditions at FCI Danbury); *United States v. Foreman, No. 19-CR-62, 2020 WL 2315908, at *2-4 (D. Conn. May 11, 2020)* (finding an "extraordinary and compelling reason" on the basis of

the inmate's hypertension and age of 58, in combination with conditions at FCI Danbury); *Scparta, 2020 U.S. Dist. LEXIS 68935, 2020 WL 1910481, at *2, 9* (finding an "extraordinary and compelling reason" on the basis of the inmate's hypertension, age of 55, and conditions at FCI Butner, which had 60 infected inmates); *United States v. Soto, No. 18-CR-10086, 2020 U.S. Dist. LEXIS 77074, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020)* (finding an "extraordinary and compelling reason" on the basis of the inmate's hypertension and the presence of 27 reported inmate cases in his facility); *United States v. Pena, No. 15-CR-551, 2020 U.S. Dist. LEXIS 85431, 2020 WL 2301199, at *3, 4 (S.D.N.Y. May 8, 2020)* (finding an "extraordinary and compelling reason" on the basis of the inmate's hypertension and hyperlipidemia and the presence of 43 confirmed cases at "the most heavily populated BOP facility"); *United States v. Campagna, No. 16-CR-78, 2020 U.S. Dist. LEXIS 54401, 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020)* (finding [*22] an "extraordinary and compelling reason" on the basis of the inmate's immunocompromization and the nature of the facility, in which "the residents—some of whom, including Defendant, work off-site on week days and stay with their families on weekends—cycle in and out of the facilities from all over the district, and staff at the facilities leave and return daily, without screening"); see also *Jenkins, 2020 U.S. Dist. LEXIS 86003, 2020 WL 2466911, at *6-7* (finding an "extraordinary and compelling reason" on the basis of the inmate's obesity and history of strokes in a facility with one reported case); *United States v. Kelly, No. 13-CR-59, 2020 U.S. Dist. LEXIS 77080, 2020 WL 2104241, at *7-8, 10 (S.D. Miss. May 1, 2020)* (finding an "extraordinary and compelling reason" solely on the basis of conditions at the low-security facility BOP facility in Oakdale, also named in the April 3 Memo, despite the inmate's young age and lack of any other risk factors for severe illness).[9]

---

[8] The Government has not addressed conditions at FCI Elkton. See generally Response.

[9] Bass's circumstances alternatively could qualify as an "extraordinary and compelling reason" either under *U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I)* ("suffering from a serious physical . . . condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."), see, e.g., *Soto, 2020 U.S. Dist. LEXIS 77074, 2020 WL 2104787, at *2* ("Hypertension is a condition that substantially diminishes Guzman Soto's ability to provide self-care in the prison environment as the condition lowers his immune response to effectively fight the coronavirus"; *Pena, 2020 U.S. Dist. LEXIS 85431, 2020 WL 2301199, at *4*, or under the "catchall" provision at *§ 1B1.13, cmt. n.1(D)* ("As

2020 U.S. Dist. LEXIS 102543, *22

**C. _Section 3142(g)_ Factors**

_Section 1B1.13 of the United States Sentencing Guidelines_ provides that a sentence should be reduced only if releasing the inmate will not pose a danger to the safety of others or the community. _§ 1B1.13(2)_ (citing _18 U.S.C. § 3142(g)_).

_Section 3142(g)_ sets out various factors that help courts assess whether releasing an inmate will pose a danger to others and the community, including (1) "the nature and circumstances [*23] of the offense charged;" (2) "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history;" and (3) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." _§ 3142(g)_.

As to the first factor, while Defendant's crimes were serious, as reflected by his 12.5-year sentence, they did not involve any violence. See, e.g., _Sawicz, 2020 U.S. Dist. LEXIS 64418, 2020 WL 1815851, at *3_ (finding that "the defendant d[id] not pose . . . a danger to the public" in part because "neither the violation on which the defendant is currently serving his prison sentence nor the conduct involved in the underlying crime involved violence"); _Rodriguez, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *11_ (noting that "[w]hile [the denfendant's] history is serious," he does not pose a danger to the community, because "[n]othing in his record suggests that he has been violent."). Bass also appears to have a mostly clean disciplinary record from his time in prison. As of November 14, 2019, aside from one instance of "being absent from assignment" in 2017, he has not committed any infractions. See Mot.

---

determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in _subdivisions (A) through (C)_."), see, e.g., _United States v. Resnick, No. 14-CR-810, 2020 U.S. Dist. LEXIS 59091, 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020)_ ("Resnick's high susceptibility to COVID-19 falls within the purview of this catchall."); Logan, Dkt. No. 140, at 8 ("_§ 1B1.13_'s catchall provision . . . covers the high risk of contracting a life-threatening case of COVID-19."); see also _United States v. Brown, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019)_ (finding that "the most natural reading of the amended _§ 3582(c)_ . . . is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.").

Ex. 3. The [*24] Government does not indicate that he has committed any infractions since November 14, 2019. See generally Response. That he has largely followed the rules while incarcerated suggests that he will do so once released, which minimizes the danger he poses to the community. See _United States v. Marks, No. 03-CR-6033, 2020 U.S. Dist. LEXIS 68828, 2020 WL 1908911, at *16 (W.D.N.Y. Apr. 20, 2020)_ ("[G]iven Marks's clean disciplinary record for many years past, and his demonstrably successful efforts at rehabilitation, I conclude that upon release, he will not pose a danger to the community.").

Regarding the second factor, the 2011 PSIR reflects that there were pending charges against Bass from 2006 brought by German authorities for non-violent offenses sounding in fraud in connection with the sale of automobiles and automobile repair services. PSIR ¶ 41. Due to these pending charges, in 2007, Bass was detained by U.S. Immigration and Customs Enforcement Agents on authority of Interpol while he was crossing the border from Canada. Id. ¶ 42. He was released the same day, as German authorities showed no interest in extradition. Id. In light of the non-violent nature of these charges, the German authorities' evident lack of interest in pursuing them, and the absence of any further criminal history, the Court [*25] does not view the 2006 charges as providing a strong basis on their own for concluding that Bass will pose a danger to the community if released.

Moreover, the Defendant's advanced age makes further criminal activity unlikely. See Mot. at 22 (citing United States Sentencing Commission, _The Effects of Aging on Recidivism Among Federal Offenders_ (Dec. 2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

Accordingly, the Court finds that Bass will not pose a risk to others or the community if released.

**D. Section _§ 3553(a)_ Factors**

Finally, "the Court must 'consider[] the [sentencing] factors set forth in _[S]ection 3553(a)_ to the extent that they are applicable.'" _Rodriguez, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *11_ (quoting _§ 3582(c)(1)(A)_). Under _§ 3553(a)_, the Court must consider what is "sufficient, but not greater than necessary, to comply with the purposes of [sentencing]." _§ 3553(a)_. Relevant factors include:

1. The nature and circumstances of the offense and history and characteristics of the defendant, see *§ 3553(a)(1)*]

2. The need for the sentence to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the defendant's crimes;

3. The need for the sentence to afford adequate deterrence to comparable **[*26]** criminal conduct, see *§ 3553(a)(2)(B)*;

4. The need for the sentence to protect the public from further crimes by the defendant, see *§ 3553(a)(2)(C)*; and

5. The need to avoid unwarranted sentence disparities among similarly situated defendants, see *§ 3553(a)(6)*.

The non-violent nature of Defendant's the offenses, his minimal criminal history, and his nearly clean disciplinary record, all detailed above, weigh in favor of release under the first factor. See *§ 3553(a)(1)*. Moreover, concerning the fourth factor, as discussed, Defendant's advanced age makes recidivism unlikely.

As to the second, third, and fifth factors, the Court notes that Bass has served nearly 70% of his initial sentence, and nearly 95% of his actual sentence based on good time credit. *Find an Inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/; Letter Requesting Extension. With only 5 months left, concerns that he must serve his full sentence to ensure respect for the law, effect general deterrence, and prevent sentence disparities are mitigated. The Court took these considerations into account at sentencing and does not find that this relatively insignificant difference in time from what was initially calculated has substantial implications under *§ 3553* analysis. **[*27]** See *United States v. Levy, No. 16-CR-270, 2020 U.S. Dist. LEXIS 83544, 2020 WL 2393837, at *7 (E.D.N.Y. May 12, 2020)* (noting in releasing an inmate with eight months remaining on a 41-month sentence that "[i]n light of the grave risk that COVID-19 poses to Levy's health, a term of imprisonment that is just eight months shy of Levy's full, actual term is sufficient" to comply with the purposes of sentencing under *§ 3553*); *Rodriguez, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *12* ("Because Mr. Rodriguez has served the vast majority of his mandatory minimum sentence and is a year and a half away from release, granting his motion sufficiently minimizes sentence disparities between him and

similarly situated defendants."). Moreover, the Court must balance the implications of subtracting five months from Defendant's sentence with the imminent threat to Defendant's health posed by COVID-19 at FCI Elkton. In light of that threat, denying this compassionate release request would impose a sentence "greater than necessary to comply with the statutory purposes of punishment," see *§ 3553(a)*, as that sentence might include serious illness or death from COVID-19. See *Levy, 2020 U.S. Dist. LEXIS 83544, 2020 WL 2393837, at *7* ("To require him to remain in detention for eight more months, when there is a real chance that he could develop a severe illness because a pandemic has emerged and conditions of confinement place him at risk given **[*28]** his medical history, would be to require a sentence that is greater than necessary to achieve the purposes of sentencing."); See also *Rodriguez, 2020 U.S. Dist. LEXIS 58718, 2020 WL 1627331, at *12*. Accordingly, Bass's release is consistent with the relevant *§ 3553(a)* factors.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 84) is **GRANTED**; and it is further

**ORDERED**, that Defendant's term of imprisonment is reduced to time served; and it is further

**ORDERED**, that Defendant be released immediately; and it is further

**ORDERED**, that Defendant comply with the terms of supervised release previously ordered by the Court; and it is further

**ORDERED**, that Defendant, upon release, remain in home quarantine for a period of **at least fourteen days**; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED: May 27, 2020

Albany, New York

/s/ Lawrence E. Kahn

2020 U.S. Dist. LEXIS 102543, *28

Lawrence E. Kahn

Senior United States District Judge

---

**End of Document**

# *United States v. Galloway*

United States District Court for the District of Maryland

May 21, 2020, Filed

Criminal No. RDB-10-0775

**Reporter**

2020 U.S. Dist. LEXIS 89689 *

UNITED STATES OF AMERICA, v. CHARLES LEONARD GALLOWAY, Defendant.

**Prior History:** *Galloway v. United States, 2016 U.S. Dist. LEXIS 99199 (D. Md., July 29, 2016)*

**Counsel:** **[*1]** For U. S. Attorneys: Ayn Brigoli Ducao, Rod J Rosenstein, Office of the United States Attorney, Baltimore, MD USA; Ellen E. Nazmy, US Attorneys Office, Greenbelt, MD USA.

**Judges:** Richard D. Bennett, United States District Judge.

**Opinion by:** Richard D. Bennett

# Opinion

## MEMORANDUM ORDER

Defendant Charles Leonard Galloway ("Defendant" or "Galloway") is currently serving a 235-month term of imprisonment for conspiracy to distribute 1 kilogram or more of heroin in violation of *21 U.S.C. § 846*. (Judgment & Commitment Order ("J&C"), ECF No. 364; Order Regarding Motion for Sentence Reduction, ECF No. 508.) Galloway, having been incarcerated since June 21, 2010, has accordingly served almost 10 years of his sentence. (Inmate Data, ECF No. 543-2.)

Now pending is Galloway's Motion for Compassionate Release pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)* which has been supplemented by the Office of the Federal Public Defender pursuant to Standing Order 2019-04 of this Court. (ECF Nos. 535, 543 *SEALED*). The Government opposes the motion. (ECF No. 547) (*SEALED*). The parties' submissions have been reviewed and no hearing is necessary. *See Local Rule 105.6 (D. Md. 2018)*. For the reasons stated herein, Galloway's Motion for Compassionate Release pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)* (ECF No. 535) is GRANTED. Galloway's **[*2]** sentence is reduced to time served and upon expiration of a 14-day quarantine period, he shall be released to the custody of his wife, Cantra Galloway, at her residence in Baltimore, Maryland and commence a 5-year period of supervised release.

## BACKGROUND

On December 15, 2010, the grand jury for the District of Maryland returned a four-count Indictment charging Galloway and others with conspiracy to distribute 1 kilogram or more of heroin, in violation of *18 U.S.C. § 846* (Count 1); possession with intent to distribute a detectable amount of heroin on August 2, 2010, in violation of *18 U.S.C. § 841(a)(1)* (Count 2); possession of a firearm in furtherance of drug trafficking on August 2, 2010, in violation of *18 U.S.C. § 924(c)* (Count 3); and possessing a firearm on August 2, 2010, after being convicted of a crime punishable by more than one year, in violation of *18 U.S.C. § 922(g)(1)*. (Count 4). (ECF No. 1.) The Government subsequently obtained a Superseding Indictment which did not alter the charges against Galloway. (ECF No. 159.)

Before trial, on December 16, 2011, the Government filed a notice of intent to seek enhanced penalties pursuant to *21 U.S.C. § 851*. (ECF No. 169.) On February 15, 2012, this Court granted Galloway's oral motion for self-representation and ordered **[*3]** the Federal Public Defendant for the District of Maryland to

act as standby counsel. (Letter Order, ECF No. 240.) Galloway's trial commenced on March 19, 2012. Ultimately, the jury convicted Galloway only as to Count 1 of the Indictment. (Jury Verdict, ECF No. 292.) The Government dismissed Count 2, this Court granted a motion for judgment of acquittal on Count 3, and the jury was unable to reach a verdict as to Count 4. (Sentencing Hearing Tr. 4:15-24, ECF No. 379.)

Sentencing proceedings commenced after trial. The Presentence Report prepared by the United States Probation Office did not find that Galloway had participated in violence during the conspiracy for which he was convicted. (ECF No. 379 at 72:24; PSR ¶¶ 7-10.) During the sentencing hearing, this Court determined that an offense level of 38 and a criminal history category of III applied, producing a Guidelines range of 292 to 365 months of imprisonment. (ECF No. 379 at 55:8-18.) This Guidelines calculation was based in part on a finding that Galloway had attempted to obstruct justice during his trial by contacting a Government witness in an effort to influence her testimony. (*Id.* at 54:23-55:5.) As a result of the Government's **[\*4]** *§ 851* notice, Galloway faced an enhanced mandatory minimum sentence of 20 years. (*Id.* at 89:12-17.) Ultimately, this Court imposed a sentence of 292 months of imprisonment, a sentence which exceeded the 20-year mandatory minimum but fell at the low end of the Guidelines range. (J&C, ECF No. 364.)

In September 2016, Galloway submitted a Motion to Reduce Sentence pursuant to Guidelines Amendment 782. (ECF No. 505.) The Government consented to the reduction. (ECF No. 507.) This Court granted Galloway's Motion and reduced Galloway's sentence to 235 months. (Order Regarding Motion for Sentence Reduction, ECF No. 508.)

On March 29, 2019, Galloway filed the presently pending Motion for Compassionate Release pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)* which has been supplemented by the Office of the Federal Public Defender pursuant to Standing Order 2019-04 of this Court. (ECF Nos. 535, 543 \*SEALED\*). The Government opposes the motion. (ECF No. 547) (\*SEALED\*).

## ANALYSIS

The *First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194,* established significant changes to the procedures involving compassionate release from federal prison. Before the *First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i)* provided the Bureau of Prisons ("BOP") with sole discretion to file compassionate release motions with **[\*5]** the Court. With the passage of the First Step Act, defendants are now permitted to petition federal courts directly for compassionate release whenever "extraordinary and compelling reasons" warrant a reduction in sentence. The Act permits a defendant to seek a sentence reduction after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the Defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *18 U.S.C. § 3582(c)(1)(A).* Once these mandatory conditions are satisfied, this Court may authorize compassionate release upon a showing of "extraordinary and compelling reasons" and after weighing the factors presented in *18 U.S.C. § 3553(a).* *18 U.S.C. § 3582(c)(1)(A)(i).*

## I. Administrative Exhaustion Requirements.

There is no dispute that Galloway has satisfied the administrative exhaustion requirements of *18 U.S.C. § 3582(c)(1)(A).* On August 7, 2017, Galloway's request for compassionate release was denied by the Warden of Federal Correctional Institution - Elkton. (Denial Letter, Sept. 20, 2017, ECF No. 543-5.) On December 3, 2018, after his transfer to Federal Correctional Institution - Schuylkill ("FCI Schuylkill"), Galloway submitted another **[\*6]** request for compassionate release which was denied. (Denial Letter, Dec. 13, 2018, ECF No. 543-6.) Galloway subsequently submitted an institutional petition, but has not yet received a response from the Bureau of Prisons.

## II. Extraordinary and Compelling Reasons.

Galloway has presented extraordinary and compelling reasons justifying his release from incarceration. The United States Sentencing Commission is charged with defining "what should be considered extraordinary and compelling reasons for sentence reduction" under *§ 3582(c)(1)(A).* *28 U.S.C. § 994(t).* The Commission has determined that "extraordinary and compelling reasons" exist where "suffering from a serious physical condition" and/or a "serious functional or cognitive impairment . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to

recover." *U.S.S.G. § 1B1.13 cmt. n.1(A)*. Additionally, the Commission has authorized the Bureau of Prisons to identify other extraordinary and compelling reasons "other than, or in combination with" the reasons justified by the Commission. *Id. § 1B1.13 cmt. n.1(D)*.

Bureau of Prisons Program Statement 5050.50 sets forth the BOP's procedures for implementing **[*7]** *18 U.S.C. § 3582*. The regulation states that the BOP will consider reductions in sentences for "inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover." Program Statement 5050.50 at 5. The regulation goes on to identify an exceedingly narrow class of individuals who will be considered for a sentence reduction: those who are "completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair" and those who are "capable of only limited self-care and [are] confined to a bed or chair more than 50% of waking hours." *Id.* In opposing the Petitioner's request for compassionate release, the Government places great emphasis on the BOP's Program Statement.

The BOP's Program Statement does not constrain this Court's analysis. The BOP cannot limit the physical ailments presenting "extraordinary and compelling reasons" for release identified by the Sentencing Commission. The Sentencing Commission has been appointed by statute to identify the circumstances giving rise to "extraordinary and compelling reasons" justifying a sentence reduction and has granted the Bureau of Prisons limited authority to **[*8]** identify *additional* reasons for sentence reductions. To the extent that the Bureau of Prisons has used its limited authority to narrow the class of individuals entitled to release, it has exceeded that authority. Additionally, as Judge Blake of this Court has recognized, the First Step Act embodies Congress's intent to reduce the Bureau of Prison's authority over compassionate release petitions and authorizes the district courts to exercise their "independent discretion to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence." *United States v. Bryant, CCB-95-0202, 2020 U.S. Dist. LEXIS 75681, 2020 WL 2085471, at *2 (D. Md. Apr. 30, 2020)*.

In this case, the Court need not reach beyond the "extraordinary and compelling reasons" identified by the Sentencing Commission because Galloway has shown that he is "suffering from a serious physical condition" and a "serious functional or cognitive impairment . . . that substantially diminishes [his] ability . . . to provide

self-care within the environment of a correctional facility and from which he is not expected to recover." *U.S.S.G. § 1B1.13 cmt. n.1(A)*. Specifically, BOP medical records indicate that Galloway suffers from a seizure disorder, aphasia, encephalopathy, gastro-esophageal reflux disease, Type II diabetes, Hepatitis B, anxiety, hypertension, **[*9]** a thyroid disorder, and gastritis. (BOP Summary of Medical Conditions, ECF No. 543-1.) On September 18, 2013, while incarcerated at FCI Elkton, Galloway was transferred to a local hospital after vomiting blood. (Psychology Note, ECF No. 543-8.) Testing revealed that Galloway had suffered an intracerebral hemorrhage or stroke resulting in the loss of brain tissue. (Letter of Dr. Zeiler, ECF No. 543-9.) Since then, Galloway has experience memory loss, aphasia, mood swings, and extreme sensitivity to light. (*Id.*) He also has difficulty walking and is prone to injury. (Preliminary Report, ECF No. 543-12.)

The Government argues that Galloway has exaggerated the effects of his condition. In support of this contention, the Government notes that Galloway holds a work assignment in the Camp Food Service Department. (Summary Reentry Plan, ECF No. 543-4.) In a 2018 clinical encounter, Galloway expressed interest in performing pull-ups and lifting weights. (BOP Health Services Clinical Encounter, ECF No. 543-11.) This selective reading of the record presents an incomplete picture of Galloway's life in prison. A BOP Health Services Medical Duty Status form indicates that Galloway was restricted **[*10]** to "no duty" as of November 7, 2018. (BOP Health Services Medical Duty Status, ECF No. 552-1.) An October 2, 2019 work detail print-out indicates that Galloway was still unable to work as of that date. (ECF No. 552-2.) Finally, Galloway's interest in performing simple exercises does not diminish the extreme severity of his medical conditions. The Sentencing Commission requires only that Galloway exhibit a diminished ability to provide self-care, not complete physical incapacity.

Finally, the court cannot overlook the present circumstances. The ongoing COVID-19 Pandemic poses unique risks to elderly and vulnerable inmates, as acknowledged by Attorney General William Barr in his March 26, 2020 memorandum to the Director of the BOP. *See* Dep't of Justice, Office of the Attorney General, *Memorandum for Director of Bureau Prisons* (Mar. 26, 2020), https://www.themarshallproject.org/documents/6820452 -Memorandum-from-Attorney-General-to-BOP-re-Home. Attorney General Barr urged the BOP Director to prioritize home confinement for vulnerable inmates "who

are non-violent and pose minimal likelihood of recidivism." *Id.* In response to an increasing number of compassionate release motions due to COVID-19, **[\*11]** district courts have increasingly granted such motions when it is clear that COVID-19 poses an extraordinary and compelling reason for release of a particularly vulnerable, non-violent defendant. *See, e.g., United States v. Foster, No. 1:14-cr-423-02, Dkt. No. 191, 2020 U.S. Dist. LEXIS 82985 (M.D. Pa. Apr. 3, 2020)* (granting release of defendant whose lung disease "may very well equate a COVID-19 diagnosis with a death sentence"); *United States v. Colvin, Criminal No. 3:19cr179-JBA, 2020 U.S. Dist. LEXIS 57962, 2020 WL 1613943 (D. Conn. Apr. 2, 2020)* (granting compassionate release of defendant with "diabetes, a 'serious...medical condition,' which substantially increases her risk of severe illness if she contracts COVID-19."). Galloway's case falls directly in line with these cases warranting compassionate release.

### III. Application of *18 U.S.C. § 3553(a)*.

Before determining whether a sentence reduction is appropriate, this Court must consider the factors set forth in *18 U.S.C. § 3553(a)* "to the extent that they are applicable." *18 U.S.C. § 3582(c)(1)(A).* Accordingly, this Court must consider (1) Galloway's personal history and characteristics; (2) his sentence relative to the nature and seriousness of his offense; (3) the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter **[\*12]** crime, and protect the public; (4) the need for rehabilitative services; (5) the applicable guideline sentence; and (6) the need to avoid unwarranted sentencing disparities among similarly-situated defendants. *See Bryant, 2020 WL 2085471 at \*4*.

Galloway's personal characteristics weigh heavily in favor of a reduction in sentence to time served. At 52 years of age and suffering from a variety of serious medical conditions, it is highly unlikely that Galloway will recidivate. U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 (2004); *see also* U.S.S.C., *The Effects of Aging on Recidivism Among Federal Offenders* (2017). Galloway's relatively good behavior in prison is further assurance that the public is not endangered by Galloway's release. Disciplinary records reveal that Galloway has only committed one minor infraction for being "absent from assignment" in 2012, before he suffered the debilitating stroke. (Inmate Discipline Data,

ECF No. 543-3.) Finally, Galloway will receive support from his spouse upon his release. (ECF No. 552-3.) Although this Court initially imposed a significant sentence proportional to Galloway's crimes, the extreme changes to Galloway's **[\*13]** health compel this Court to grant compassionate release.

### CONCLUSION

Accordingly, for the reasons stated above, it is HEREBY ORDERED this 21st day of May, 2020, that Defendant Galloway's Motion for Compassionate Release pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)* (ECF No. 535) is GRANTED, subject to the following conditions:

1. Pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)*, the Defendant Charles Leonard Galloway's term of incarceration is reduced to time served, such that he is released from the custody of Bureau of Prisons as soon as the terms of this Order can be implemented;

2. Prior to his release from custody, the Bureau of Prisons is directed to place the Defendant Charles Leonard Galloway in quarantine for a period of 14 days and to evaluate him for the purposes of receiving a medical clearance;

3. Upon the expiration of the 14-day quarantine period and receipt of a medical clearance, the warden of FCI Schuylkill shall forthwith release from custody the person of the Defendant, Charles Leonard Galloway;

4. Defendant Charles Leonard Galloway shall be on supervised release status for a period of five years;

5. Defendant Charles Leonard Galloway shall be released to the custody of his wife, Cantra Galloway, at her residence in Baltimore, Maryland;

 **[\*14]** 6. While traveling from FCI Schuylkill to his residence, Defendant Charles Leonard Galloway will isolate himself to the best of his ability. Upon reaching his residence, Defendant Charles Leonard Galloway shall observe all applicable stay-at-home orders; and

7. Pretrial/Probation will review the conditions of release with Defendant Charles Leonard Galloway.

/s/ Richard D. Bennett

United States District Judge

## *United States v. Gray*

United States District Court for the District of Maryland

June 3, 2020, Filed

Criminal No. RDB-16-0364

**Reporter**

2020 U.S. Dist. LEXIS 97513 *

UNITED STATES OF AMERICA, v. JEROME GRAY, Defendant.

**Prior History:** *United States v. Alexander, 795 Fed. Appx. 220, 2020 U.S. App. LEXIS 6220 (4th Cir. Md., Feb. 28, 2020)*

**Counsel:** **[*1]** For USA, Plaintiff: James Thomas Wallner, LEAD ATTORNEY, Office of the United States Attorney, Baltimore, MD USA; LaRai Everett, LEAD ATTORNEY, US Attorney's Office, Baltimore, MD; Zachary B Stendig, US Attorneys Office, Baltimore, MD.

**Judges:** Richard D. Bennett, United States District Judge.

**Opinion by:** Richard D. Bennett

# Opinion

## MEMORANDUM ORDER

Defendant Jerome Gray ("Defendant" or "Gray") seeks compassionate release from incarceration at Federal Medical Center ("FMC") Lexington, where 76 inmates and 3 staff members has tested positive for COVID-19. Gray is 66 years of age and suffers from coronary artery disease ("CAD"), hypertension, Type II diabetes with diabetic neuropathy, and osteoarthritis of the knees. He

is currently serving an 84-month (7-year) term of imprisonment for conspiracy to distribute and possess with intent to distribute heroin in violation of *21 U.S.C. § 846*. (Judgment & Commitment Order ("J&C"), ECF No. 393.) Gray has been in federal custody since August 18, 2016. (*Id.*) Accordingly, he has served over 45 months of his 84-month sentence.

Now pending is Gray's Motion for Compassionate Release pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)* which has been supplemented by the Office of the Federal Public Defender pursuant to Standing Order 2019-04. **[*2]** (ECF Nos. 466, 469). The Government opposes the motion. (ECF No. 475) (*SEALED*). The parties' submissions have been reviewed and no hearing is necessary. *See Local Rule 105.6* (D. Md. 2018). For the reasons stated herein, Gray's Motion for Compassionate Release pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)* (ECF Nos. 466, 469) is GRANTED. Gray's sentence is reduced to time served and upon expiration of a 14- day quarantine period, he shall be released to the custody of his former spouse, Diona Gray, at her residence in Martinsburg, West Virginia and commence a 4-year period of supervised release.

## BACKGROUND

On September 13, 2016, the grand jury for the District of Maryland returned an 11- count Second Superseding Indictment charging Gray and several other Defendants. Gray was charged in Count One with conspiracy to distribute and possess with intent to distribute heroin, in violation of *18 U.S.C. § 846*. On April 26, 2017, Gray pled guilty to that offense pursuant to the terms of a plea agreement. (Arraignment, ECF No. 142; Plea Agreement, ECF No. 143.)

On June 14, 2018, this Court imposed a sentence of 84 months of incarceration. (J&C, ECF No. 393.) The sentence was based in part on the agreed-upon Guidelines calculation submitted by Gray and the Government, **[*3]** as well as the findings in the Presentence Investigation Report ("PSR"). The parties

stipulated that a base offense level of 30 applied pursuant to *U.S.S.G. § 2D1.1(c)(5)*. (Plea Agreement ¶ 6(b).) Gray stipulated that a firearm was possessed during the conspiracy, requiring a 2-level increase and producing an offense level of 32. (*Id.*) A 3-level reduction for acceptance of responsibility resulted in a total offense level of 29. (*Id.* ¶ 6(c); PSR ¶ 21, ECF No. 177.) At sentencing, this Court granted a further 3-level reduction for the reasons indicated on the record, reducing the offense level to 26. A criminal history category of III applied as a result of a 1987 conviction for assault with intent to murder, assault on an officer, and possession of a handgun. (PSR ¶¶ 27-29.) The offense level of 26 and criminal history category of III produced a Guidelines range of 78 to 97 months of incarceration. Ultimately, this Court imposed an 84-month sentence, a sentence falling within the middle of the advisory Guidelines range. (J&C, ECF No. 393.)

On March 13, 2020, Gray submitted a Motion for Compassionate Release pursuant to *18 U.S.C. § 3582(c)*, which has been supplemented by the Office of the Federal Public Defender pursuant to **[*4]** Standing Order 2019-04 of this Court. (ECF Nos. 466, 469). The Government opposes the motion. (ECF No. 475) (*SEALED*).

## ANALYSIS

The *First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194*, established significant changes to the procedures involving compassionate release from federal prison. Before the *First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i)* provided the Bureau of Prisons ("BOP") with sole discretion to file compassionate release motions with the Court. With the passage of the First Step Act, defendants are now permitted to petition federal courts directly for compassionate release whenever "extraordinary and compelling reasons" warrant a reduction in sentence. The Act permits a defendant to seek a sentence reduction after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the Defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *18 U.S.C. § 3582(c)(1)(A)*. Once these mandatory conditions are satisfied, this Court may authorize compassionate release upon a showing of "extraordinary and compelling reasons" and after weighing the factors presented in *18 U.S.C. § 3553(a)*. *18 U.S.C. § 3582(c)(1)(A)(i)*.

## I. Administrative Exhaustion Requirements.

There is no dispute **[*5]** that Gray has satisfied the administrative exhaustion requirements of *18 U.S.C. § 3582(c)(1)(A)*. On October 23, 2019, Gray submitted a request to reduce his sentence to the Warden of FMC Lexington. (ECF No. 475-1) (*SEALED*). The Warden denied the request on November 12, 2019. (ECF No. 475-2) (*SEALED*). Well after the thirty-day waiting period expired, Gray filed the instant Motion for Compassionate Release on March 13, 2020.

## II. Extraordinary and Compelling Reasons.

Gray has presented extraordinary and compelling reasons justifying his release from incarceration. The United States Sentencing Commission is charged with defining "what should be considered extraordinary and compelling reasons for sentence reduction" under *§ 3582(c)(1)(A)*. *28 U.S.C. § 994(t)*. Of relevance here, the Commission has determined that "extraordinary and compelling reasons" exist where a defendant is "suffering from a serious physical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover." *U.S.S.G. § 1B1.13 cmt. n.1(A)*. Similarly a defendant who is "(i) at least 65 years of old; (ii) is experiencing a serious deterioration in physical or mental health because **[*6]** of the aging process; and (iii) has served at least 10 years of 75 percent of his or her term of imprisonment, whichever is less" presents extraordinary and compelling reasons to release. *U.S.S.G. § 1B1.13 cmt. n.1(B)*. Finally, the Sentencing Commission has authorized the Bureau of Prisons to identify other extraordinary and compelling reasons "other than, or in combination with" the reasons identified by the Commission. *Id. § 1B1.13 cmt. n.1(D)*.

Although potentially useful guides, neither the Sentencing Commission's guidelines nor the Bureau of Prisons' regulations constrain this Court's analysis. As Judge Blake of this Court has recognized, the First Step Act embodies Congress's intent to reduce the Bureau of Prison's authority over compassionate release petitions and authorizes the district courts to exercise their "independent discretion to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence." *United States v. Bryant, CCB-95-0202, 2020 U.S. Dist. LEXIS 75681, 2020 WL 2085471, at *2 (D. Md. Apr. 30, 2020)*. Accordingly, this Court may find

2020 U.S. Dist. LEXIS 97513, *6

"extraordinary and compelling reasons" justifying a sentence reduction in circumstances which have not been identified by the Sentencing Commission or the Bureau of Prisons.

Gray's circumstances closely resemble the circumstances described in *U.S.S.G. § 1B1.13 cmt. n.1(A)* and *(B)*. Gray is **[\*7]** 66 years of age and suffers from a host of serious medical conditions, namely: coronary artery disease ("CAD"), hypertension, Type II diabetes with diabetic neuropathy, and osteoarthritis of the knees. (ECF No. 471-1, 471-5.) As a result of the latter condition, Gray is a candidate for total knee replacement surgery and requires the use of a cane and wheelchair. (ECF No. 471-7.) Finally, Gray has already served roughly half of his sentence. Although Gray may not precisely fit within the criteria identified by the Sentencing Commission, his age, medical conditions, and term of confinement nevertheless produce extraordinary and compelling reasons warranting release from incarceration. Such a finding is especially warranted in light of the ongoing COVID-19 Pandemic.

Gray's medical conditions place him at greater risk of developing severe complications from the spread of COVID-19 within FMC Lexington. The Bureau of Prisons reports that 76 inmates and 3 staff members of FMC Lexington have tested positive for COVID-19.[1] As acknowledged by Attorney General William Barr in his March 26, 2020 memorandum to the Director of the BOP, COVID-19 poses unique risks to elderly and vulnerable inmates **[\*8]** like Gray. *See* Dep't of Justice, Office of the Attorney General, *Memorandum for Director of Bureau Prisons* (Mar. 26, 2020), https://www.themarshallproject.org/documents/6820452 - Memorandum-from-Attorney-General-to-BOP-re-Home. In response to an increasing number of compassionate release motions due to COVID-19, district courts have increasingly granted such motions when it is clear that COVID-19 poses an extraordinary and compelling reason for release of a particularly vulnerable, non-violent defendant. *See, e.g., United States v. Foster, No. 1:14-cr-324-02, Dkt. No. 191, 2020 U.S. Dist. LEXIS 82985 (M.D. Pa. Apr. 3, 2020)* (granting release of defendant whose lung disease "may very well equate a COVID-19 diagnosis with a death sentence"); *United States v. Colvin, Criminal No. 3:19cr179-JBA, 2020 U.S. Dist. LEXIS 57962, 2020 WL 1613943 (D. Conn. Apr. 2, 2020)* (granting

compassionate release of defendant with "diabetes, a 'serious...medical condition,' which substantially increases her risk of severe illness if she contracts COVID-19."). Gray's case falls directly in line with these cases warranting compassionate release.

### III. Application of *18 U.S.C. § 3553(a)*.

Before imposing a reduction in sentence, this Court must consider the factors set forth in *18 U.S.C. § 3553(a)* "to the extent that they are applicable." **[\*9]** *18 U.S.C. § 3582(c)(1)(A)*. Accordingly, this Court must consider (1) Gray's personal history and characteristics; (2) his sentence relative to the nature and seriousness of his offense; (3) the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public; (4) the need for rehabilitative services; (5) the applicable guideline sentence; and (6) the need to avoid unwarranted sentencing disparities among similarly-situated defendants. *See Bryant, 2020 U.S. Dist. LEXIS 75681, 2020 WL 2085471 at \*4*.

Gray's personal characteristics weigh in favor of a reduction in sentence to time served. Gray was not alleged to have played a violent role in the conspiracy as to which he pled guilty. The Presentence Investigation Report (ECF No. 177) reflects two drug convictions in the early to mid-1980s. He was convicted on two counts of assault with intent to murder and assault on an officer in the Circuit Court for Anne Arundel County in 1987. At 66 years of age and suffering from a variety of serious medical conditions, it is highly unlikely that Gray will commit another serious crime. U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 (2004); **[\*10]** *see also* U.S.S.C., *The Effects of Aging on Recidivism Among Federal Offenders* (2017). Furthermore, reducing Gray's sentence to time served will not produce unwarranted sentencing disparities. Gray was one of fourteen Defendants indicted in this case, all of whom pled guilty. Gray was only charged in Count One. His code-fendants received sentences ranging from 24 months to 120 months. Once reduced to time served, Gray's sentence will effectively be reduced to 45 months of incarceration—squarely within the sentencing range imposed on his co-defendants.

Finally, Gray will receive support from his former spouse, Diona Gray, upon his release. Ms. Gray has expressed her willingness to permit Mr. Gray to reside in

---

[1] Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/.

2020 U.S. Dist. LEXIS 97513, *10

her 3-bedroom home in Martinsburg, West Virginia. As Ms. Gray is a licensed physical therapy assistant in a nursing home, she is uniquely positioned to provide a safe home environment and to direct Mr. Gray to the proper medical resources as he attempts to manage his medical conditions outside of the prison environment.

**CONCLUSION**

Accordingly, for the reasons stated above, it is HEREBY ORDERED this 3rd day of June, 2020, that Defendant Gray's Motion for Compassionate Release pursuant **[*11]** to *18 U.S.C. § 3582(c)(1)(A)(i)* (ECF Nos. 466, 469) is GRANTED., subject to the following conditions:

> 1. Pursuant to *18 U.S.C. § 3582(c)(1)(A)(i)*, the Defendant Jerome Gray's term of incarceration is reduced to time served, such that he is released from the custody of Bureau of Prisons as soon as the terms of this Order can be implemented;
> 2. Prior to his release from custody, the Bureau of Prisons is directed to place the Defendant Jerome Gray in quarantine for a period of 14 days and to evaluate him for the purposes of receiving a medical clearance;
> 3. Upon the expiration of the 14-day quarantine period and receipt of a medical clearance, the warden of FMC Lexington shall forthwith release from custody the person of the Defendant, Jerome Gray;
> 4. Defendant Jerome Gray shall be on supervised release status for a period of four years;
> 5. Defendant Jerome Gray shall be released to the custody of his former spouse, Diona Gray, at her residence in Martinsburg, West Virginia;
> 6. While traveling from FMC Lexington to his residence, Defendant Jerome Gray will isolate himself to the best of his ability. Upon reaching his residence, Defendant Jerome Gray shall observe all applicable stay-at-home orders; and

> 7. Pretrial/Probation will review the conditions **[*12]** of release with Defendant Jerome Gray.

/s/ Richard D. Bennett

United States District Judge

## *Wilson v. Williams*

United States District Court for the Northern District of Ohio

April 22, 2020, Decided; April 22, 2020, Filed

CASE NO. 4:20-cv-00794

**Reporter**

2020 U.S. Dist. LEXIS 70674 *; 106 Fed. R. Serv. 3d (Callaghan) 894

CRAIG WILSON, et al., Petitioners, vs. MARK WILLIAMS, et al., Respondents.

**Subsequent History:** Stay denied by *Wilson v. Williams, 2020 U.S. App. LEXIS 14049 (6th Cir., Apr. 30, 2020)*

Stay denied by *Wilson v. Williams, 2020 U.S. Dist. LEXIS 81445 (N.D. Ohio, May 8, 2020)*

Later proceeding at *Wilson v. Williams, 2020 U.S. Dist. LEXIS 87607 (N.D. Ohio, May 19, 2020)*

Stay granted by *Williams v. Wilson, 207 L. Ed. 2d 168, 2020 U.S. LEXIS 3042 (U.S., June 4, 2020)*

Stay denied by *Wilson v. Williams, 2020 U.S. Dist. LEXIS 97970 (N.D. Ohio, June 4, 2020)*

Vacated by *Wilson v. Williams, 961 F.3d 829, 2020 U.S. App. LEXIS 18087, 2020 FED App. 179P (6th Cir.) (6th Cir. Ohio, June 9, 2020)*

Motion denied by *Wilson v. Williams, 2020 U.S. App. LEXIS 21285 (6th Cir., July 8, 2020)*

**Prior History:** *United States v. Jackson, 2019 U.S. Dist. LEXIS 84709 (N.D. Ind., May 20, 2019)*
*United States v. Whitley, 2009 U.S. Dist. LEXIS 12573 (E.D. Mich., Feb. 19, 2009)*

**Counsel:** [*1] For Craig Wilson, on behalf of himself and those similarly situated, Eric Bellamy, on behalf of himself and those similarly situated, Kendal Nelson, on behalf of himself and those similarly situated, Maximino Nieves, on behalf of himself and those similarly situated,

Petitioners: David A. Singleton, Michael L. Zuckerman, Ohio Justice & Policy Center, Cincinnati, OH; Freda J. Levenson, ACLU of Ohio, Cleveland, OH; Joseph W. Mead, Cleveland, OH; Mark A. Vander Laan, Dinsmore & Shohl - Cincinnati, Cincinnati, OH; David J. Carey, ACLU of Ohio - Columbus, Columbus, OH.

For Warden Mark Williams, In his Official Capacity as Warden of Elkton Federal Correctional Institution, Respondent: James R. Bennett, II, Sara E. DeCaro, Office of the U.S. Attorney - Cleveland, Northern District of Ohio, Cleveland, OH.

For Michael Carvajal, In his Official Capacity as the Federal Bureau of Prisons Director, Respondent: James R. Bennett, II, Sara E. DeCaro, Office of the U.S. Attorney - Cleveland, Northern District of Ohio, Cleveland, OH; Amicus Curiae, Disability Rights Ohio; Laura A. Osseck, Disability Rights Ohio, Columbus, OH.

For Kathryn Hampton, MSt, Brie Williams, M.D, Movants: Darren W. Johnson, David [*2] C. Kimball-Stanley, Susanna M. Buergel, Paul, Weiss, Rifkind, Wharton & Garrison - New York, New York, NY; Jacqueline C. Greene, Sarah J. Gelsomino, Friedman & Gilbert, Cleveland, OH.

**Judges:** JAMES S. GWIN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JAMES S. GWIN

# Opinion

ORDER

[Resolving Doc. 1]

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On April 13, 2020, Petitioners, inmates at Elkton Federal Correctional Institution, brought this emergency habeas action seeking release from Elkton due to the spread of COVID-19 within the prison.[1] Petitioners claim to represent both a class of all Elkton inmates as well as a subclass of medically vulnerable inmates.[2] Respondents opposed.[3]

On April 17, 2020 the Court held a hearing on the matter. On April 18, 2020, both parties filed additional materials in response to the Court's hearing inquiries.[4]

For the foregoing reasons, the Petitioners' motion for relief is **GRANTED IN PART** and **DENIED IN PART**.

## I. COVID-19 at Elkton

State government and the media have well documented the spread of COVID-19 and the efforts to contain the virus and limit its impact. The virus's highly-infectious nature and the risks it poses, especially to medically vulnerable populations, has led to the implementation **[*3]** of unprecedented measures throughout the country and the world.

While research concerning the virus is ongoing, for some time health officials have known and reported that asymptomatic persons spread the virus.[5] A large percentage of coronavirus-infected citizens are asymptomatic.[6] These asymptomatic persons show no, or limited, symptoms. Yet, they spread the virus.

Due to this threat from infected but asymptomatic individuals, testing, tracing and treatment became the first mitigation responsibilities. As the virus has become more widespread, state government has directed citizens to reduce the spread not only through careful hygiene practices, but also through social distancing and isolation.

For inmates in our country's prisons the virus is no less a threat, but distancing measures are only minimally available.

Defendants Elkton officials have implemented measures to lessen the COVID-19 threat. Elkton segregates new inmates for fourteen days.[7] Elkton officials evaluate existing inmates with virus symptoms **[*4]** to determine whether isolation or testing is appropriate.[8] They check inmate and staff temperatures.[9] Elkton officials segregate inmates for fourteen days before allowing the inmates to leave Elkton.[10]

But despite their efforts, the Elkton officials fight a losing battle. A losing battle for staff. A losing battle for inmates.

The parties to the present action dispute some of the factual details of the current conditions within Elkton. Even in light of these disputes, the prison's "dorm-style" design guarantees that inmates remain in close proximity to one another.[11] With the shockingly limited available testing and the inability to distance inmates, COVID-19 is going to continue to spread, not only among the inmate population, but also among the staff.

According to Respondents, Elkton has had 59 confirmed cases of COVID-19 among inmates.[12] The number of infected staff members, 46, is almost as high.[13] The

---

[1] Doc. 1.

[2] Id.

[3] Doc. 10.

[4] Docs. 18, 19.

[5] CDC, *Coronavirus Disease 2019: Recommendations for Cloth Face Covers*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html (last visited Apr. 20, 2020) (citing Yan Bai, Lingsheng Yao, and Tao Wei, *et al.*, *Presumed Asymptomatic Carrier Transmission of COVID-19*, JAMA (Feb. 21, 2020), https://jamanetwork.com/journals/jama/fullarticle/2762028).

[6] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. TIMES (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[7] Doc. 10 at 8.

[8] Id. at 9.

[9] Id. at 9-10.

[10] Id. at 27.

[11] Doc. 10 at 7.

[12] Doc. 19 at 2.

[13] The official numbers on the Bureau of Prison's website conflict with the numbers reported by Respondents. The BOP's website reports 52 confirmed cases among inmates, 46 cases among staff. Contrarily, Respondents report 59 cases

2020 U.S. Dist. LEXIS 70674, *4

number has risen even in the days since the initiation of this lawsuit and will continue to do so absent intervention.

Notably, it is unlikely that these figures represent the actual number of cases at the institution, given the paltry number of tests the federal government **[*5]** has made available for the testing of Elkton's inmates.

To date, Elkton has received only 50 COVID-19 swab tests and one Abbott Rapid testing machine with 25 rapid tests.[14] Most swab tests have already been used. Because the Department of Justice has given BOP so few tests, Elkton medical staff has needed to triage test usage.

Respondents represent that "test swabs are back-ordered until July or August," but they "believe that they will receive an additional 25 rapid test[s]" each week.[15] These additional tests are all but useless considering Elkton's 2,400 inmates.

Recent experience at another Ohio correctional facility, Marion Correctional Institution, run by the Ohio Department of Rehabilitation and Corrections, shows how quickly and insidiously the virus spreads among a tightly quartered prison population.

Both Elkton and Marion are low security prisons and house approximately 2,500 inmates.[16]

The State of Ohio has tested its prisoners en masse for COVID-19. At Marion 1,950 inmates tested positive for COVID-19.[17] This number includes large numbers of inmates who were asymptomatic and would otherwise

not have been tested.[18]

Everything suggests that if BOP tested as ODRC commendably has, results would show that the virus has become equally widespread within Elkton. However, without testing there is no way to know how many Elkton inmates have the virus.

The Ohio prisons virus response undercuts BOP's ability to argue that testing is either unavailable or is impossible. Why has the Justice Department allocated Elkton an entirely insignificant number of tests while Ohio has been able to pull off mass testing across not only Marion, but at multiple institutions?

While the COVID-19 tests inadequacy is one area of grave concern, testing is only one part of the multi-faceted approach institutions like Elkton must take to reduce the virus's spread.

Respondents report that the prison, in accordance with BOP guidance, has changed its operations to try to limit the virus's spread.[19] For instance, the prison has implemented health screening measures for various groups of inmates, staff, and civilians.[20] These are all good efforts.

However, once the virus is inside the prison, as it already is at Elkton, screening measures can only be so effective. And screening will only help to identify individuals with active symptoms, **[*7]** not those asymptomatic individuals who can nevertheless spread the virus undetected.

Respondents have also implemented "modified operations" to somewhat reduce inmate contact with each other. Elkton allows inmate housing units of 150 to pick up pre-packaged meals, receive dispensed medications, and visit the commissary with only a single housing unit moving around the institution at one time.[21] Better practices, but not enough.

Respondents attempt to liken each housing unit to a "family unit." They say that each unit is akin to unincarcerated community members who live with

---

[14] Doc. 19 at 1-2.

[15] Id.

[16] Ohio Department of Rehabilitation & Correction, *Marion Correctional Institution*, https://drc.ohio.gov/mci (last visited Apr. 22, 2020).

[17] Ohio Department of Rehabilitation & Correction, *COVID-19 Inmate Testing Updated 4/20/2020* **[*6]** , https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-20-2020%20%201304.pdf (last visited Apr. 20, 2020).

---

among inmates and 34 among staff. *Compare* Federal Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited April 22, 2020), *with* Docs. 10 at 10, 19 at 2.

---

[18] Id.

[19] Doc. 10 at 7-11.

[20] Id. at 8-9.

[21] Doc. 10 at 21.

roommates or family.[22] They say that each housing unit is separate from other units, visitors, and sick inmates.[23]

But each single housing unit includes about 150 people.[24] Respondents ignore that some unit inmates nonetheless circulate throughout the prison as "essential" workers. Because some untested inmates circulate throughout Elkton, the housing units are not truly isolated. And with 150 "family members," there are significant opportunities to increase the risk of spread. Within each housing unit there seems to be little chance of obstructing the spread of the virus.

Respondents say that soap and disinfectant are **[*8]** readily available, a fact that Petitioners dispute.[25] However, these supplies can only be so useful in an environment where the inmates are constantly in close proximity to one another. Likewise, the education about hygiene and social distancing Respondents tout is only effective if the inmates have the supplies and physical space to put such knowledge into practice.[26]

Furthermore, while the deteriorating health conditions at Elkton pose a danger for each of the 2,400 men who are incarcerated at Elkton, the institution's inability to stop the spread of the virus among the inmates in its care poses an even greater risk for inmates whose medical conditions put them at higher risk of death if they contract the virus.[27]

Plus, while this litigation concerns Elkton's conditions for its inmates, the same conditions endanger prison staff, who must continue to go to work despite the virus's spread throughout the facility. And the Elkton spread endangers the staff's families who come into contact with Elkton's undoubtedly exposed staff.

In light of these realities, Petitioners, inmates at Elkton, bring the present action. They sue on behalf of themselves and on behalf of a class **[*9]** of all current and

future Elkton inmates.[28]

They bring additional claims on behalf of the "Medically-Vulnerable Subclass," defined as:

> [A]ll current and future persons incarcerated at Elkton over the age of 50, as well as all current and future persons incarcerated at Elkton of any age who experience: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS or prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); diabetes; chronic kidney disease or undergoing dialysis; or liver disease.[29]

Petitioners seek certification of the classes. In addition, they request:

> a temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Respondents to identify within six (6) hours of the Court's order, and submit to the Court a list of, all Medically-Vulnerable Subclass Members, and release all such persons within twenty-four (24) hours, with such release to include **[*10]** supports to ensure social distancing and other expert-recommended measures to prevent the spread of coronavirus.[30]

Petitioners define release as "discharge of incarcerated persons from the physical confines of Elkton, not necessarily release from custody."[31] Petitioners suggest that "[r]elease options may include, but are not limited to: release to parole or community supervision; transfer furlough (as to another facility, hospital, or halfway house); or non-transfer furlough, which could entail a release person's eventual return to Elkton once the pandemic is over and the viral health threat abated."[32]

In other words, Petitioners seek an "enlargement." Enlargement is not release, although some courts refer

---

[22] *Id.* at 21-22.

[23] *Id.*

[24] *Id.*

[25] *Compare* Doc. 10 at 27, *with* Doc. 1 at 17.

[26] Doc. 10 at 11-12.

[27] *See generally* Briefs for Disability Rights Ohio *and* Public Health and Human Rights Experts as Amici Curiae Supporting Petitioners, Docs. 8-1 and 14-1.

---

[28] Doc. 1 at 29.

[29] *Id.*

[30] Doc. 1 at 36.

[31] *Id.* at 2 n. 2.

[32] *Id.* at 2.

to it using the terms release or bail.[33] When a court exercises its power to "enlarge" the custody of a defendant pending the outcome of a habeas action, the BOP maintains custody over the defendant, but the place of custody is altered by the court.[34]

After the release of the subclass, Petitioners request "a plan, to be immediately submitted to the Court and overseen by a qualified public health expert" that provides for mitigation efforts in line with CDC guidelines [*11] and a housing and/or public support plan for released inmates.[35] They also seek the release of Class Members so that the remaining inmates can follow CDC guidance to maintain six feet of space between them while in the prison.[36]

Respondents respond that Petitioners cannot challenge the conditions inside the prison through a habeas corpus action and that this Court and the BOP do not have the authority to grant early release.[37]

## II. Discussion

District courts have inherent authority to grant enlargement to a defendant pending a ruling on the merits of that defendant's habeas petition.[38] The Court finds that the exceptional circumstances at Elkton and the Petitioners' substantial claims, that are likely to succeed at the merits stage, necessitate the exercise of that authority and that such relief is proper for members of the subclass defined infra.[39]

However, given the nature of the present litigation as class action habeas proceeding, the Court is unable to determine the specific type of enlargement most suitable for each subclass member. In light of this difficulty, the Court will grant a preliminary injunction, in aid of its authority to grant enlargements, ordering Respondents to determine [*12] the appropriate means of transferring medically vulnerable subclass members out of Elkton. Pursuant to the below analysis, the Court finds that Petitioners have met the standard for a preliminary injunction.

## A. Jurisdiction

Petitioners argue that Elkton's inability, even if it tried, to adequately protect the inmates from the risks posed by coronavirus subjects the prisoners to substantial risk of harm in violation of their *Eighth Amendment* rights. Petitioners say that their claim is cognizable under *28 U.S.C. § 2241* as a habeas action because they are challenging the execution of their sentences, rather than the validity of the convictions themselves.[40] Petitioners argue that they are not seeking to challenge a specific aspect of their confinement, but the confinement itself.[41]

Respondents argue that habeas relief is not the proper vehicle to challenge conditions of confinement.[42]

Courts have attempted to clarify the types of claims appropriate for habeas relief and distinguish those claims from civil rights claims more appropriately resolved under *§ 1983*. The general result has been that challenges to the fact or duration of confinement that seek release sound in habeas whereas actions challenging the conditions of confinement [*13] raise concerns properly addressed under *§ 1983*.[43]

But, these seemingly bright line rules are difficult to apply in practice. The near impossibility in some cases of drawing such distinctions has become even more obvious with COVID-19. Whereas many medical needs claims might appropriately be addressed through *§ 1983*

---

[33] *See* Declaration of Professor Judith Resnik Regarding Provisional Remedies for Detained Individuals at 8, *Money et al. v. Jeffreys*, No. 1:20-cv-02094 (N.D. Ill. April 4, 2020), ECF No. 24-3.

[34] *Id.*

[35] Doc. 1 at 36-37.

[36] *Id.* at 37.

[37] Doc. 10 at 15-19.

[38] *See, e.g.*, *Mapp v. Reno, 241 F.3d 221, 226 (2d Cir. 2001)*; *Dotson v. Clark, 900 F.2d 77, 79 (6th Cir. 1990)*.

[39] *Dotson, 900 F.2d at 79.*

---

[40] Doc. 1 at 34-35.

[41] Doc. 18 at 8-9.

[42] Doc. 10 at 15-16.

[43] *See Muhammad v. Close, 540 U.S. 749, 750, 124 S. Ct. 1303, 158 L. Ed. 2d 32 (2004)* ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus . . . requests for relief turning on circumstances of confinement may be presented in a *§ 1983* action."); *Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)*; *Preiser v. Rodriguez, 411 U.S. 475, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1978)*.

litigation, claims concerning COVID-19 are not so easily classified as *§ 1983* claims.

Inmates challenging BOP's COVID-19 response challenge the dangerous conditions within the prison created by the virus. However, the only truly effective remedy to stop the spread is to separate individuals—a measure that in our nation's densely populated prisons is typically impossible without the release of a portion of the population. So, such actions ultimately seek to challenge the fact or duration of confinement as well.[44]

In this case, the Petitioners frame their action as a *§ 2241* habeas claim.[45] The Sixth Circuit, echoing the distinctions recognized by other courts, has found that "*§ 2241* is not the proper vehicle for a prisoner to challenge conditions of confinement."[46] However, the Sixth Circuit has also held "*§ 2241* is appropriate for claims challenging the execution or manner in which the sentence **[*14]** is served."[47]

Petitioners' action evades easy classification. Part of the difficulty rests in Petitioners' differing relief requests for the class and subclass. For the significantly vulnerable subclass the Petitioners seek immediate release, arguing that for the medically vulnerable inmates continued imprisonment at Elkton is unconstitutional given the COVID-19 outbreak.

Notably, these Petitioners do not seek a commutation of their sentences, but rather to serve their sentences in home confinement, parole, or in half-way houses at

---

[44] *Mays v. Dart, No. 20 C 2134, 2020 U.S. Dist. LEXIS 62326, 2020 WL 1812381, at *6 (N.D. Ill. Apr. 9, 2020).* Two federal district courts have noted without deciding that claims such as those brought by Petitioners might be cognizable as habeas claims because the relief sought would affect the duration of confinement or because the conditions complained of could not be eliminated without releasing the inmates from detention. *See A.S.M. v. Donahue, No. 7:20-CV-62, 2020 U.S. Dist. LEXIS 65226, 2020 WL 1847158, at *1 (M.D. Ga. Apr. 10, 2020)*; *Mays, 2020 U.S. Dist. LEXIS 62326, 2020 WL 1812381 at *6.*

[45] Whereas other petitioners bringing COVID-19-related challenges have pleaded both habeas and *§ 1983* claims in the alternative, Petitioners do not do so here.

[46] *Luedtke v. Berkebile, 704 F.3d 465, 465-66 (6th Cir. 2013)* (citing two additional Sixth Circuit cases that found the same).

[47] *United States v. Peterman, 249 F.3d 458, 461 (6th Cir. 2001).*

least until the risk of the virus has abated. This claim is closer to a challenge to the manner in which the sentence is served and is therefore cognizable under *28 U.S.C. § 2241*.

For the remainder of the less-obviously-vulnerable class the challenges sound more as a confinement conditions claim. Petitioners seek the oversight of a public health expert to mitigate the risk COVID-19 poses to class members that remain incarcerated at Elkton. Because the not medically vulnerable Elkton inmates seek an alteration to the confinement conditions, the claims are more like *§ 1983* claims.

Because Petitioners have brought their claims as a habeas petition, the Court may only properly address **[*15]** those claims suitable for habeas relief. The remainder of this order addresses the habeas claims of the vulnerable subclass alone.

## B. Class Certification

Given the emergency nature of this proceeding, a class certification determination has not yet taken place. That does not, however, preclude Petitioners from obtaining class-wide interim relief at this stage. "[T]here is nothing improper about a preliminary injunction preceding a ruling on class certification."[48] This Court may grant preliminary injunctive relief to a conditional class.

As a preliminary matter, the Court finds that the Petitioners' subclass definition is likely too broad. Although the risk of complications from COVID-19 is serious for all inmates, the Court limits the subclass to those identified by the CDC as being at higher risk.[49] This includes all Elkton inmates 65 years or older and those with documented, pre-existing medical conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher). **[*16]** [50] The subclass

---

[48] *Gooch v. Life Investors Ins. Co. of America, 672 F.3d 402, 433 (6th Cir. 2012).*

[49] The Court has "broad discretion to modify class definitions." *Ball v. Kasich, 307 F. Supp.3d 701, 718 (S.D. Ohio Mar. 30, 2018).*

[50] CDC, *Coronavirus Disease 2019: People Who Are At Higher*

definition excludes those whose only risk factor is a history of smoking, given the difficulty of documenting such occurrence and identifying those individuals through BOP records alone.

Under *Federal Rule of Civil Procedure 23(a)*, a class must meet the requirements of numerosity, commonality, typicality, and adequate representation. Additionally, one of *Rule 23(b)*'s requirements must also be satisfied.

Petitioners have made a sufficient showing at this stage to satisfy the *Rule 23(a)* factors for the above-defined subclass.

**Numerosity**: The subclass consists of hundreds of Elton inmates.[51]

**Commonality**: "Commonality requires [Petitioners] to demonstrate that the class members have suffered the same injury."[52] "Their claims must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[53] This inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit.[54]

In this case, all subclass members have been subjected to dangerous conditions **[*17]** in which they run a high risk of exposure to the deadly COVID-19 virus. The inquiry driving the litigation is whether the BOP's failure to create safe conditions for inmates with especially

---

*Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited April 20, 2020).

[51] In accordance with the Court's order, dated April 17, 2020, Respondents submitted for *in camera* review, lists of Elton inmates with certain medical conditions. Although the Court cannot say with certainty the exact number of inmates who comprise the subclass, it is satisfied that the number is in the hundreds.

[52] *Ball, 307 F. Supp.3d at 719* (quoting *Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-50, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011))*.

[53] *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig., 722 F.3d 838, 852-53 (6th Cir. 2013)* (citing *Dukes, 564 U.S. at 350*).

[54] *Id.*

vulnerable health has violated those inmates' rights. Answering this question will determine whether the inmates are entitled to movement from Elton.

Respondents argue that the subclass lacks commonality given the class's combination of "inmates that have different crimes, sentences, outdates, disciplinary histories, ages, medical histories, proximities to infected inmates, availability of a home landing spot, likelihoods of transmitting the virus to someone at home detention, likelihoods of violation or recidivism, and dangers to the community."[55]

However, the Petitioners seek varied relief that allows the BOP to make individualized determination as to where each subclass member should be placed. Petitioners do not seek to open the prison gates to allow its inmates to run free. In fact, Petitioners concede that "release" might look different for different inmates. The Petitioners acknowledge that while some inmates might be placed in home confinement others should be furloughed and that in all instances **[*18]** such "release" could be temporary.[56]

The motivating question in the litigation is whether the subclass members' rights are being violated by the deteriorating conditions at Elton. As such, the subclass can satisfy commonality.

**Typicality**: "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'"[57] Three of the named Petitioners have documented medical issues that are commiserate with those suffered by the subclass. The fourth named Petitioner, Maximino Nieves, could represent that class, but not the subclass, as he attests that he doesn't have a serious medical history.[58] Excepting Nieves, nothing suggests that the remaining three Petitioners' claims are distinct from those of the remainder of the subclass. Typicality is satisfied.[59]

---

[55] Doc. 10 at 36-37.

[56] Doc. 1 at 2 n. 2.

[57] *In re Whirlpool, 722 F.3d at 852* (citation omitted).

[58] Doc. 1-8 at 2.

[59] Respondents argue that the named Petitioners defy typicality because they are all ineligible for home confinement. This contention ignores the fact that other means of removal from Elton might be available to the named Petitioners other than home confinement, such as transfer to another facility.

**Adequate Representation**: The Court is satisfied that counsel is competent to represent the class. Additionally, the interests of the named Petitioners do not conflict with those of the other subclass members.

Having satisfied the _Rule 23(a)_ requirements, the subclass must also demonstrate that it meets one of the _Rule 23(b)_ requirements. Petitioners argue that "Respondents have acted on grounds generally applicable to all proposed Class **[*19]** members, and this action seeks declaratory and injunctive relief."[60] Indeed, Respondents' failure to protect the inmates from the spreading virus applies to the entirety of the subclass generally and injunctive relief is appropriate as to the subclass. _Rule 23(b)(2)_ is therefore satisfied.

For the purposes of the preliminary injunction inquiry, the Court finds that the subclass as defined in this order likely meets the requirements for class certification.

## C. Injunctive Relief

"Four factors guide a district court's decision to issue a preliminary injunction: whether the plaintiffs will likely win down the road, whether an injunction would prevent the plaintiffs from being irreparably harmed, whether an injunction would harm others, and how the injunction would impact the public interest."[61] The Court considers each in turn.

## 1. Likely Success

Petitioners' claims are predicated on a violation of their _Eighth Amendment_ rights which protects them from "cruel and unusual punishments." In order to succeed on an _Eighth Amendment_ claim, Petitioners must satisfy both an objective and subjective component.[62]

"The objective component of the test requires the existence of a 'sufficiently serious' medical need."[63] Petitioners obviously satisfy this component. **[*20]** At

this moment a deadly virus is spreading amongst Elkton's population and staff. For infected inmates, the virus can lead to pneumonia. In the worse pneumonia cases, COVID-19 victims suffer diminishing oxygen absorption, with resulting organ failure leading to death. Victims choke to death. While not every inmate who contracts the virus will die, the subclass members are at a much greater risk of doing so. They have a very serious medical need to be protected from the virus.

The subjective component requires that Respondents have acted with deliberate indifference, "a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"[64] Petitioners satisfy this standard.

While Respondents offer certain prison-practice changes to show they know COVID-19 risks and have sought to reduce those risks, the Court still finds that, at this preliminary stage of the litigation, the Petitioners have sufficiently met the threshold for showing that Respondents have been deliberately indifferent.

One only need look at Elkton's testing debacle for one example of this deliberate indifference. Additionally, **[*21]** Elkton has altogether failed to separate its inmates at least six feet apart, despite clear CDC guidance for some time that such measures are necessary to stop the spread and save lives.

Having met both prongs of the _Eighth Amendment_ analysis, Petitioners have demonstrated a likelihood of success on the merits.

## 2. Irreparable Harm

Respondents argue that Petitioners have not shown that release will reduce the risk of exposure to COVID-19. But the district court cases Respondents use that have found that release would not lessen the risk to a defendant's health did not deal specifically with Elkton confinement.[65] Of the reported inmate deaths in nation-

---

[60] Doc. 1 at 31.

[61] _McNeil v. Community Prob. Servs., LLC, 945 F.3d 991, 994 (6th Cir. 2019)_.

[62] _Miller v. Calhoun Cty., 408 F.3d 803, 812 (6th Cir. 2005)_.

[63] _Id._ (citing _Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004))_.

[64] _Id. at 813_ (quoting _Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994))_.

[65] _United States v. Taylor, No. 5:19-CR-192-KKC-MAS, 2020 U.S. Dist. LEXIS 54443, 2020 WL 1501997, at *5 (E.D. Ky. Mar. 26, 2020)_ (noting that the Court believed that the practices at "any facility" were sufficient to protect from COVID-19); _United States v. Steward, 2020 U.S. Dist. LEXIS_

wide BOP custody, 6 out of 23, more than 1 in 4, has occurred at Elkton, making it a hotspot for the virus and certainly more dangerous than other facilities.[66]

Respondents also argue that the Petitioners' harm is speculative. It is true that some subclass members may not die if they contract the virus. However, it is more than mere speculation that the virus will continue to spread and pose a danger to inmates if BOP does not increase its efforts to stop the spread.[67] Petitioners have therefore shown a risk for irreparable **[*22]** harm.

### 3. Harm to Others

Respondents argue that the release of inmates from Elkton "would cause substantial damage to others" because there is no assurance that the inmates can care for themselves upon release.[68] They argue the inmates might be left without access to food, shelter, or medical care.[69]

As stated previously, Petitioners do not ask this Court to throw open the gates to the prison and leave the inmates that are released to fend for themselves. Instead, Petitioners seek "release" that consists of moving vulnerable inmates to various other types of confinement so that they are no longer at risk of dying from the virus. And as Respondents acknowledge, it is BOP's current policy to quarantine all inmates that are transferred from Elkton for 14 days before transfer.[70] The continued implementation of this policy reduces the risk that an inmate with COVID-19 will carry the virus with him outside of the prison.

Furthermore, there is a continued risk of harm to others, including prison staff, if inmates remain in the prison and the virus continues to thrive among the dense inmate population.

---

55267, 2020 WL 1468005, at *1 (S.D.N.Y. Mar. 26, 2020) (denying release from Metropolitan Correctional Center).

[66] Federal Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited April 22, 2020).

[67] *See* Doc. 14-1 at 5-10 (describing the inadequacy of the Elkton measures and the risk of spread within the prison environment).

[68] Doc. 10 at 3.

[69] *Id.* at 3, 33-34.

[70] Doc. 10-2 at 7.

### 4. Public Interest

Respondents argue that the public faces a grave danger if inmates are to be released **[*23]** *en masse* onto the streets. They say:

> Our over-burdened police and safety services should not be forced to deal with the indiscriminate release of thousands of prisoners on the streets without any verification that those prisoners will follow the laws when they are released, that they will have a safe place to go where they will not be mingling with their former criminal associates, and that they will not return to their former ways as soon as they walk through the prison gates.[71]

First, Respondents might as well be arguing against the release of any inmate, at any time, for any reason, because even in the best of circumstances the country's criminal justice system has no way, short of life imprisonment, of ensuring former prisoners do not recidivate. The COVID-19 pandemic has not suddenly raised this issue.

Third, the danger of recidivism reduces with age, especially after age 40.[72] The subclass inmates are older and by definition, the vulnerable sub-class inmates suffer serious medical conditions.

Second, it bears repeating that the Petitioners are not asking the Court to dump inmates out into the streets. No one's interest would be served in doing so. The Court is confident that the transfer **[*24]** of prisoners from Elkton to other means of confinement could accomplish the goal of protecting Elkton's vulnerable population while also protecting public safety.

Third, six Elkton inmates have already died. Likely, they died after agonizing days under intensive care, most probably with ventilators. The BOP absorbs the high cost of this treatment—costs that are likely multiples of what it would have cost to test each Elkton inmate and guard.

Finally, "it is always in the public interest to prevent the

---

[71] Doc. 10 at 41-42.

[72] See generally United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, (Dec. 2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

violation of a party's constitutional rights."[73]

## D. The Prison Litigation Reform Act

Respondents argue that the *Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626*, bars this Court from granting the inmates' release.[74] This is not so. The PLRA does not extend to "habeas corpus proceedings challenging the fact or duration of confinement in prison."[75] Because the Court has determined that the subclass's claims are properly before the Court as a habeas action, this prohibition does not apply.[76]

Additionally, Respondents argue that a release order may only be entered by a three-judge court and that the court must find that "crowding is the primary cause of the violation of a Federal right" and "no other relief [*25] will remedy the violation."[77] As stated previously the PLRA does not bar this habeas proceeding. However, even if it did, the Court is not ordering the release of the prisoners. Instead, the inmates will remain in BOP custody, but the conditions of their confinement will be enlarged.

## III. Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Petitioners' motion for relief.

The Court orders the Respondents to identify, within one (1) day all members of the subclass as defined in this Order. Respondents must identify in the list each subclass member's sentencing court and the case number of their underlying criminal conviction.

Following identification, the Court orders Respondents to evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or

community supervision, transfer furlough, or non-transfer furlough within two (2) weeks.

In undertaking this evaluation, Respondents will prioritize the review by the medical threat level. For example, older inmates with heart, pulmonary, diabetes or immunity risks should receive review priority over subclass members who are younger.

Subclass members who are ineligible [*26] for compassionate release, home release, or parole or community supervision must be transferred to another BOP facility where appropriate measures, such as testing and single-cell placement, or social distancing, may be accomplished. In transferring subclass members, Respondents must continue to comply with BOP policy of quarantining inmates for 14 days prior to transfer out of Elkton.

Any subclass members transferred out of Elkton may not be returned to the facility until the threat of the virus is abated or until a vaccine is available and Elkton obtains sufficient vaccine supplies to vaccinate its population, whichever occurs first.

IT IS SO ORDERED.

Dated: April 22, 2020

*/s/ James S. Gwin*

JAMES S. GWIN

UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

[73] *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994).*

[74] Doc. 10 at 16.

[75] *18 U.S.C. § 3626(g)(2).*

[76] *See Colton v. Ashcroft, 299 F. Supp. 2d 681, (E.D. Ky. 2004)* ("*28 U.S.C. §§ 2241*, *2254*, and *2255* filings have been deemed not covered by the PLRA.").

[77] *18 U.S.C. § 3626(a)(3)(E).*

# Exhibit B

## Chaplain Jesse R. McGuire, D.Min.

*Jesse McGuire Ministries, Inc. / P.O. Box 8223 / Phoenix, Arizona, 85066-8223*

**Wade G. Fink, Attorney at Law**                                                     June 22, 2020
370 East Maple Road, 3rd Floor
Birmingham, Michigan 48009

Dear Sir,

My name is Rev. Dr. Jesse R. McGuire, President of Jesse McGuire Ministries, Inc., former Chaplain at CCA Saguaro Correctional Center, in Eloy, AZ, and I'm currently the Chaplain at Sante Hospice, of Scottsdale, AZ. I am writing this letter regarding the current state of incarceration of one William Michael Howard, 47522039. I am writing this firstly as a professional, and secondly, as a family member, married to his sister Donna M. (Howard) McGuire for 40 years.

I have known Michael (Howard) for over 40 years, and I know him as a hard-working man, who prior to his recent incarceration, was gainfully employed, living and taking care of his own residence, and caring for his extended family, by staying in contact, and attending and enjoying family events. I have always known Michael to be kind, non-violent, but strongly opinionated (as we are all), however, and strong in his personal opinions and convictions (as we all should be).

I am personally aware of Michael's struggle with his personal demons (as we all do), and the repercussions that come from those struggles. I am also acutely aware of Michael's past addictions, and his endeavor to overcome them. As a former Chaplain working in a prison facility, I have seen the adverse repercussions of these types of addictions, and personal, psychosocial consequences that can result. Some individuals survive these challenges, and some unfortunately, do not. As a current Chaplain of a Hospice facility, I see the end result of chronic drug and alcohol addiction, and the slow, sometimes agonizing end to those who are not physically or mentally strong enough to effectively cope with the devastating outcome of chemical dependencies.

I understand that an opportunity has arisen that could possibly result in the early release of William Michael Howard, from incarceration. We do understand the horrible presence, and the mortal aftermath of the Covid 19 pandemic, and we believe, that alone is proper motivation for his early release. However, I would like to appeal to those officials who can somehow see the good that's left in Michael; the fact that he can work, make an honest living, and he has the ability to care for himself, and his residence, in the wake of an early release.

As a brother-in-law, and as a friend, I would like to personally vouch for William Michael Howard, understanding his long past of drug addiction and incarceration, his current state of affairs, and his time already served, but mostly for the commitment he has made to all of his family that once released from his current rectification, that he will remain drug free, gainfully employed, and a vital, active member of this family, his community, and this global society.

Kindest Regards,

Rev. Dr. Jesse R. McGuire, D.Min., M.Div., B.Th.
Chaplain, Jesse McGuire Ministries